384 F.Supp. 895 (1974)
In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
In the Matter of The UNITED NEW JERSEY RAILROAD AND CANAL CO. and Other Secondary Debtors of Penn Central Transportation Company, Debtor.
In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.
In the Matter of The CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor.
In the Matter of The LEHIGH AND HUDSON RIVER RAILWAY COMPANY, Debtor.
In the Matter of READING COMPANY, Debtor.
In the Matter of The ANN ARBOR RAILROAD COMPANY, Debtor.
Nos. 74-8, 74-12, 74-11, 74-6, 74-10, 74-7 and 74-9.
Special Court. Regional Rail Reorganization Act.
Argued August 27 and 28, 1974.
Decided September 30, 1974.
*896 *897 *898 *899 *900 Before FRIENDLY, Presiding Judge, and McGOWAN and THOMSEN, Judges.
FRIENDLY, Presiding Judge:
We have here a number of appeals from orders of district courts under the second sentence of ง 207(b) of the Regional Rail Reorganization Act of 1973 (generally hereafter the Act), 87 Stat. 985 (1974), which subsection we quote in its entirety in the margin.[1] The district *901 courts made the orders in the reorganization proceedings under ง 77 of the Bankruptcy Act which were before them. Appendix A to this opinion lists the various appellants and appellees and counsel for them.
In the first five cases in the caption โ those dealing with the Penn Central, the Penn Central secondary debtors, the Lehigh Valley (LV), the Central Railroad of New Jersey (CNJ), and the Lehigh & Hudson River Railway (L&H) โ the respective judges[2] concluded that the Act "does not provide a process which would be fair and equitable to the estate of the railroad in reorganization . . . ."[3] In the cases of the Reading and the Ann Arbor, Judge Ditter in the District Court for the Eastern District of Pennsylvania and Judge Pratt in the District Court for the Eastern District of Michigan took a contrary view and ordered that reorganization should proceed under the Act.[4]
Broadly speaking, the parties who are appellants in the first five cases โ the United States, the Interstate Commerce Commission, the United States Railway Association (USRA), and railroad labor organizations โ are appellees in the last two, whereas creditor and stockholder interests support the orders in the first five cases and attack those in the Reading and Ann Arbor proceedings.[5] The Penn Central trustees support the Act only if the Supreme Court rules that a remedy under the Tucker Act is available. See Parts VII and VIII infra. In two other ง 77 proceedings which the Judicial Panel on Multi-district Litigation referred to us by its order of March *902 1, 1974,[6] those concerning the Erie-Lack-awanna, in the District Court for the Northern District of Ohio, and the Boston & Maine, in the District Court for the District of Massachusetts, the respective judges[7] entered orders under the first sentence of ง 207(b), finding that "the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act."[8] Since these conclusions have not been contested by anyone, the Erie-Lackawanna and Boston & Maine cases are not before us.[9] The court wishes to express its appreciation to counsel for their cooperation in limiting the number and size of briefs by allowing most of the major legal issues to be presented in the Penn Central appeal by counsel for the United States and its agencies; the Penn Central Trustees; institutional investors, indenture trustees, certain creditors, and shareholders of the Penn Central; and the New Haven trustee as a large creditor and stockholder of Penn Central.
The Act was a Congressional response to the threat to the national welfare posed by the bankruptcy of the railroads in the northeastern United States we have listed. The most dramatic was the bankruptcy of the Penn Central on June 21, 1970, little more than two years after consummation of its widely heralded merger.[10] These bankruptcies differed from earlier railroad insolvencies in an essential respect. Whereas earlier insolvencies had typically been caused by inability to meet fixed charges or debt maturities,[11] the causes of current railroad *903 bankruptcies in the northeastern region went much deeper; the roads were unable to pay taxes and operating expenses, even with substantial undermaintenance of plant which, in turn, led to revenue losses and increased expense, particularly for freight car hire.[12] Although it was at first believed that the problems of the Penn Central could be overcome within the existing legal framework,[13] early in 1973 the Penn Central Trustees reported to the reorganization court that substantial governmental assistance, later quantified as between $600 and $800 million, was needed to improve Penn Central's plant and equipment in such a manner as to secure the traffic increases on which a successful income-based reorganization would depend. Trustees' Interim Report of February 1, 1973, at 1; Trustees' Interim Report of January 1, 1973, at 2 (submitted to Judge Fullam in In re Penn Cent. Trans. Co., Bky. No. 70-347, (E.D.Pa.1974)).
Congress thereupon passed a joint resolution, 87 Stat. 5 (1973), directing the Secretary of Transportation to submit within 45 days "a report which . . . provides a full and comprehensive plan for the preservation of essential rail transportation services in the Northeast. . . ." Id. at 6. The Secretary rendered a report on March 26, 1973. In the meantime, however, Judge Fullam had entered an order directing the Penn Central Trustees to file either a plan of reorganization or a proposal for liquidating the road. In re Penn Cent. Transp. Co., 355 F.Supp. 1343 (E.D.Pa., 1974). While acknowledging that "the legislative and executive branches of government must be looked to for solutions" of the problems of Penn Central, id. at 1345, he found those problems to be so severe that "the point of unconstitutionality is fast approaching, if it has not already arrived," id. at 1344, and suggested that it was "highly doubtful that the Debtor could properly be permitted to continue to operate on its present basis beyond October 1, 1973." Id. at 1346. Spurred by Judge Fullam's warning, see House Report at 27, Congress engaged in the extensive consideration which led to passage of the Act.
While the Act is titled a reorganization statute, its drafters acknowledged that the northeastern railroad problem cannot be solved simply by resort to the traditional procedures available under ง 77 of the Bankruptcy Act and the Interstate Commerce Act, 49 U.S.C. ง 1 et seq. (1970). See House Report at 29. The Act therefore contains provisions, of which more hereafter, designed to eliminate duplicative trackage of one or more railroads and also to permit abandonment of unprofitable mileage without the delays and uncertainties characteristic of proceedings under ง 1(18) of the Interstate Commerce Act, to provide governmental assistance in meeting the *904 onerous labor protective conditions imposed by the Interstate Commerce Commission or provided in collective bargaining agreements, to assist in the sale of passenger facilities to the National Railroad Passenger Corporation (Amtrak) or state, local or regional authorities, and to provide funds for rehabilitation and modernization of neglected physical plant and for subsidy of non-economic service. Recognizing the existence of new problems, Congress devised imaginative and innovative solutions, in an endeavor to avoid the national disaster that would result from cessation of the bulk of railroad operations in the north-east.
The basic scheme of the Act is as follows: It relates to railroads in reorganization under ง 77 of the Bankruptcy Act in a region defined in ง 102(13), which may be generally described as the north-eastern United States from the Canadian border on the north to Virginia, West Virginia, and the Ohio River on the south, and from the Atlantic Ocean on the east to Michigan and Illinois on the west.[14] The Act provides for two new entities. One is the United States Railway Association (USRA), a government nonprofit corporation of the District of Columbia. See generally Title II. USRA is vested with powers and duties of three major sorts: One is to develop a "final system plan," ง 202(a)(1), determining, inter alia, which rail properties of the bankrupt railroads that are to be reorganized under the Act shall be conveyed to Consolidated Rail Corporation (hereafter described), sold to profitable railroads operating within the region, purchased, leased, or otherwise acquired from the Corporation by Amtrak, purchased or leased from the Corporation by states or public transportation authorities for providing rail passenger service, or devoted to other public purposes; which rail properties of profitable railroads operating in the region may be offered for sale to the Corporation or other profitable railroads operating in the region; and what the consideration will be. ง 206(c), (d). The second is authority to issue obligations, not more than $1.5 billion of which shall be outstanding at any one time, guaranteed by the Secretary of Transportation, whose possible uses are described below. ง 210. A third is the power to make loans to assist in carrying out the Act. ง 211. The other new entity is a for-profit corporation, Consolidated Rail Corporation (Conrail), see generally Title III, established under the laws of a state, which "shall not be an agency or instrumentality of the Federal Government." ง 301(b). Conrail is to acquire and operate the rail properties provided for conveyance to it in the "final system plan." ง 302(a), (b).
After proceedings here unnecessary to detail, USRA is to submit to Congress a final system plan within 450 days of enactment of the Act. งง 207(c), 208(a). This shall be deemed approved unless, within 60 calendar days of continuous session of Congress after submission, either house of Congress passes a resolution of disfavor; in that event USRA is to submit a revised plan to which similar procedures apply. ง 208(a), (b). The goals of the final system plan, the factors to be considered in its formulation, and its content are described in ง 206, which we set out in the margin.[15] *905 *906
*907 Section 209(c) provides:

Delivery of Plan to Special Court โ Within 90 days after its effective date, the Association shall deliver a certified copy of the final system plan to the special court and shall certify to the special court โ
(1) which rail properties of the respective railroads in reorganization in the region and of any railroad leased, operated, or controlled by such railroads in reorganization are to be transferred to the Corporation, in accordance with the final system plan;
(2) which rail properties of the respective railroads in reorganization in the region or railroads leased, operated, or controlled by such railroads in reorganization are to be conveyed to profitable railroads, in accordance with the final system plan;
(3) the amount, terms and value of the securities of the Corporation (including any obligations of the Association) to be exchanged for those rail properties to be transferred to the Corporation pursuant to the final system plan, and as indicated in paragraph (1) of this subsection; and
(4) that the transfer of rail properties in exchange for securities of the Corporation (including any obligations of the Association) and other benefits is fair and equitable and in the public interest.
Section 303(a) directs that, within 10 days after the action specified in ง 209(c), Conrail shall deposit with this court all of its stock and other securities and obligations of USRA designated in the final system plan to be exchanged for the rail properties to be conveyed to Conrail, and each profitable railroad operating in the region purchasing rail properties of the various bankrupt estates in accordance with the final system plan shall similarly deposit the compensation to be paid by it. Within 10 days after such deposit, this court shall, ง 303(b),
(1) . . . order the trustee or trustees of each railroad in reorganization in the region to convey forthwith to the Corporation and the respective profitable railroads operating in the region, all right, title, and interest in the rail properties of such railroad in reorganization and shall itself order the conveyance of all right, title, and interest in the rail properties of any railroad leased, operated, or controlled by such railroad in reorganization that are to be conveyed to them under the final system plan as certified to such court under section 209(d) of this Act.
Section 303(b) further provides:
(2) All rail properties conveyed to the Corporation and the respective profitable railroads operating in the region under this section shall be conveyed free and clear of any liens or encumbrances, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided at the time of enactment of this Act for the continuance of rail passenger service or any lien or encumbrance of no greater than 5 years' duration which is necessary for the contractual performance by any person of duties related to public health or sanitation. Such conveyances shall not be restrained or enjoined by any court.

*908 (3) Notwithstanding anything to the contrary contained in this Act, if railroad rolling stock is included in the rail properties to be conveyed, such conveyance may only be effected if the profitable railroad operating in the region or the Corporation to whom the conveyance is made assumes all of the obligations under any conditional sale agreement, equipment trust agreement, or lease in respect to such rolling stock and such conveyance is made subject thereto; and the provisions of this Act shall not affect the title and interests of any lessor, equipment trust trustee, or conditional sale vendee or assignee under such conditional sale agreement, equipment trust agreement or lease under section 77(j) of the Bankruptcy Act (11 U.S. C. 205(j)).
(4) Notwithstanding anything to the contrary contained in this Act, if a railroad in reorganization has leased rail properties from a lessor that is neither a railroad nor controlled by or affiliated with a railroad, and such lease has been approved by the lessee railroad's reorganization court prior to the date of enactment of this Act, conveyance of such lease may only be effected if the Corporation or the profitable railroad to whom the conveyance is made assumes all of the terms and conditions specified in the lease, including the obligation to pay the specified rent to the non-railroad lessor.
After the conveyances, this court must undertake an extensive process of hearing and decision described in ง 303(c), which we set forth in the margin.[16] *909 That decision may be appealed directly to the Supreme Court, which, however, "shall dismiss any such appeal within 7 days after entry of such an appeal if it determines that such an appeal would not be in the interest of an expeditious conclusion of the proceedings and shall grant the highest priority to the determination of any such appeals which it determines not to dismiss." ง 303(d).
In addition to these provisions bearing directly on the reorganization process, other important provisions should be mentioned. The Secretary of Transportation is authorized, pending implementation of the final system plan, to pay to the trustees of railroads in reorganization such sums as are necessary for the continued provision of essential transportation services; these are to be "upon such reasonable terms and conditions as the Secretary establishes, except that recipients must agree to maintain and provide service at a level no less than that in effect on the date of enactment of this Act." ง 213(a).[17] The sum of $85 million was authorized to be appropriated for this purpose, ง 213(b). The Secretary, with approval of USRA, is also authorized, in the period prior to the conveyance to Conrail, to enter into agreements, to be financed by obligations not exceeding $150 million, with "railroads in reorganization" as defined in ง 102(12),[18] for the acquisition, maintenance or improvement of railroad facilities and equipment necessary to improve property that will be in the final system plan, ง 215; as we read the section, these advances are not debts of the estates of the borrowing railroads, although they must be assumed by Conrail. USRA is also authorized to make loans (or in some instances guarantees of loans) to Conrail, Amtrak, and other railroads in the region (including a railroad in reorganization which has been found to be reorganizable under ง 77) for purposes of assistance in the implementation of the final system plan; upon direction by the Secretary, to a state or local or regional transportation authority which has made an offer to purchase any rail properties of a railroad in reorganization under the Act in an amount not exceeding 70% of the purchase price and also to provide additional assistance not to exceed 70% of the cost of restoring or repairing such rail properties to conditions enabling safe and efficient rail transportation; and to a railroad which connects with a "railroad in reorganization" and requires financial assistance to avoid having to invoke ง 77. ง 211.[19] The Act also has a program, at present limited to *910 two years, for subsidies for continuation of rail service on lines not included in the final system plan. ง 402. As much as $90 million may be appropriated for this purpose during each of the two years of the program's operation. ง 402(i)(1). Any state taking advantage of the loan program of ง 211 with respect to the purchase of rail properties, discussed above, forfeits its right to a continuation subsidy. ง 403(a). Conrail, USRA (where applicable), and railroads acquiring operation of railroads in reorganization under the Act are to be reimbursed, in an amount not exceeding $250 million, for the cost of complying with employee protective conditions, ง 509; this should contribute to the viability of Conrail[20] and should attract purchasers for properties not to be included in that system.[21] Finally, there are new procedures governing the discontinuance of rail service and abandonment of rail property. ง 304.
A three-judge court, convened pursuant to 28 U.S.C. งง 2282 and 2284, has entered a declaratory judgment that the Act was unconstitutional, as applied to the Penn Central reorganization, in three respects:
(1) Section 303, insofar as it fails to provide compensation for interim erosion pending final implementation of the final system plan, is in contravention of the Fifth Amendment;
(2) Section 304(f), relating to interim abandonments, violates the Fifth Amendment insofar as it would require continued operation of rail services at a loss in violation of the constitutional rights of owners and creditors;
(3) So much of ง 207(b) as requires the reorganization courts to dismiss pending ง 77 proceedings under the circumstances set forthin ง 207(b) violates the uniformity clause of the Constitution, Art. I, Section 8, Clause 4.[22]
Connecticut General Insurance Corp. v. United States Railway Ass'n, 383 F. Supp. 510 (E.D.Pa.1974). The case has been appealed to the Supreme Court, with all briefs to be filed by mid-October 1974.
We have concluded that the Act does "provide a process which would be fair and equitable" to the reorganization estates. That conclusion rests, in considerable measure, on our belief, contrary to that of the Connecticut General court, that Congress did not withdraw the ability of parties having a claim that the Act deprives them of a right "founded . . . upon the Constitution" to seek redress in the Court of Claims under the *911 Tucker Act, 28 U.S.C. ง 1491 (1970). The Tucker Act issue, however, is before the Supreme Court in the appeal in the Connecticut General case. Because of that and also because, apart from that, our decision on that issue might not have preclusive effect upon the Government, we shall mold our order so as to enable us to make whatever modifications, if any, the Court's decision may render appropriate.
This opinion will consider major issues common to all appeals, although the factual discussion of "erosion" and the "viability" of Conrail will be built primarily on the record in the Penn Central case. We do this since Penn Central comprises some 94% of the operated rail mileage and 87% of the railroad operating revenues of the roads here before us[23] and also because the Penn Central factual record, although by no means wholly satisfactory, comes nearer to being so than those in the other cases. An opinion by Judge McGowan will deal with special issues raised by the appeals as to leased lines which are secondary debtors in the Penn Central proceedings. Judge Thomsen's opinion will discuss special considerations raised in other appeals. All of us join in all three opinions.

I. JURISDICTION.
The New Haven trustee, a large holder of divisional mortgage bonds and stock of Penn Central and also a creditor for the substantial amount of consideration for the New Haven remaining unpaid when Penn Central entered ง 77, see New Haven Inclusion Cases, 399 U. S. 392, 483-489, 90 S.Ct. 2054, 26 L.Ed. 2d 691 (1970), mounts a number of challenges to our jurisdiction. These are as follows:
The first claim is that the 180-day order does not constitute a decision of a case or controversy because ง 207(b) of the Act has no requirement for adversary pleadings.[24] Such lack of adversary pleadings is scarcely unprecedented in bankruptcy. To cite one example, a court may dismiss a petition under Chapter X of the Bankruptcy Act if not satisfied that the petition has been filed in good faith, ง 141, although no one has asked it to do so. The court may also approve the petition ex parte, "a judicial determination of law and fact," 6 Collier on Bankruptcy, ถ 6.02 at 1001 (Moore ed. 1971). In these cases it was reasonable to expect that USRA and perhaps other parties would support reorganization under the Act while others would oppose. Cf. Fong Yue Ting v. United States, 149 U.S. 698, 729, 13 S. Ct. 1016, 37 L.Ed. 905 (1893) (deportation hearing); Tutun v. United States, 270 U.S. 568, 575, 577, 46 S.Ct. 425, 70 L.Ed. 738 (1926) (naturalization hearing). To say that there was a live controversy, see Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241, 57 S.Ct. 461, 81 L.Ed. 617 (1937); Goosby v. Osser, 409 U.S. 512, 516-517, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973), in each of these cases would be something of an under-statement. If more were needed, the ง 77 proceedings, in which all the orders here sub judice were entered, themselves constitute the necessary case or controversy. See Burco, Inc. v. Whitworth, 81 F.2d 721 (4th Cir.), cert. denied, 297 U. S. 724, 56 S.Ct. 670, 80 L.Ed. 1008 (1936).
The trustee next claims that the Act contravenes Article III because the *912 finding in clause (1) of the third sentence of ง 207(b) "and that the public interest would be better served by such a reorganization [under ง 77] than by a reorganization under this Act" is legislative rather than judicial. It is argued that the district courts had no jurisdiction to make such a finding and, consequently, we have no jurisdiction to review it. Cf. Mitchell v. Maurer, 293 U. S. 237, 55 S.Ct. 162, 79 L.Ed. 338 (1934). As the cases stand, the only ones where anything turned on such a finding were those of the twelve Penn Central secondary debtors which Judge Fullam found to be reorganizable on an income basis under ง 77 but concerning which he was unable to find that the public interest would be better served thereby. See Judge McGowan's opinion. In all other cases the district court found that the road was not reorganizable under ง 77 and these findings are beyond successful challenge;[25] there was therefore no occasion for it, or for us, to consider whether reorganization under ง 77 would better serve the public interest.
The question whether a given decision is legislative or judicial is not susceptible of solution by a litmus paper test. Admittedly the Act does not in terms set out what criteria the judge should apply. But each district judge was familiar with the course of the proceedings under ง 77, with the problems that would be faced in endeavoring to continue thereunder, with the important benefits potentially afforded by the Act, and also with its problems. We do not see why the decision whether it was better to proceed under ง 77 or under the Act was any more legislative than a decision under ง 328 of the Bankruptcy Act that a proceeding under Chapter XI "should have been brought under Chapter X of this Act," an issue which the Supreme Court has thrice implicitly determined that an Article III court could properly decide. SEC v. U. S. Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956); SEC v. American Trailer Rentals Co., 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965). The type of decision required also does not seem essentially different from that demanded under Fed.R. Civ.P. 23(b)(3) whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Several provisions of ง 77 require the reorganization court to make determinations of the public interest. See ง 77(c)(6) (lessor's duty to operate upon rejection of lease); ง 77(o) (abandonment or sale of lines); In re Boston & Maine Corp., 455 F.2d 1205 (1st Cir. 1972) (application of ง 77(o)). The power of the courts to apply similarly broad standards has repeatedly been sustained, United Steelworkers of America v. United States, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959); United States v. First Nat'l City Bank, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). See also Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 462 n. 6, 57 S.Ct. 556, 81 L.Ed. 736 (1937). As intimated in Hart & Wechsler, The Federal Courts and the Federal System 237-38 (2d ed. 1973), we think these decisions, as well as Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933), *913 have drained all vitality from Federal Radio Comm'n v. General Electric Co., 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969 (1930), which is relied on by counsel for the Penn Central Secondary Debtor Indenture Trustees, who also raise the point here under discussion.
The New Haven trustee also argues that we are being asked to render an advisory opinion because if we find the Act in part defective Congress may repair it, whereas if we hold the Act constitutional on the grounds that it leaves creditor and stockholder interests free to sue the United States under the Tucker Act for any deficiency in compensation or for unconstitutional erosion, Congress subsequently may eliminate that remedy.
The former possibility is in no way troubling. A decision condemning the present statute would not be deprived of effect by Congress' taking steps to meet the court's objections. as it has frequently done. See, e.g., the amendment of the Frazier-Lemke Act, sustained in Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), in order to overcome the defects that had led to condemnation of the act of June 28, 1934, 48 Stat. 1289, in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). McGrath v. Kristensen, 340 U.S. 162, 71 S. Ct. 224, 95 L.Ed. 173 (1950), seems sufficient to dispose of the trustee's second suggestion. See generally Hart & Wechsler, The Federal Courts and the Federal System, Note on the Court of Claims and the Problem of Legislative Revision 98 (2d ed. 1973).[26]
Another contention raised by the New Haven trustee is that we are somehow deprived of jurisdiction because Congress passed the Act in the face of a pending motion by the trustee to dismiss the Penn Central reorganization proceeding under ง 77(g). But Congress did not purport to strip the reorganization court of power to decide the motion; it simply created new legislation which might lead that court to consider it the part of wisdom not to decide the motion until the feasibility of proceeding under the new Act had been explored and then to render a decision consistent with the result of that exploration. We know of no principle whereby the making of a motion in a pending case can strip the Congress of its power to enact legislation creating an alternative solution which the court might deem worthy of consideration. Cf. Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. (59 U.S.) 421, 15 L.Ed. 435 (1855).
Finally the New Haven trustee contends that the last sentence of ง 207(b) prohibiting review of our decisions on appeals from the 180-day orders deprives us of jurisdiction. Much of the learned discussion, including extensive quotations from Professor Henry M. Hart, Jr.'s remarkable article, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362 (1953), falls by the wayside in light of the possibility of obtaining Supreme Court review of the constitutionality of the Act by appeal from the decision of the three-judge court in the Connecticut General case, see generally Choper, The Supreme Court and the Political Branches: Democratic Theory and Practice, 122 U.Pa. L.Rev. 810, 852-55 (1974), unless the trustee is justified in fearing that because the Act requires us to render our decision before the Supreme Court will have heard the Connecticut General appeal, our judgment may have a preclusive effect on the Court โ an issue discussed in Part II B below. In any event unconstitutionality of this provision *914 would not have the effect of depriving us of jurisdiction; it would simply entitle the Supreme Court to disregard this limitation if its appellate jurisdiction were invoked.

II. COLLATERAL ESTOPPEL.
We deal here with two issues in the law of judgments which Congress could hardly have expected to arise.

A. The effect upon this court of the decision of the three-judge court in the Connecticut General case.

Several opponents of the Act contend that the decision of the three-judge court in the Connecticut General case has preclusive effect upon this court with respect to the three issues there decided and other points on which the court necessarily ruled in reaching those conclusions. The argument runs as follows: Collateral estoppel normally applies to issues of law as well as to issues of fact. ALI, Restatement of Judgments 2d ง 68 (Tent.Draft No. 1, March 28, 1973). But see Vestal, Res Judicata/Preclusion 250 (1969). And "[t]he federal rule is that the pendency of an appeal does not suspend the operation of an otherwise final judgment as res judicata or collateral estoppel, unless the appeal removes the entire case to the appellate court and constitutes a proceeding de novo," 1B Moore, Federal Practice ง 0.416 [3] at 2252 (1974), citing many cases; ALI, Restatement of Judgments 2d ง 41f at 5-6 (Tent.Draft No. 1, March 28, 1973), although, of course, the matter may be reopened if there is a reversal. The conclusions of the three-judge court allegedly thus preclude relitigation in the Penn Central and Penn Central secondary debtor cases by USRA, the United States, the Interstate Commerce Commission, and the Penn Central trustees, each of whom was a party to the Connecticut General case, of issues there decided. Furthermore, under the rationale of Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), these parties would also be precluded from relitigating those issues in any other case.
We believe it would be wrong for this court to refuse to consider relevant issues of law simply because they were also decided by the Connecticut General court. There are many parties โ labor organizations and public bodies โ supporting the validity of the Act who were not parties to that case, and we perceive no basis for use of collateral estoppel against them. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra, 402 U.S. at 329, 91 S.Ct. 1434. Moreover, Congress envisioned a special role for this court which, in contrast to the Connecticut General court, can look at all the proceedings rather than only at one, and has available more ample factual records. We do not think Congress intended that in the cases which it put before us, raising issues of such major public importance, our review of the decisions of the district courts under the second sentence of ง 207(b) should be trammeled by the decision of another court, although we, of course, treat its ruling with respect. Compare Denver Build. & Constr. Trades Council v. NLRB, 87 U.S.App.D.C. 293, 186 F.2d 326, 330-32 (1950), rev'd on other grounds, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

B. The effect of our decision on Supreme Court review of the Connecticut General case.

We have already referred to the fear, expressed by the New Haven trustee, that our judgment, which the final sentence of ง 207(b) expressly makes unreviewable,[27] might preclude a contrary *915 ruling by the Supreme Court on the appeal in the Connecticut General case. We feel certain that it will not. Any decision by this court is essentially interlocutory โ either allowing reorganization to proceed under the Act or requiring further action in the proceedings under ง 77. Although finality in the sense of 28 U.S.C. ง 1291 is not always required for issue preclusion, see Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 87-90 (2d Cir. 1961), cert. denied, 368 U.S. 986, 82 S. Ct. 601, 7 L.Ed.2d 524 (1962); Zdanok v. Glidden Co., 327 F.2d 944, 955 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); ALI Restatement of Judgments 2d, ง 41g, at 6-7, the circumstances here would dictate strongly against reliance on that principle so as to preclude decision on the issues in Connecticut General by the highest court in the land. As we have recently seen, great cases often demand departures from procedural rules which serve a useful purpose in the ordinary run of litigation but would lead to an unjust result in the case at hand. United States v. Nixon, 418 U.S. 683, 94 S. Ct. 3090, 41 L.Ed.2d 1039 (1974) (refusing to apply general rule that the denial of a motion to quash a subpoena is not appealable unless the person subpoenaed subjects himself to contempt). Similarly, while the rule that there can be no preclusion where "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment by an appellate court in the initial action . . . .", ALI, Restatement of Judgments 2d, supra, ง 68.1(a), does not generally require a second appellate review, the issues here are of such importance that the inability to secure Supreme Court review of our decision should prevent its having preclusive effect on that Court. While the provision of ง 207(b) requiring us to render our decision within 80 days after appeals have been taken renders it infeasible for us to stay these proceedings pending a Supreme Court decision, as suggested by some of the parties and in the amicus brief of the New York State Department of Transportation, we shall mold our judgment so that we can reflect any changes appropriate in light of the Court's determination. We also state, for whatever bearing it may have, that the last thing we have in mind is to impair in any way the Court's freedom of action in the Connecticut General appeal.

III. THE REQUIREMENT OF UNIFORMITY
Article I, ง 8, Clause 4 of the Constitution empowers the Congress
To establish a uniform Rule of Naturalization, and uniform laws on the subject of Bankruptcies throughout the United States:
The purpose behind the grant of the bankruptcy and naturalization powers was to enable the new central government to eradicate the opportunities for fraud and forum-shopping engendered by varying state insolvency and naturalization laws, see The Federalist No. 42, at 308 (Law ed. 1961); Story, Commentaries on the Constitution, ง 1109 (1833). It was thus rather natural for the framers to suggest that an important advantage of federal supersession would lie in uniformity. While the primary reason for use of this adjective was very likely promotional rather than normative, we agree that in giving the bankruptcy power to Congress the framers intended to prevent its use in a manner that would in some degree continue the evils it was meant to end. That, however, is a long way from construing the adjective so as to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions. Such appears to be the clear intimation of *916 Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 463 n. 7, 57 S.Ct. 556, 81 L.Ed. 736 (1937), upholding a provision in the amended Frazier-Lemke Act permitting bankruptcy courts to determine whether the Act should continue to apply in particular localities. See also Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 189-190, 22 S.Ct. 857, 46 L.Ed. 1113 (1902).
However, we are not required to rest our decision on such considerations. The uniformity required by Article 1, ง 8, Clause 4, is geographical, not temporal. Cf. Hanover Nat'l Bank v. Moyses, supra. If the Act had been written to apply only to railroads that were in proceedings for reorganization under ง 77 on the date of its enactment, objection on the ground of lack of uniformity would not have been even arguable. While the Act does not say in ipsissimis verbis that it applies only to such railroads, ง 207(b) and the elaborate timetable provided in the Act make plain that such was the intent of Congress. Every such railroad was within the region defined in ง 102(13) of the Act, with the single exception of the Tennessee Central Railroad Company; this small railroad has not operated since August 31, 1968, substantially all of its lines have been sold to other railroads, and the only unresolved questions concern the distribution of certain funds still retained by the railroad. See In re Tennessee Central Ry., 304 F.Supp. 789 (M.D.Tenn.1969). Clearly the Tennessee Central is not a candidate for reorganization under the Act. Even if it were, the uniformity clause would not be offended by a statute dealing only with railroads in ง 77 proceedings at the time of its enactment whose rail lines and other properties were then in operation. Yet such a statute would have had precisely the same inclusions and exclusions as the Act. The only provision in the Act that would have required change if the statute had been drafted in either of the ways we have suggested is ง 206(c)(1)(B), providing that an offer of rail properties for sale may be made only "to a profitable railroad operating in the region . . . ." But if Congress had worded the statute in either of the forms discussed, the commerce power would have permitted it, despite the uniformity clause, to limit sales to railroads whose operations were in the general geographical area served by the seller, in order to minimize the disruption of competitive balance elsewhere. Since what Congress did was not in violation of the Constitution, we decline to hold its action to have constituted a breach of the uniformity clause simply because it used words readily intelligible to its members and the public rather than circumlocutions that would have had exactly the same effect.

IV. FAIR AND EQUITABLE PROCESS โ GENERAL CONSIDERATIONS
The task set for us by Congress is to review the decisions of the reorganization courts that the Act does not or, as held in the Reading and Ann Arbor cases, does "provide a process which would be fair and equitable to the estate of the railroad in reorganization . . . ."[28]
A few conclusions emerge rather clearly and rapidly from the statutory text. We are free, indeed bound, to look down the road, without the same concern for considerations of prematurity or ripeness that would be material in other contexts. If the process in its present or future operation is unconstitutional, *917 we must, of course, condemn it unless the unconstitutional provision can be properly excised under the separability clause, ง 604.[29] Beyond this, however, a process not condemned by the Constitution still may not be "fair and equitable."
At this point agreement ceases. Some parties have suggested that courts must look at the process without regard to the facts. We do not believe Congress intended this;[30] in any event we find such a feat beyond our capacities. The parties also differ over how our telescope should be tilted. The Government parties say that, since Congress presumably did not intend to do anything unfair or inequitable, Brief of Appellants at 45-50, In re Penn Central Transp. Co., No. 74-8 (joint brief for Nos. 74-8, 74-12, 74-11, 74-6, 74-10) (hereinafter cited as Appellants' Joint Brief), we should sustain the Act notwithstanding any doubts about the ultimate viability of Conrail. Id. at 62 n. 105, 76. Others, especially the investors, say that, if there is any significant possibility that the Act might operate so as to deprive them of legal rights, we must condemn it since, as they also argue, there will be no later opportunity for us or anyone else to do this within the Act's framework. Joint Brief of Certain Appellees at 85-91, In re Penn Central Transp. Co., No. 74-8 (hereinafter cited as Appellees' Joint Brief).
The correct view must lie between these extremes. Congress cannot be held to a standard of perfection which few institutional arrangements could pass. Indeed, there is a certain incongruity between the high demands which the investors make of the Act and the unhappy position they, or in any event most of them, occupied when it was enacted. The idea that billions of dollars of liquidation proceeds of these bankrupt railroads are lurking just around the corner is unrealistic in the last degree. On the other hand, it can hardly suffice that the Act might provide fair treatment under optimum conditions which are very unlikely to occur. This is true even on our view with respect to the ultimate applicability of the Tucker Act. If, as the investors assert, the outcome of proceedings under the Regional Rail Reorganization Act were certain to be that, after much further "erosion," they would be handed a package of essentially worthless Conrail securities and then have to sue in the Court of Claims, it would scarcely be fair and equitable, even though it might be constitutional, to make them wait many years for their due. We therefore think it necessary and desirable to discuss the main complaints of the opponents on their merits and not rest entirely on our view of the applicability of the Tucker Act.
One minor complaint which may be dismissed here and now is the *918 attack on the following provision of ง 207(b), see note 1 supra:
Because of the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act, each such court shall order that the reorganization be proceeded with pursuant to this Act unless it (1) has found that the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by such a reorganization than by a reorganization under this Act, or (2) finds that this Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization. . . .
Some of the opponents complain that the language in this provision, combined with the difficulties of obtaining or developing certain facts about the ultimate shape of Conrail, the mix of consideration, or the potential profitability of railroads in reorganization, renders the Act "unfair, inequitable and unconstitutional." Brief of Secondary Debtor Indenture Trustees at 19, In re United N. J. R. R. &. C. Co. and Other Secondary Debtors of Penn Cent. Transp. Co., No. 74-12. See Appellees' Joint Brief at 114. While this provision creates a presumption in favor of reorganization under the Act, as Judge Fullam correctly recognized below, In re Penn Cent. Transp. Co., 382 F.Supp. 856, 862, supra, mem. op. we fail to see why it is unconstitutional, or unfair and inequitable, for Congress to declare a preference for one mode of reorganization rather than another and to place the burden of persuasion on those who challenge its judgment. This comes nowhere near the "conclusive presumption," which the Supreme Court has recently condemned as violative of the Due Process Clause. See Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Vlandis v. Kline, 412 U.S. 441, 446, 452, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); Cleveland Bd. of Educ. v. LaFluer, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

V. EROSION OF INVESTORS' RIGHTS
A major criticism by opponents of the Act is that, by forcing continued operation at allegedly hopeless losses until the conveyance to Conrail or other carriers of the rail properties included within the final system plan without provision for compensation of those losses, it contravenes the principles laid down in a line of cases beginning with Brooks-Scanlon Co. v. Railroad Comm'n, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920), and including Bullock v. Railroad Comm'n, 254 U.S. 513, 41 S.Ct. 193, 65 L.Ed. 380 (1921), and Railroad Comm'n v. Eastern Texas R. R., 264 U. S. 79, 84, 44 S.Ct. 247, 68 L.Ed. 569 (1924). The gist of these cases was compressed in two statements of Mr. Justice Holmes in Brooks-Scanlon, 251 U.S. at 399, 40 S.Ct. at 184:
. . . A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage . . . . If the plaintiff be taken to have granted to the public an interest in the use of the railroad, it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss.
Although the continued vitality of these decisions was challenged in the New Haven Inclusion Cases, the lower courts rejected the attack, see New York, N. H. &. H. R. R. First Mortgage 4% Bondholders' Committee v. United States, 289 F.Supp. 418, 440-441 (S.D.N.Y.1968); In re New York, N. H. & H. R. R., 304 F.Supp. 793, 802-804 (D.Conn.1969), modified and aff'd sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); New York, N. H. & H. R. R. First Mortgage 4% Bondholders' Committee v. United States, 305 F.Supp. 1049, 1055 (S.D.N. Y.1969), vacated on other grounds sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 *919 (1970), and the principle has been recognized in connection with the reorganization of the Penn Central. In re Penn Cent. Transp. Co., 494 F.2d 270, 278-283 (3 Cir.), petition for cert. filed, 42 U.S. L.W. 3633 (U.S. May 8, 1974) (No. 73-1672). While we in no way disagree with the Brooks-Scanlon principle, we think the advocates of the erosion argument, which constituted the principal ground for the Connecticut General decision, have failed to analyze the issue with sufficient precision.
Although the fundamental principle of Brooks-Scanlon remains unimpaired, the right to withdraw the grant has been procedurally qualified in two ways.[31] One is that the reorganization court must be allowed a reasonable time to determine whether management can be improved, the property can be restructured so as to restore its earning power, or a disposition more consistent with the public interest than liquidation can be found.[32] Under the rule of Continental Illinois Nat'l Bank & Trust Co. v. Chicago, R. I. & P. Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), where creditors' remedies, the exercise of which might seriously impair formulation of an effective plan of reorganization, were held in abeyance during a period in which the value of the collateral could decline, the estate of a railroad may be made to suffer interim losses for a reasonable period during which a feasible plan of reorganization may be developed. The key finding prerequisite to such postponement of creditors' remedies is the likelihood of successful reorganization, variously described in analogous contexts as "probably feasible" and highly likely. Cf. Central R. R. Co. of N. J. v. Manufacturers Hanover Trust Co., 421 F.2d 604, 606, 608 (3d Cir. 1974); In re Third Avenue Transit Corp. v. Lehman, 198 F.2d 703, 706 (2d Cir. 1952); In re Penn Cent. Transp. Co., supra, 494 F.2d at 276. Opponents of the Act, claiming that Conrail has no prospects of viability and that there are no other means for adequately protecting claimants' rights, conclude that the Act necessarily thereby provides a process which is not fair and equitable to the bankrupt estates. If we were convinced that they were correct on the viability question and if no other procedural consideration intervened, we might be inclined to agree. As we note in the next part, however, the evidence on Conrail's prospects is not so wholly negative as these opponents suggest. There is in any event another and still more pertinent procedural consideration.
This is that liquidation cannot commence until public bodies, acting under statutory authority, have had a reasonable opportunity to consider and act upon the proposed abandonment, as ง 77(o) prescribes with respect to the ICC. This is true even when the Constitution requires that a certificate of abandonment must ultimately issue, since such proceedings give other parties, notably public authorities, a final opportunity to come up with plans that may prevent serious injury to the public interest. Such is the teaching of Palmer *920 v. Massachusetts, 308 U.S. 79, 88, 60 S.Ct. 34, 84 L.Ed. 93 (1939) ("[T]he power of the district courts to permit abandonments is specifically conditioned on authorization by the Commission"); New York, N. H. & H. R. R. First Mortgage 4% Bondholders Committee v. United States, supra, 305 F.Supp. at 1055 (while railroads with no reasonable hope of future earnings had a constitutional right to cease operations and liquidate, it could not do so until ICC issued abandonment certificate); and finally and most important, the New Haven Inclusion Cases, supra, 399 U.S. at 461, 90 S.Ct. 2054. Such administrative review "assures that an agency with substantial expertise . . . will provide that the appropriate amalgam of public concerns for rail transport and private rights of property is achieved." In re Central R. R. Co. of N. J., 485 F. 2d 208, 215 (3d Cir. 1973) (en banc). It follows that the Act does not unconstitutionally erode the rights of the investors except as it may impair the power of the reorganization court, on a proper showing, to direct the trustee to apply for the approvals needed for a cessation of operations or the power of an administrative agency to grant such approval.[33]
The opponents contend that the Act does contain a provision of the latter sort, which makes futile any attempt to move the reorganization courts to authorize discontinuance or abandonment applications. The provision is ง 304(f), which reads as follows:

Interim Abandonment. โ After the date of enactment of this Act, no railroad in reorganization may discontinue service or abandon any line of railroad other than in accordance with the provisions of this Act, unless it is authorized to do so by the Association and unless no affected State or local or regional transportation authority reasonably opposes such action, notwithstanding any provision of any other Federal law, the constitution or law of any State, or decision or order of, or the pendency of any proceeding before any Federal or State court, agency, or authority.
But for the second "unless" clause, this provision would simply substitute USRA for the ICC as the federal agency authorized to permit abandonments or discontinuance of service under งง 1(18) and 13a of the Interstate Commerce Act.[34] The Government parties claim that this is precisely the effect and that ง 304(f) will facilitate rather than impede abandonments and discontinuances since it substitutes informal action for the evidentiary hearings required by ง 1(18) and, to some extent, by ง 13a. This is standing the section on its head. While we do read ง 304(f) as eliminating any need for approval by the ICC or state agencies and thus facilitating interim abandonment or discontinuance to *921 that extent, see note 34 supra, the standard to be applied by USRA is very strict. Instead of determining whether "the present or future public convenience and necessity permit of such abandonment," ง 1(18), or applying the similar standards of ง 13a (discontinuance of service), USRA may not permit interim abandonment or discontinuance if any affected state or local or regional transportation authority "reasonably opposes such action." The test is not whether the opposition is sound but whether there is a reasonable basis for it.[35] The rather strict limitation on interim abandonments or discontinuances contained in ง 304(f) is a complement of the provision that abandonments and discontinuances of property and service not contained in the final system plan may take effect "notwithstanding any provision of the Interstate Commerce Act (49 U.S.C. 1, et seq.) or the constitution or law of any State or the decision of any court or administrative agency of the United States or any State." ง 304(c). Opportunity to speak against such abandonments and discontinuances is confined to provisions in the Act for comments to USRA on the preliminary system plan, ง 207(a)(1), for public hearings to be held thereafter by the Rail Services Planning Office, ง 207(a)(2), and for Congressional review of the final system plan, ง 208(a), during which local interests presumably will be aired. In order to avoid large inroads on the time of USRA as a consequence of abandonment applications in what was conceived as a rather short interim period and especially to prevent the premature arousing of local opposition,[36] Congress confined interim abandonments or discontinuances to those which were not opposed or concerning which opposition would be unreasonable.[37]
On its face such a change in the standards for abandonment or discontinuance for over a year might indeed seem serious.[38] But the issue must be viewed in a practical frame, namely, by comparing the prospects afforded by ง 304(f) with those that would have prevailed in its absence. An affidavit filed with us by an attorney for the ICC states that for the year ending June 30, 1973, the average time for handling abandonment applications where an oral hearing was held was 15 months from the date of filing and 11 months from the date when the Commission designated the case for hearing on proof that required local notice, 49 C.F.R. ง 1121.5, had been given.[39] *922 Moreover, when Congress passed the Act, the Commission had placed a freeze on all abandonment applications because of the injunction issued in Harlem Valley Transp. Ass'n v. Stafford, 360 F. Supp. 1057 (S.D.N.Y.1973), subsequently affirmed, 500 F.2d 328 (2d Cir. 1974), requiring the ICC staff to prepare a NEPA impact statement, 42 U.S. C. ง 4332(2)(C), prior to the hearing. Although we are advised that the moratorium has now been lifted, the Commission had a backlog of 325 abandonment applications on July 30, 1974, in which NEPA impact statements must be prepared prior to hearing. Penn Central alone had 141 applications pending Commission action. The Commission, we were told, has augmented its staff with environmental experts and formulated new procedures to satisfy Harlem Valley, but the implementation of the new procedures will hardly be without friction. The log jam that would be created by a flood of applications for large scale or total abandonments by the carriers here in question boggles the mind. A statement of the environmental consequences of abandonment of large parts of the Penn Central alone would doubtless rival that for the construction of the Alaska Pipeline, which spread over 6 volumes and cost $9 million to prepare. Wilderness Society v. Morton, 156 U.S. App.D.C. 121, 479 F.2d 842, 846-847 (D.C. Cir.), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). And, unlike the Alaska Pipeline statement, such a statement in a Penn Central abandonment case would become a subject for cross-examination and rebuttal in an evidentiary hearing.[40]See, e. g., Pennsylvania v. United States, 361 F.Supp. 208, 212 (M.D.Pa.1973). We thus believe that even if abandonment applications had been authorized by the reorganization courts and filed early in 1974, the chance of favorable action by the Commission on any large-scale abandonments within 620 days would have been exceedingly poor. Such force as exists in the erosion argument thus rests primarily on the risk that, due to administrative delays, see notes 38 supra and 73 infra, or to Congressional disapproval of the final system plan, ง 208(a), and the theoretically possible infinite regression provided by ง 208(b), the period prior to conveyance to Conrail might prove to be much longer.
For such merit as this argument may have, a ready cure would be to hold ง 304(f) unconstitutional insofar as it denies the right of access to the ICC and state regulatory agencies, or, if that were not regarded as sufficient, to rule, in the language of the order in Connecticut General, that ง 304(f) may not be applied "with respect to any abandonment, cessation or reduction of service which has been or may hereafter be determined by a court of competent jurisdiction to be necessary for the preservation of rights guaranteed by the United States Constitution." Indeed, that gloss has already been superimposed by the Connecticut General order and will remain in effect unless erased by the Supreme Court. We are thus in a situation where there are only two possible outcomes, and authoritative decision between these will likely be made before the year-end.[41] One is that ง 304(f) will be ruled not to be unconstitutional; *923 the other is that the Court will enter whatever order is needed to prevent that subsection's operating in an unconstitutional manner.[42] This would seem to mean that ง 304(f) cannot pose any problem from the date of the Court's decision and, for the practical reasons already mentioned, we do not believe it will have injured any of the estates in the interval between January 2, 1974, and that date.
We believe, however, that further observations on the erosion problem will be helpful since excision or modification of ง 304(f) is not a particularly attractive solution. Much of the discussion by the opponents and the reorganization courts that have condemned the Act on this ground concerns losses and erosion prior to its enactment. This appears to be relevant only in two ways. The first is evidentiary, as providing some basis for predicting future erosion. The other is that the longer erosion has been in process and the greater it has been in amount relative to the value of the estate, the less are the limits that can be tolerated for the future. Opponents of the Act thus did not satisfy their burden merely by showing past losses; they were required to show (1) that there would be significant erosion while the processes of the Act were at work, and (2) that the Act provided no adequate means of compensation.
Since, as indicated above, operation of railroads undergoing ง 77 reorganization at an actual loss is a relatively recent phenomenon, it is not surprising that the courts have had little occasion to define just what items constitute unconstitutional "erosion".
There is no disagreement that at least four items qualify for inclusion โ the issuance of trustees' certificates with liens superior to those of mortgage bonds, accumulation of property taxes which similarly prime such liens, accumulation of administration expenses which are entitled to priority over secured creditors, and use of cash or property held as security for liens to pay operating expenses.[43] We have not been pointed to convincing evidence in the Penn Central record that any of these developments is likely in the 620 days prior to conveyance on the optimum schedule provided in the Act, in light of the grants for emergency assistance authorized by ง 213(a), the provisions of ง 215, and the 10% freight rate increase, effective June 5, 1974, authorized in Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974 [Ex parte No. 305], 39 Fed.Reg. 20256 (1974), earmarked for capital improvements and deferred maintenance except as needed for increased material and supply costs other than fuel.[44] An affidavit *924 of Ernest Varalli, employed by the Penn Central Trustees as Assistant Vice President โ Budget Planning, submitted at the 120-day hearing, prior to the Ex parte 305 increases, estimated that, through 1975, an additional $118 million in taxes on the Penn Central might accrue. However, this accrual would be more than offset by an increase in freight operating revenues. The income statement submitted by the Penn Central Trustees to the reorganization court for the period January 1 to July 31 shows a substantial improvement for 1974 over 1973, which itself showed a reduction in the annual deficit of net railway operating income from the $236.5 million experienced in 1970 to $92.7 million. Freight railway operating revenues increased by almost 13.5%. Indeed for the month of July 1974, after taking account of tax accruals and equipment hire, there was positive net railway operating income of more than $2.2 million.[45] There was also testimony before Judge Fullam as to the effect of Ex parte 305 on revenues through the first quarter of 1975. Some $88 million in additional revenues would be available through the end of 1974, an additional $42 million during the first quarter of 1975, and presumably at least an equivalent amount during the second. Barring an economic catastrophe, there is thus little likelihood that during 1975 Penn Central will experience any of the four items of erosion we have recognized.[46]
When we go beyond these four items, any semblance of agreement as to what constitutes impermissible erosion ends. The Government parties object strenuously to what they term the income statement method of determining erosion; the investors defend this, although contending that the excess of the results produced by this method over others is not significant. Resolution of the controversy would require, among other things, a determination of the proper method for valuation of the properties to be conveyed to Conrail or other railroads and an estimate of the likely disposition of those not so conveyed. If liquidation value is the proper test, we confront the fact that of the total value of roughly $3.5 billion (excluding the so-called Park Avenue properties in New York City) as of May 30, 1973, found in a report of Day & Zimmerman commissioned by the Penn Central Trustees,[47] over $2.6 billion represented land values, which would not be decreased by continued loss operations except for the items previously mentioned. The salvage value of other items will decrease as a result of continued use but not necessarily as much as the depreciation charges. Indeed, the scrap value of some assets, e. g., steel scrap, have increased in recent years considerably more than the overall inflation rate. Moreover, with the beneficial effects of rate increases going beyond cost inflation and of applying such increases and ง 215 funds to catch-up *925 maintenance, which are discussed in Part VI, it would not be unreasonable to expect, subject to the important reservations in note 44 supra, that Penn Central could earn, or nearly earn, its depreciation charges in 1975.[48]
The investor interests and the Penn Central Trustees, in addition to challenging much of what has just been said,[49] complain that even income statement erosion does not tell the whole story. Net railway operating income does not reflect any charges for the use of capital (save those in equipment leases), such as interest on funded debt and leased line rentals. Bondholders, they assert, are hurt by long continued refusal to pay for the use of their capital as well as by a decrease in the value of the assets available for repayment; yet no one predicts that Penn Central can resume full payment of interest on debt or of leased line rentals prior to the conveyance to Conrail. Agreeing that deprivation of a return on capital obligations entitled to consideration in a reorganization is a matter of serious concern, we think it can be tolerated somewhat longer than an actual whittling away of asset values by continued operation, so long as there is a reasonable prospect of a successful reorganization.
The upshot of our analysis thus is that, aside from the legal and practical considerations at the beginning of this part, the factual showing of likely unconstitutional erosion subsequent to January 2, 1974, in the Penn Central case was not so strong as would lead us to condemn the Act on that score, even apart from the Tucker Act remedy, if there were fair assurance that the final system plan would be consummated approximately as scheduled and that the investors would receive adequate consideration for properties sold to Conrail. The difficulty is that such assurance does not exist.[50]
The Government parties answer that, apart from a remedy under the Tucker Act or the possible excision or reformulation of ง 304(f), this court could compensate for any unconstitutional erosion in the final system plan, either by fixing a valuation date prior to the date of conveyance or by a specific award, ง 303(c)(2)(B), or a deficiency judgment against Conrail under ง 303(c)(2)(C). The earlier valuation date method would hardly be satisfactory even if permissible,[51] since this would not cure erosion with respect to rail properties that were not conveyed. It would be permissible for the final system plan to *926 provide or for us to direct that compensation for erosion should be made in the case of any railroad some of whose properties are conveyed. However, if, as the opponents urge, the consideration now authorized is inadequate as compensation for the properties themselves, enlarging the amount of claims that may be made against it would be of no avail.
In summary, we think the erosion claims are largely met by the points that, to such extent, if any, as ง 304(f) may constitute a problem, this can be eliminated by the Supreme Court before any legally cognizable damage has been done. We think also that, at least for the Penn Central and the Reading, see note 50, the erosion likely during the interim period has been considerably exaggerated, assuming that the conveyance occurs approximately as scheduled. However, reasonably entertained doubts that USRA will be able to meet its prescribed schedule, see note 38 supra, or that Congress may not accept USRA's initial effort would require reformulation or excision of ง 304(f) (as imposed, for example, by the Connecticut General court) unless a Tucker Act remedy exists. Given the availability of a Tucker Act remedy, no such action would be necessary. Absent such remedy, on the other hand, we think that the Act would be unconstitutional in any event, for reasons now to be discussed.

VI. THE COMPELLED CONVEYANCE AND THE ADEQUACY OF THE CONSIDERATION
In our view the most serious challenge to the fairness of the Act is this: Section 303 directs that within 10 days after the deposit of the securities and other compensation to be paid under the final system plan, which deposit is to be made within 10 days after delivery to us of a certified copy of the plan, this court shall "order the trustee or trustees of each railroad in reorganization in the region to convey forthwith to the Corporation and the respective profitable railroads operating in the region, all right, title, and interest in the rail properties of such railroad in reorganization and shall itself order the conveyance of all right, title, and interest in the rail properties of any railroad leased, operated, or controlled by such railroad in reorganization that are to be conveyed to them under the final system plan as certified to such court under section 209(d) of this Act." ง 303(b)(1). The conveyances are to be "free and clear of any liens or encumbrances," subject to various qualifications set forth in ง 303(b)(2), (3) and (4), and "shall not be restrained or enjoined by any court." It is only after making these orders that this court is to engage in the process described in ง 303(c).[52] We were horrified to learn that one of the Act's principal advocates had estimated this process as requiring from 5 to 10 years. 119 Cong.Rec. H 9742 (daily ed. Nov. 8, 1973). While we do not mean it to take that long, it will necessarily be time consuming.[53]
At argument counsel for USRA referred to this provision for enabling Conrail to get off to a reasonably quick start as "the genius of the Act." Certainly it is the only mechanism, short of condemnation, that would permit Conrail to begin operation within any reasonable time. Reorganizations under ง 77, with the seemingly interminable proceedings before the Commission and the battledore-and-shuttlecock between it and the reorganization courts, have dragged on for years.[54] It was for this reason that *927 Congress rejected the suggestion of the Secretary of Transportation, Letter from Claude S. Brinegar to Hon. Warren G. Magnuson, Nov. 14, 1973, in Sen. Rep.No.93-601, 93rd Cong., 1st Sess. 133 (1973), U.S.Code Cong. & Admin.News 1973, pp. 3242, 3294 [hereinafter cited as Senate Report], that this court should pass on the sufficiency of the consideration before rather than after the conveyances. See Senate Report at 15; House Report at 54-55 ("It is the intent of the Committee [on Interstate and Foreign Commerce] that the rail properties designated in the Final System Plan be conveyed first, and that any and all litigation concerning the amount or type of payment or consideration take place thereafter. The timely implementation of the Final System Plan cannot be obstructed by controversy over the payment for the properties.")
What the supporters find to be genius, the opponents consider to be evil genius. They assert that, except for eminent domain, there is no precedent for a regime of conveying first and valuing later. And they regard the exception as furnishing no support for the Act since it rests on the assurance that government will provide "a full and perfect equivalent of the property taken," Monongahela Navigation Co. v. United States, 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893), which they say the Act does not. The Act thus fails as a bankruptcy statute because of the absence of judicial determination of fairness prior to the required exchange, as in the "cramdown" provision of ง 77(e) sustained in R. F. C. v. Denver & R. G. W. R. R., 328 U.S. 495, 533, 66 S. Ct. 1282, 90 L.Ed. 1400 (1946), and as an eminent domain statute because of the lack of assurance of full payment.
Although the argument is forceful,[55] we would not accept it if we were certain that this court had been given the means to rectify any unfairness inherent in the final system plan. Congress did not have to choose between the Scylla of outright condemnation and subsequent nationalization and the Charybdis of a collapse of rail transportation in the most heavily industrialized section of the country.[56] What was said with regard to the New Haven in the Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 510-511, 88 S.Ct. 602, 614, 19 L.Ed.2d 723 (1968), applies here with exponential force:
While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest in not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move.
Congress evidently thought it had created the means to assure against any unfairness in the final system plan. It spoke in terms of "a constitutional minimum," ง 303(c)(1)(B), 303(c)(3), and apparently considered it had provided USRA or, failing that, this court with the means adequate to provide for the payment of this. Seemingly it reasoned somewhat as follows: Congress is entitled to insist on the continued operation of rail lines earning or capable of earning *928 a profit.[57] The very first goal of the final system plan is "the creation, through a process of reorganization, of a financially self-sustaining rail service system in the region." ง 206(a)(1). The owners of the hypothetically profitable properties conveyed to Conrail will receive all its securities plus up to $500 million in Government guaranteed obligations,[58] along with other benefits. They will thus retain all the earning power with which they parted, plus the added sweetener of having part of the consideration in Government guaranteed obligations.[59]
We think the reasoning, while understandable, was too simplistic.[60] The mere fact, if it be one, that Conrail might make some profit would not necessarily give its securities a value sufficient to render them fair compensation.[61] In order to be assured of fairness this court must be confident that it would either have knowledge at the time of conveyance that the securities and other benefits would equal the "constitutional minimum," something manifestly impossible since neither side of the equation could be accurately determined,[62] *929 or the power to summon whatever additional resources are needed. This proposition is reinforced by the question, discussed below, whether Conrail will be a profitable railroad at all.
Unhappily the options afforded us by ง 303(c)(2) do not fulfill the latter requirement. The first, ง 303(c)(2)(A), a reallocation of securities among the various railroads, while of possible value to some smaller lines, is meaningless with respect to Penn Central, which is bound in any event to receive the lion's share of the securities.[63] The second, a power to "order the Corporation to provide for the transfer to the railroad of other securities of the Corporation or obligations of the Association as designated in the final system plan in such nature and amount as would make the exchange or exchanges fair and equitable," has more usefulness but not enough.[64] What would be truly useful, power to increase the amount of obligations of the Association, is expressly conditioned, ง 210(b), at least if the final system plan had provided for the maximum of $500 million, on a joint resolution adopted by the Congress. Since an increase in the amount of common stock would add substantially nothing to its value, all that would be left for us would be to increase the amount of debt or to provide that more of this should be secured. While experience with railroad reorganization plans, under the Public Utility Holding Company Act, and in other contexts has demonstrated that an alteration in mix to provide a more attractive capital structure can add to total market value,[65] such alterations cannot be relied upon to cure any major deficiency.[66]
The final tool given us, ง 303(c)(2)(C), is seemingly a rather curious one, namely, to "enter a judgment against the Corporation" for the deficiency between the value of the securities *930 of Conrail, obligations of USRA, and other benefits and the fair value of the properties conveyed.[67] If this were unsatisfied, as it almost certainly would be if in any substantial amount unless Congress promptly stepped up with additional funds, see remarks of Rep. Shoup, 119 Cong.Rec. H9247 (daily ed. Nov. 8, 1973), the levy of execution would largely strip all value from everything but the USRA obligations and any secured debt that had been issued. In order to avoid the levy of execution, Conrail would probably seek reorganization under ง 77. Perhaps what Congress had in mind was that such a judgment would enable the bankrupt estates to get back what they had conveyed; it thereby assumed that the Act would be fair and equitable.[68] But since we would not be entering the judgment for some years, levy of execution, even if permitted to occur, would return the properties only after the accrual of new prior claims, the possible incurring of senior debt, and perhaps further erosion[69] while we might not go quite so far as Judge Fullman, who characterized the deficiency judgment as *931 "essentially circuitous," in his concurring opinion in Connecticut General Ins. Corp. v. U.S.R.A., supra, or as "relatively pointless," in his Penn Central decision here under review, we do agree that it fails to supply an adequate tool with which to cure any deficiency in the consideration.
Confronted with all this, the Government parties contend that if this court were convinced that the plan was fundamentally unfair, it could refuse to direct the conveyance provided for in ง 303(b). We agree that, absent a Tucker Act remedy, we would have power, indeed a duty, to take such a course, deriving not from the Act[70] but from the Constitution. But this does not cure the defect. Unlike ง 304(f), ง 303(b) cannot be excised under the separability clause, ง 604. Compare Hill v. Wallace, 259 U.S. 44, 70-72, 42 S.Ct. 453, 66 L.Ed. 822 (1922); Williams v. Standard Oil Co., 278 U.S. 235, 241-245, 49 S.Ct. 115, 73 L.Ed. 287 (1929); Railroad Retirement Board v. Alton R.R., supra, 295 U.S. at 361-362, 55 S.Ct. 758. See also Carter v. Carter Coal Co., supra. As counsel for USRA rightly said, it is the very heart of the Act. If we should refuse to order the conveyance, no alternate procedure is available under the Act; USRA would have to return to Congress for possible new legislation. The situation would revert to that of 1973, with operations having been compelled for another two years and no solution in sight. Beyond all this there is the problem that, when we are obliged to act or not to act in compliance with ง 303(b), we shall have only the meagre and one-sided information furnished pursuant to ง 206(f), the outraged cries of investors, and the conflicting answers of the Government to assist us in our deliberations with respect to valuation problems of unprecedented complexity. We therefore decline to hold that an opportunity, which derives from the Constitution but which we would necessarily have to exercise in haste and without adequate information or opportunity for hearing and deliberation,[71] is sufficient to cure a defect which would otherwise require us to hold that the Act "does not provide a process which would be fair and equitable to the estate of the railroad in reorganization." Absent a showing that the Government guaranteed obligations, the securities of Conrail, and "other benefits" clearly would provide fair compensation,[72] we would thus be compelled *932 to affirm the five decisions so holding and reverse the two decisions holding the contrary but for our view that a remedy under the Tucker Act is not foreclosed.
As we will now develop, there was no such showing. To the contrary the investors showed Conrail's prospects to be sufficiently doubtful that, taking into account the limited nature of the powers of rectification which Congress has conferred upon us, we would not find the processes of the Act to be fair and equitable, absent a Tucker Act remedy. On the other hand, as we will also show, they did not demonstrate such a certainty of failure as to make it unfair and inequitable, as they contend, to compel them to resort to the processes of the Act if recourse to the Tucker Act remains open.
The investors in Penn Central mounted an elaborate case, hereafter summarized, to show that Conrail would be, as sharply put, "another Penn Central," with much talk of promise but little reality. Somewhat surprisingly the Government parties declined the gambit except to the extent of vigorous cross-examination. Their basic position is that, since no one can tell what form Conrail will take until the final system plan becomes effective,[73] it is inappropriate and premature to speculate on its viability and the courts should have faith that if USRA cannot formulate a plan that will create "a financially self-sustaining rail service system in the region," ง 206(a)(1), it will report its inability to Congress, which "could well . . . at that stage . . . right any apparent constitutional wrong, or . . . provide any additional resources determined necessary at that time to assure Conrail's viability."
While we do not need to decide this, the reorganization courts and this court perhaps could rely on such a presumption in the absence of contrary evidence, although the practical compulsion on USRA to bring forth a plan will be exceedingly *933 heavy. But when, as in the Penn Central proceeding, the opponents came forward with evidence that what would seem the most probable form of Conrail would be a dismal failure, the supporters could not rely on a mere presumption of Conrail's viability.[74]
While the opponents in Penn Central offered a quantity of evidence, it will be sufficient to discuss the presentation by Mr. John W. Ingraham, a vice president and senior credit officer of First National City Bank of New York (Citibank). Mr. Ingraham had been assigned since July 1, 1970, "to oversee recovery efforts on behalf of 48 lending banks and 5 participating banks in a $300 million Credit Agreement dated as of April 1, 1969 with Penn Central Transportation Company under which Citibank acts as Agent"; he had available and made use of various studies commissioned by the Penn Central trustees, the reports of those and other trustees to the reorganization courts, materials from the August-September, 1973, Penn Central hearing before the I.C.C., the 120-day hearings before the reorganization court for both Penn Central and the secondary debtors, and other material.[75]
Mr. Ingraham's study assumed a 15,000-mile system made up mainly of Penn Central but also comprising mileage of the other railroads here before us (excluding the L & H, a Class II railroad with 115 miles of operating trackage, about 0.5% of the total for these roads in 1973) โ a shrinkage of some 8,000 miles.[76] The analysis was made on the basis of January 1, 1974, constant dollars; Ingraham thought that estimates made on what seems the more realistic basis of continued inflation would yield even worse results.[77]
The nub of Ingraham's analysis was this: He assumed for the first year of Conrail's operation โ roughly 1976 โ freight revenues equivalent to those of the bankrupt roads increased by 10%. He estimated further increases over the base year of 20%, 30%, and 40%, respectively, for the third, sixth and ninth years of operations. He thus assumed a compound annual growth rate for freight volume over nine years of 3.8%, which he characterized as optimistic in view of the historical figure of 2.5%, but he apportioned a large part of the total 40% in growth to early years in order to provide Conrail more income in *934 years when it was most needed. These assumptions produced negative net railway operating income from freight service in each year unless Conrail was able to reduce its operating ratio (the ratio of operating expenses to operating revenues expressed as a percentage) below 75%. Even a 70% operating ratio, which Ingraham considered unattainable, produced net railway operating income from freight service of only $56, 62, 70 and 90 million in the four years for which he projected figures. Deductions of interest charges, including amounts ranging from $35 to $31 million for acquisition bonds at an assumed interest rate of 7% (but not for leased line rents), and for "catch-up" maintenance, and passenger service losses produced deficits even at a 70% operating ratio until the ninth year and even in that year the net income was only $51 million. The most vital schedule in the analysis was one showing that at a 75% (or greater) operating ratio and excluding certain items, e. g., passenger service losses (estimated at $55 million per annum), Conrail would have the cash required for cash expenditures only in its first year of operation, when it would have the benefit of an assumed $300 million working capital loan, and that cash deficits would rise in the third, sixth, and ninth years to $15, 160 and 186 million, respectively. Even at a 70% operating ratio the positive cash balance before the excluded items would be only $109 and $105 million in the first and third years of operation and would turn to negative figures of $31 and $51 million in the sixth and ninth. The adverse changes in the later years are the result of a number of factors, including amortization requirements on new equipment debt, on rehabilitation bonds, and on acquisition bonds (only partially counteracted by a reduction of principal payments on old equipment debt), exhaustion of the $300 million of borrowed working capital, the institution of a $125 million common stock dividend in the sixth year.[78]
We have no doubt that Mr. Ingraham made a thoughtful and conscientious analysis. On the other hand, like all predictions, his rested on assumptions and some of these may well have been too pessimistic.
The first main attack by the supporters of the Act is that he underestimated freight revenues. As stated, he estimated a 10% increase in freight revenues for 1976 over 1973; apparently this was on the basis of two years' growth in volume and changes in commodity mix. Most of this 10% increase, it is argued, has already become available as a result of the 10% rate increase which was granted in Ex parte 305, effective June 5, 1974, subsequent to the preparation of Ingraham's analysis for the Penn Central case.[79] The effect of the increase cannot be brushed aside, it is said, on the ground that Ingraham's revenue estimates were based on January 1, 1974, *935 dollars, for the roads had already received 1974 increases to compensate for inflation, 3% in Ex parte 299, 4% in Ex parte 303, and 3% as a fuel surcharge, and the bulk of the 10% of Ex parte 305 was intended not to counterbalance inflation, but to enable the roads to catch up with deferred maintenance.[80] If one combines an effective increase until Ex parte 305 expires on June 30, 1975 (absent Commission action to retain it), of 9.5% due to Ex parte 305,[81] the other freight rate increases granted in 1974, and the increase of 4.1% per annum as a result of freight volume increases, commodity mix shifts, and changes in unit revenues postulated in a study (in the Penn Central record) by Temple, Barker & Sloane, consultants to the trustees, 1976 freight revenues would be increased from Ingraham's $2,195 million to $2,594 million.[82] So much of this as was represented by rate increases rather than by traffic growth would translate itself automatically into a reduction of operating ratio if expenses were held constant โ an assumption consistent with the concept that increased expenses due to further inflation would be met by additional rate increases. To take a simple example, if a 10% rate increase could be translated into 9.5% added revenues, Penn Central's 1973 freight operating ratio of 80.3% would become 73.3% (80.3 ๗ 109.5 = 73.3). While this reduction would not be attained to the extent that the catch-up maintenance program required greater operating expenses,[83] that program would have other favorable effects which Ingraham allegedly did not adequately consider.
The other major attack is on the expense side. One of the most serious effects of the bankruptcies of the Penn Central and other railroads and the deferred maintenance both before and after bankruptcy has been the growth of net rents for equipment. This has been due to two different factors. The financial *936 plight of the roads has forced them to finance new purchases by leases rather than the traditional equipment trusts. This markedly decreases net railway operating income since all such rents are deducted as expenses even though a large portion represents an increase in capital; moreover, the total outlay is greater than the interest and amortization charges under equipment trust obligations. Even more important, the lack of an adequate number of serviceable owned freight cars, with consequent added dependence on the fleets of other roads and private owners, and the delay in handling such cars due to "slow orders" on many miles of track and other inefficiencies resulting from deferred maintenance have resulted in vastly increased per diem charges. In 1970 the Penn Central paid a total of $79,448,000 for net car hire expenses, but by 1973 that figure had grown by $43,189,000 to $122,637,000. Car lease rental expenses grew during the same period from $36,028,000 to $66,703,000. Moreover, in 1973 Penn Central had a net debit balance in its incentive per diem accounts of $10,944,000. Schedule 376 of Annual Reports Form A (1970), Form R-1 (1973). The magnitude of these factors is shown by the fact that in 1973 Penn Central's net rents for equipment constituted 14.8% of freight operating revenues as compared, e. g., with 2.5% for the Chesapeake & Ohio, 3.7% for the Norfolk & Western, 9.4% for the Seaboard Coast Line, 7.3% for the Southern, and 5.3% for the Louisville & Nashville. With the benefit of the Ex parte 305 increase insofar as it generates revenues for capital expenditures and ง 215 loans,[84] Penn Central and the other bankrupt railroads should be able to make substantial progress in decreasing net equipment rents before the conveyance to Conrail, and Conrail, with another $500 million of loans available solely for rehabilitation and modernization of rail properties conveyed, ง 210(b), should be able to do better still. Ingraham's estimates that Conrail would start in year 1 with a 14.3% ratio of net rents to freight revenues, and would be able to reduce this only to 12.9%, 11.5% and 10.3% in the third, sixth and ninth years of operation do not appear to be substantiated in the record and may well be too pessimistic. To the extent that rehabilitation can be carried on before the conveyance to Conrail, post-conveyance expenditures and the large borrowings postulated by Ingraham as needed for rehabilitation and new equipment rising to a net of $2,228 billion in year 9, with attendant requirements of $272 million for amortization and interest, would be reduced.
There are still other favorable factors that might make a 70% freight operating ratio, computed on Ingraham's basis, much more reasonable than he assumed. The 1973 freight operating ratio of the five roads was 80.9% and the expenses reflected in the ratio included elements of inflation thought by the ICC to justify 10% in the three rate increases granted in 1974 before Ex parte 305. The Wyer-Dick estimates of 1973, which are in the Penn Central record, forecast savings in operating expenses of the order of $300 million from a 15,000-mile Penn Central core system, without significant loss of revenue; this would imply a freight operating ratio of 64% before taking into account the effect of *937 catchup maintenance on expenses, which Ingraham handled as a separate item in the cash flow rather than as an expense entering into the operating ratio. As was acknowledged by Charles C. Shannon, President of the consulting firm, Wyer, Dick & Company, and witness for the investors, during cross-examination, there is a rule of thumb commonly used by the ICC that increased volume can be handled at a 50% marginal operating ratio. A prime objective of the Act is to produce operating economies by eliminating unprofitable and duplicating mileage;[85] we should not lightly assume that this will not be achieved.[86] Also noteworthy are the Act's provisions which should assure against passenger service losses and provide a return (whether by lease or sale) on Penn Central's substantial investment in the portion of the Boston-Washington corridor properties that are used by Amtrak for passenger service.[87]
Some idea of the effect of taking into account these and other factors is conveyed by the affidavits of two transportation experts, Gerald W. Fauth, Jr., and James S. Krull, submitted by appellees other than the Government in the Ann Arbor case to refute the conclusions in Mr. Ingraham's affidavit submitted to the Ann Arbor court by opponents. Using operating ratios ranging downward from 73% in year 1 (1976) to 69% in year 9 (1984), Mr. Fauth arrived at positive net railway operating income for Conrail in every year ranging upward from $139.6 million in 1976 to $1026.4 million in 1984, and net income after taxes ranging upward from $42.4 million in 1976 to $638.5 million in 1984. Excess of cash sources over uses would range upward from $141 million in 1976 to $696 million in 1984 โ after providing for dividends of $69 million in years 6 and 9 on an estimated $1,370 million of stock, an amount Mr. Fauth viewed as more realistic in light of valuation studies. See note 78 supra. Mr. Fauth's analysis accepted Mr. Ingraham's analytic framework in large part but, in disagreement with him, reflected the following factors: the availability of additional revenues as a consequence of Ex parte 305 and other rate increases for use in capital improvement programs and other purposes; a greater growth factor for freight volume; consequently higher railway operating revenues for year 1; substantially reduced net car hire and equipment lease rents to reflect the anticipated rehabilitation program and the industry average; and availability and use of cash in excess of current cash needs. Mr. Krull's analysis led him to conclusions as to the viability of Conrail generally in line with Mr. Fauth's.
Counsel for the investors in Penn Central objected to our considering the Fauth and Krull affidavits in the Ann Arbor because he had no opportunity to cross-examine. But we cannot close our eyes to material that has come to our attention in examining the records in all these cases. These proceedings, after all, are not mere private litigation; and it would be anomalous in the last degree for us to hold that Conrail was viable for purposes of the Ann Arbor case but not for that of the Penn Central. At the very least the Fauth and Krull affidavits can be taken as quantifying points scored in Ingraham's cross-examination and as showing that qualified experts can reasonably reach markedly different conclusions depending on their assumptions. If Fauth's estimate, or Krull's estimate based on a 70% operating ratio, should be realized, the value of the Conrail shares, under normal market conditions, along with the $500 million *938 of Government guaranteed bonds, could well equal the value of the properties conveyed on the basis of Day & Zimmermen's April 1973 $1.87 billion liquidation value estimate for a 15,000-mile Penn Central system[88] โ without consideration of the other benefits conferred by the Act.
We are not suggesting any certainty that such heartening results will be obtained, even though we have not yet mentioned such elements as the recovery of traffic lost to competing railroads or other modes of transportation as a result of the deficiencies in the track and equipment of the bankrupt roads; the elimination of such crazy-quilts of industrial trackage as that in Philadelphia, vividly described in the DOT report;[89] and others too numerous to mention. As heretofore suggested, see note 44 supra, much will depend on a quickened response to inflation by the Commission and on Conrail's ability to pass on increased rates without loss of traffic to competing modes of transportation which, although perhaps even more subject to inflationary pressures, may find it desirable not to increase some rates to the same degree. Obviously Conrail's management will have to be markedly different from Penn Central's prior to bankruptcy. Even more will depend on the general economic condition of the country. We have a deep sense of unreality in discussing projections of what Conrail will do in 1985 or even in 1976 when the prospects for 1975 are so uncertain and gloomy. As to this, we can say only what we did before โ that if an economic calamity should occur, the investors would be in no position to liquidate immediately and would surely resist computation of liquidation value on the basis of what they would urge to be spot depression prices.
The upshot is that the investors cast sufficient doubts on Conrail's prospects that it would be unfair and inequitable to remit them solely to the inadequate remedies provided in ง 303(c)(2). On the other hand, there is a sufficient possibility of the viability of Conrail that it is not unfair and inequitable to require them to await the processes of the Rail Reorganization Act if a remedy under the Tucker Act is ultimately available.

VII. AVAILABILITY OF A REMEDY UNDER THE TUCKER ACT
The alignment of the parties with respect to the availability of a remedy under the Tucker Act for any unconstitutional erosion or for inadequacy of compensation is rather different from what one would have expected. The *939 United States, which normally opposes with vigor the right to assert claims against the Government in any doubtful case, along with USRA and the Interstate Commerce Commission, stoutly contend that a supplemental remedy under the Tucker Act is available,[90] although they doubt that resort to it will be necessary. In contrast the investor groups who would benefit from such a remedy strongly contend that it does not exist. Only the Penn Central trustees take the positions seemingly in line with their interests, namely, that the Tucker Act remedy exists and that the Act would be unconstitutional without it. The three-judge court in the Connecticut General case held that the remedy was not available, and those reorganization courts which considered the issue reached the same conclusion, most relying directly on that holding without engaging in further extended analysis. Recognizing the point to be close, we disagree.
Our disagreement is rooted in a belief that the Connecticut General court may not have framed the issue properly. As said in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 170, 67 S.Ct. 237, 243, 91 L.Ed. 162 (1946),
Putting the wrong questions is not likely to beget right answers even in law.
The Connecticut General court apparently viewed the availability of a Tucker Act remedy as depending on whether the "Congress intended that the financial obligations of the United States be limited to the express terms of the Act." Subsequently, Judge Fullam, a member of the Connecticut General court, put the issue in the 180-day decision in In re Penn Central Transportation Co., 382 F.Supp. 851, supra, here under review, as being whether in adopting the Act "Congress had intended to permit recourse to a Tucker Act remedy in the event that implementation of the [Act] proved violative of constitutional rights . . .", apparently requiring an affirmative showing of such intent. If that were the true issue, we would agree that affirmative intent cannot be found. But, as hereafter developed, the true issue is whether there is sufficient proof that Congress intended to prevent such recourse. The Act being admittedly silent on the point, the issue becomes whether the scheme of the Act, supplemented by the legislative history, sufficiently evidences a Congressional intention to withdraw a remedy that would otherwise exist.
The Tucker Act, 28 U.S.C. ง 1491, confers jurisdiction on the Court of Claims:
[T]o render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
If the United States eliminates or substantially impairs an owner's use of his property or requires him to convey it, there is a "taking," which gives rise to *940 a claim under the Constitution, whether or not the United States so intended. This is the teaching of United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and of other cases too numerous to require citation. The investors' claim here is that the Act does precisely this, by forcing a conveyance of certain rail properties to Conrail at less than fair compensation and by requiring loss operations to continue while the required proceedings are being prosecuted. Such claims would be cognizable in the Court of Claims as claims founded upon the Constitution, unless the Act by fair implication withdraws such jurisdiction. In order for this negative implication to prevail the evidence must be weighty since, as will subsequently be developed, several rules of construction operate to sustain that court's jurisdiction if a fair basis exists for doing so.
The strongest argument that Congress intended to withdraw the Tucker Act remedy that would otherwise be available is based on the existence of a set of provisions in the Act limiting the amount of certain obligations guaranteed by the United States that may be issued by USRA. The total amount of USRA obligations guaranteed by the Government which may be issued is limited to $1.5 billion, of which not more than $1 billion may be issued to Conrail and not more than $500 million may be used for acquisition purposes,[91] ง 210(b), except as this amount may be increased by a joint resolution of Congress. The only authorizations for appropriations are those contained in ง 210(f) โ appropriations to the Secretary of Transportation for such amounts as are necessary to discharge the obligations of the United States with respect to guaranteed obligations of USRA authorized by the Act โ and in ง 214 โ appropriations for expenses of the Secretary, the Rail Services Planning Office, and USRA. Such provisions, it is urged, are inconsistent with an open-ended liability in the Court of Claims.
The argument is reinforced by the limited nature of the powers conferred on this court by ง 303(c) discussed in Part VI of this opinion. As there explained, if this court finds that the terms of exchange of rail properties for securities are not fair and equitable to any reorganized estate and cannot be cured by reallocation of Conrail securities (including authorized obligations of USRA) among the various estates, or by changing the amount or the mix of such securities, the only further tool available for us is to "enter a judgment against the Corporation." The manifold problems of such a judgment, previously analyzed, could have been avoided by allowing us to enter judgments against the United States, a potential remedy that Congress did not afford us. Putting the matter in another way, since this court would hardly direct the entry of a deficiency judgment against Conrail, with all its inherent difficulties, if inadequacy of the compensation could be cured by a judgment against the United States in the Court of Claims, Congress apparently did not intend the latter.
The Government parties and the Penn Central trustees seek to answer these contentions on the basis that Congress was so convinced of the constitutional adequacy of the Act, which made available some $2 billion of Government monies, that it never considered the possible need for a suit in the Court of Claims. This belief was expressly stated in the House Report at 54-55.[92] There is no *941 evidence in the text or scheme of the Act that if Congress had recognized possible constitutional inadequacy of compensation, it would have preferred that the Act be struck down, with consequent serious disarray, rather than that additional monies be expended to rectify the inadequacy. Congress clearly intended to meet the constitutional standard of fairness and equity, ง 303(c)(3), yet the only operative provision in this regard authorizes this court to reduce payments to the bankrupt estates if we find that these and other benefits "are fairer and more equitable than is required as a constitutional minimum." Id. We should not lightly assume that had Congress considered the problem, it would have placed itself in the morally indefensible position of affording redress if the final system plan provided too much but denying it if the plan provided too little.
The view that Congress did not intend to withdraw jurisdiction under the Tucker Act but simply failed to consider the issue is reinforced by reference to ง 601, entitled "Relationship To Other Laws." This section specifically declares that the antitrust laws are inapplicable to any action taken to formulate or implement the final system plan, ง 601(a) (2), that the Interstate Commerce Act and the Bankruptcy Act are inapplicable whenever inconsistent with the Act, ง 601(c), and that ง 102(2)(C) of the National Environmental Policy Act of 1969 shall not apply to any action taken under authority of the Act before the effective date of the final system plan, ง 601(b). Ten other sections of the Act rule out, in whole or in part, the applicability of various statutes.[93] Yet there is no provision withdrawing the jurisdiction of the Court of Claims, under its general jurisdictional statute, for any constitutional claim resulting from operation of the Act.
With the arguments premised on the general scheme and text of the Act thus somewhat in balance, those parties who contend that no Tucker Act remedy exists rely on two pieces of legislative history, one from each side of the Capitol. The one from the Senate side is quite equivocal. In explaining the Conferences Report, Senator Hartke, who was a Senate manager, said:
It we did nothing while continuing to mandate rail service, there is the distinct possibility in view of the prior action of Congress that a number of these people could make a claim against the Government which could be sustained in the Court of Claims.
119 Cong.Rec.S. 23,783-84 (daily ed. Dec. 21, 1973).
However, these remarks are not inconsistent with the view that the Senator was so convinced that the bill, as amended in conference, contained such adequate compensation provisions that a suit in the Court of Claims could not prevail, particularly in view of what he had characterized as a "rather slim" chance of the creditors getting their money through liquidation,[94] rather than as meaning that such a claim could not be maintained. On the House side, reliance is placed on a colloquy between two of the House managers on the Conference Committee in the debate on that Committee's report, 119 Cong.Rec. 11,876 (daily ed. Dec. 20, 1973), which we set forth in the margin.[95] Literally, *942 at least, this colloquy concerns only the deficiency judgment against Conrail, and the powers of this court โ not the residual power which the Court of Claims would possess unless this was explicitly or implicitly withdrawn.[96]
Battle over the weight to be given to statements on the floor of Congress, even by sponsors of legislation, has been waged for many years.[97] The banner of those favoring such use has tended to advance, if for no other reason than the frequent lack of other material illuminating Delphic enactments. But it is one thing to rely on such statements, often themselves of debatable meaning, when resolution of the issue will allow a statute to stand with one meaning or another, and quite a different thing when such reliance may cause the statute to fall. Apart from the principles of construing to avoid unconstitutionality or even serious constitutional doubt, which are hereafter discussed, such reliance in this case would amount to saying that the members of Congress who heard or read the statements and the many more who did not would have opted for a construction that entailed serious danger of imperiling many months of diligent and constructive Congressional effort on a problem of vital consequences to the nation rather than take the slightest chance of the courts being able to order a further payment by the United States in such amounts, if any,[98] *943 as would be necessary to save the statutory plan. We have been cited to no decision in which a court has resorted to statements on the floor of Congress in order to consign an ambiguous statute to destruction.[99]
If, as we believe, the Act can fairly be read as not withdrawing the remedy under the Tucker Act that would otherwise exist, even though a contrary reading might be somewhat more natural, several principles of statutory construction and at least one Supreme Court decision require us to adopt the former view.
One such principle is that repeals by implication are not favored. Graham v. Goodcell, 282 U.S. 409, 424-426, 51 S.Ct. 186, 75 L.Ed. 415 (1931); FTC v. A. P. W. Paper Co., 328 U.S. 193, 203-204, 66 S.Ct. 932, 90 L.Ed. 1165 (1946); Amell v. United States, 384 U. S. 158, 165-166, 86 S.Ct. 1384, 16 L.Ed. 2d 445 (1966). As recently said in Morton v. Mancari, 417 U.S. 535, 550, 94 S. Ct. 2474, 2483, 41 L.Ed.2d 290 (1974):
The courts are not [free] to pick and choose among congressional enactments and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.
A new statute will not be read as wholly or even partially amending a prior one unless there exists a "positive repugnancy" between the provisions of the new and those of the old that cannot be reconciled. Wood v. United States, 16 Pet. (41 U.S.) 342, 362-363, 10 L.Ed. 987 (1842); Mercantile National Bank v. Langdeau, 371 U.S. 555, 565-566, 83 S. Ct. 520, 9 L.Ed.2d 523 (1963). See Red Rock v. Henry, 106 U.S. 596, 601-602, 1 S.Ct. 434, 27 L.Ed. 251 (1882); United States v. Borden, 308 U.S. 188, 198-203, 60 S.Ct. 182, 84 L.Ed. 181 (1939); Fawcett v. Commissioner, 149 F.2d 433, 434 (2d Cir. 1945). This principle rests on a sound foundation. Presumably Congress had given serious thought to the earlier statute, here the broadly based jurisdiction of the Court of Claims. Before holding that the result of the earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the legislature's using language showing that it has made a considered determination to that end. See FTC v. A. P. W. Paper Co., supra, at 203-204, 66 S.Ct. 932.
A second body of principles relates to possible conflict between a statute and the Constitution. When a statute is ambiguous, "construction should go in the direction of constitutional policy," United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944), here the Fifth Amendment right of a person whose *944 property is taken to just compensation. When one admissible construction will preserve a statute from unconstitutionality and another will condemn it, the former is favored even if language, see Twenty Per Cent Cases, 87 U.S. 179, 187, 22 L.Ed. 339 (1873); American Communications Ass'n v. Douds, 339 U. S. 382, 407, 70 S.Ct. 674, 94 L.Ed. 925 (1950), and arguably the legislative history point somewhat more strongly in another way. As said in United States Civil Service Comm'n v. National Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973), a court's "task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." Indeed the same rule has been held to prevail even when a construction less favored but not excluded by the language and history will avoid a serious constitutional doubt. See United States v. Jin Fuey Moy, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061 (1916); Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 346, 48 S. Ct. 194, 72 L.Ed. 303 (1928); Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953).
Going further, the Government parties contend that Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932), "is even more directly in point and is . . . dispositive."[100] While the argument has a surface plausibility, analysis shows that the Court was not obliged to and did not face a problem so difficult as that which has arisen here.
Kincaid, an owner of land in the Boeuf River Basin brought a suit against the United States, the Secretary of War, and others, which sought to enjoin the construction of the Boeuf Floodway under the Mississippi Flood Control Act, 45 Stat. 534 (1928). He alleged that construction of the Flood-way would increase the depth of flood water on his lands, that the Flood Control Act required the Government to condemn or to otherwise acquire flowage rights over the property before proceeding with the project, and that starting work before acquiring such rights constituted a taking without just compensation in violation of both the Act and the Constitution. The district court found it unnecessary to reach the constitutional issue since it held that ง 4 of the Act required the Government to condemn or to otherwise acquire either Kincaid's property or rights over that property, before commencing construction of the floodway. It enjoined the defendants, with the exception of the Government which it earlier had held immune from suit, 35 F.2d 235 (W.D.La.1929), from continuing work on the project until compensation had been paid. 37 F.2d 602 (W.D.La.1929). The court of appeals affirmed in a short per curiam opinion, 49 F.2d 768 (5th Cir. 1931). The Supreme Court held that it was improper to have granted an injunction since Kincaid had an alternative remedy at law, an action for just compensation under the Tucker Act. The Court indicated that it was not material whether defendants had in fact violated their duty under the Flood Control Act to acquire flowage rights over Kincaid's land prior to construction of the project since the Fifth Amendment requires only that the individual be compensated after the taking, not before, 285 U.S. at 103-104, 52 S.Ct. 267.
Two sections of the Flood Control Act were directed to the question of damages *945 and of compensation for taking of land. Section 3 provided in part that:
. . . No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, That if in carrying out the purposes of this [Act] it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.
Section 4 provided in part that:
The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River. . . .
The Secretary of [War] may cause proceedings to be instituted for the acquirement by condemnation of any lands, easements, or rights of way which, in the opinion of the Secretary of [War] and the Chief of Engineers, are needed in carrying out this project, the said proceedings to be instituted in the United States district court for the district in which the land, easement, or right of way is located. . . . The provisions of sections [5 and 6 of the River and Harbor Act of July 18, 1918,] are [hereby] made applicable to the acquisition of lands, easements, or rights of way needed for works of flood control. . . .
The apparent strength of the case from the standpoint of the Government parties lies in the fact that the first part of the quoted portion of ง 3 seems to indicate that Congress did not intend to compensate the individuals whose property was damaged by floods, yet the Court ruled that the Tucker Act was still applicable so that Kincaid might receive compensation for any of his property that was taken by increased flooding from construction under the Act. However, when one considers the "no liability" provision in the context of the legislative history of the Act analyzed in detail in the margin,[101] it is clear that *946 the provision was not intended to apply to Kincaid's claim. There was a general consensus in Congress that property owners whose land was actually damaged as a result of the Project should be compensated for the value of what was taken, but a corresponding fear that, under the bill as passed by the Senate and as introduced in the House, the Government might be held liable for immense amounts of flood damage in the future even though this did not result from the reallocation of flood waters by the Project, and the "no liability" clause was inserted only to protect against this.
Viewed in the light of this legislative history, the Hurley case stands simply for the propositions that when there is a taking, the failure of Government officials to institute condemnation proceedings provided for in the statute authorizing the taking does not prevent an owner from suing under the Tucker Act,[102] and that he should be remitted to that remedy,[103] but not for the broader proposition apparently asserted here by the Government parties that in the absence of an express repeal of the remedy, even an expressed intention to avoid liability will not alone suffice to withdraw access to the Court of Claims.
While Hurley v. Kincaid thus does not provide the strong support for their position that the Government parties assert, such support is furnished by another Supreme Court decision not cited by them. This is Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), which Professor Henry M. Hart, Jr., correctly cited for the position that:
. . . where constitutional rights are at stake the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity, or of withdrawing jurisdiction, in order to defeat them.[104]
At issue in Lynch and its companion case, Wilner v. United States, were policies for yearly renewable term insurance issued during World War I pursuant to the War Risk Insurance Act of 1917, งง *947 400-405, 40 Stat. 409. The plaintiffs, beneficiaries of such policies, alleged that their insureds had been totally and permanently disabled before September 1, 1919, while the policies were in force; that under the terms of the policies the insureds were entitled to compensation sufficient to pay the premiums on the policies until they matured by death; that no such compensation had ever been paid; that the insureds had died respectively in 1924 and 1929; that the United States had refused payment; and that such refusal constituted a "disagreement" entitling the beneficiary to sue the United States in an appropriate district court under ง 405 of the Act as amended by subsequent legislation in 1924 and 1930, see 292 U.S. at 581 n. 11, 54 S.Ct. 840. The United States demurred on the basis of a clause of ง 17 of the Economy Act of 1933, 48 Stat. 11, a measure enacted in the depths of the Great Depression to limit government spending, which stated:
. . . all laws granting or pertaining to yearly renewable term insurance are hereby repealed . . . .
The Government prevailed in the district courts and the courts of appeals, 67 F.2d 490 (5th Cir. 1933), 68 F.2d 442 (7th Cir. 1934).
In a unanimous opinion by Mr. Justice Brandeis, the Supreme Court reversed, reasoning essentially as follows: The quoted provision was indeed intended to abolish the liability of the United States, 292 U.S. at 583, 54 S.Ct. 840, but, as applied to a government contract as distinguished from "the many grants of gratuities to veterans and dependents of veterans," id. at 585, 54 S.Ct. at 846, also repealed by ง 17, such action was a taking of property forbidden by the due process clause of the Fifth Amendment. Admittedly Congress was under no similar disability to withdraw its consent to suit against the United States. But Congress had failed to do this, as indeed was unnecessary with respect to most of the other repeals effected by ง 17 where Congress could validly abolish the liability of the United States. While Congress was in error in not recognizing the distinction between its power to withdraw grants of gratuities and to abolish contractual rights, the Court would not read the statute as depriving holders of the latter of a remedy in the absence of a clear direction to that end.[105] In a passage particularly pertinent here, the Court said, 292 U.S. at 586, 54 S.Ct. at 846:

Fifth. There is a suggestion that although, in repealing all laws "granting or pertaining to yearly renewable term insurance," Congress intended to take away the contractual right, it also intended to take away the remedy; that since it had power to take away the remedy, the statute should be given effect to that extent, even if void insofar as it purported to take away the contractual right. The suggestion is at war with settled rules of construction. It is true that a statute bad in part is not necessarily void in its entirety. A provision within the legislative power may be allowed to stand if it is separable from the bad. But no provision however unobjectionable in itself, can stand unless it appears both that, standing alone, the provision can be given legal effect and that the Legislature intended the unobjectionable provision to stand in case other provisions held bad should fall. Dorchy v. Kansas, 264 U.S. 286, *948 288, 290, 44 S.Ct. 323, 68 L.Ed. 686. Here, both those essentials are absent. There is no separate provision in section 17 dealing with the remedy; and it does not appear that Congress wished to deny the remedy if the repeal of the contractual right was held void under the Fifth Amendment.
Translated into terms of this case, there is no separate provision in the Rail Reorganization Act dealing with the Tucker Act remedy, and it does not appear that Congress wished to deny this remedy if the Act should be held to involve a possible taking that would require the award of just compensation under the Fifth Amendment.
We therefore hold that the Act does not preclude relief in the Court of Claims.[106]

VIII. THE ADEQUACY OF THE REMEDY UNDER THE TUCKER ACT
Most representatives of investor interests contend that even if a suit under the Tucker Act remains open, the remedy is inadequate.
We shall deal in Section A with arguments on this score that would be applicable even if only a single railroad were here involved. Having considered these, we will then discuss in Section B the contention, raised especially by investors in the smaller roads, that it is particularly unfair or even unconstitutional to require them to accept, as part of the compensation for any property finally taken, securities of a combined corporation, with the consequence that they must look to the value of the entire enterprise rather than of the small segment on which they initially relied in making their investment. Finally, in Section C we will consider the special problem of the effect, or lack of effect, on the Court of Claims of our judgment with respect to the applicability of the Tucker Act.

A.
Most baldly put, the contention is that the Rail Reorganization Act is simply a condemnation statute masquerading under bankruptcy robes, and that if Congress wishes to condemn assets that are to be conveyed to Conrail, it must provide for payment in cash and then, if it chooses, for sale of the securities of Conrail to investors willing to buy them. The just compensation clause, it is argued, cannot be satisfied by a mix of securities, other benefits, and such additional cash as is needed to bring the total to the level of just compensation.
We are not certain that this would be so even if we were to accept the premise that the Act was simply an exercise of eminent domain under the commerce power. It is not apparent, as a matter of principle, why, when there is such uncertainty as to the value of what the owner gives, there must be absolute precision concerning the value of what he gets. The classic statement in Monongahela Navigation Co. v. United States, supra, 148 U.S. at 326, 13 S.Ct. at 526, said only that the compensation "must be a full and perfect equivalent for the property taken", without reference to its form. While in later cases the Court, citing Monongahela Navigation as authority for the proposition, has used such phrases as "the market value of the property at the time of the taking contemporaneously paid in money", Olson v. *949 United States, 292 U.S. 246, 255, 54 S. Ct. 704, 708, 78 L.Ed. 1236 (1934); "the full and perfect equivalent in money of the property taken", United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943); and the "full monetary equivalent of the property taken", United States v. Reynolds, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970), see also Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-474, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973), no Supreme Court case has ever turned on the question whether compensation other than money is an adequate form of compensation[107] Indeed, a contrary position is arguably inherent in the decisions that any special benefits to a property owner's other holdings should be taken into account in determining just compensation. In Bauman v. Ross, 167 U.S. 548, 584, 17 S.Ct. 966, 980, 42 L.Ed. 270 (1896), the Court, answering an argument that compensation may not be made in such "contingent and speculative benefits to arise in the future," pointed out that the damage done to the condemnee is similarly speculative, and that he is only entitled to be made whole. 167 U.S. at 584-587, 17 S.Ct. 966. See also Chesapeake & Ohio Canal Co. v. Key, 5 Fed.Cas. 563, 564 (No. 2649) (C.C.D.C.1829) ("the Constitution does not require that value should be paid, but that just compensation should be given."); United States v. 1000 Acres of Land, More or Less, in Plaquemines Parish, La., 162 F.Supp. 219, 221 (E.D.La.1958) ("[T]he Fifth Amendment does not require payment in money."); United States ex rel. TVA v. Indian Creek Marble Co., 40 F.Supp. 811, 819 (E.D.Tenn.1941) ("[T]he constitutional requirement has no reference to the form in which compensation shall be paid, whether in cash or in benefits incident to the use to which the property taken is put by the condemnor.")
In any case, we do not find it necessary to decide this question since we see no reason to disagree with the contention of the Government parties that in formulating a reorganization plan Congress may draw on both the bankruptcy and the commerce power to require a reorganization wherein the compensation investors receive consists of Conrails securities, USRA obligations and other benefits up to their full value and need depend on eminent domain, with concomitant cash payment, only for any shortfall. While the reorganization process provided in the Act goes beyond previous bankruptcy concepts, notably by not requiring voting by investor interests, the language of Continental Bank v. Chicago, Rock Island & P. Ry., 294 U.S. 648, 668, 671, 55 S.Ct. 595, 604, 79 L.Ed. 1110 (1935),[108] and the decision upholding the cram-down provision of ง 77, RFC v. Denver & Rio Grande Western R.R., supra, 328 U.S. at 531-533, 66 S.Ct. 1282, go far toward justifying this. Moreover, decisions sustaining ง 11(b)(1) and (2) of the Public Utility Holding Company Act show that Congress can require what amounts to a reorganization under the commerce power alone without awarding any compensation so long as investors receive fair and equitable treatment. North American Co. v. SEC, 327 U.S. 686, 707-710, 66 S.Ct. 785, 90 L.Ed. 945 (1946); American Power & Light Co. v. SEC, 329 U.S. 90, 106-107, 67 S.Ct. 133, 91 L.Ed. 103 (1946).
We would not wish, however, to rest our decision on what may seem to be semantics. The gravamen of the investors' *950 complaint is that, regardless of the label attached to these processes and no matter how carefully this court attempts to arrive at a fair and reasonably accurate estimate of the value of the compensation provided under the Act,[109] there will inevitably be some measure of uncertainty. Hovering behind the table is the ghost of the ICC's $87.50 per share projection of the likely post-merger value of the Penn Central stock that was exchanged for the New Haven Railroad's assets.[110]See New Haven Inclusion Cases, supra, 399 U.S. at 483-487, 90 S.Ct. 2054.[111]
Despite the understandable fears engendered by that unhappy experience, there appears to be no doubt that a bankruptcy court can constitutionally be vested with power to resort to its informed judgment in determining what constitutes satisfaction of the claims of creditors. Perhaps most in point is Wright v. Union Central Life Ins. Co., supra, 311 U.S. 273, 61 S.Ct. 196, 85 L. Ed. 184, upholding the Frazier-Lemke Act, as amended, (ง 75(s)(3)), which authorized farmers who defaulted on their mortgages to remain on the property for three years and then to have the opportunity to buy the land, free of the lien, at its appraised value. In Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 529-530, 61 S.Ct. 675, 687, 85 L.Ed. 982 (1941), which concerned a reorganization under then ง 77B of the Bankruptcy Act, the Court, though reaffirming the absolute priority rule of Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), and Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), stated:
So long as the new securities offered are of a value equal to the creditors' claims, the appropriateness of the formula employed rests on the informed discretion of the court.
And in RFC v. Denver & Rio Grande Western R.R. Co., supra, 328 U.S. at 517-524, 66 S.Ct. at 1294, the Court sustained a reorganization plan even though the Commission "did not make a finding that the cash value of the securities awarded the senior claimants as of the effective date of the plan equalled the face of the claims" since it gave what were deemed to be sufficient reasons for concluding that the compensation flowing to the various classes of bondholders for the rights surrendered by them was adequate in light of the full priority rule. Furthermore our valuation of the Conrail securities will not have to be made until Conrail has had some years of operating experience, see note 53 supra, and the Court of Claims might be free, see note 109 supra, to look at still later figures.[112]
For these reasons, as well as the implications of Bauman v. Ross, supra, we thus reject the contention that the Act *951 would be defective because the value of the consideration consisting of securities of Conrail (including USRA obligations) and other benefits would be the subject of estimate, even though any shortfall could be recovered in cash.

B.
Investors in several of the smaller lines argue that whether or not the foregoing analysis would be sound if Congress had here been dealing with only a single railroad, it does not justify compelling them to take, as total or partial compensation, securities of Conrail, which they expect to be essentially a continuation of Penn Central under another name.[113] Although, except for the Reading, the loss situation of the smaller roads is worse than Penn Central's,[114] the investors evidently believe their prospects of selling part or all of the lines to public authorities or other railroads to be sufficiently promising that they would prefer that course to inclusion in the Conrail System.[115]
While these investors place great reliance on St. Joe Paper Co. v. Atlantic Coast Line R.R., 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710 (1954), we find scant relevance in that case. Both the majority opinion and the dissenting opinion of Mr. Justice Douglas for three justices conceived the issue to be the proper construction of ง 77 of the Bankruptcy Act as applied to a proposal that reorganization should take the form of a merger with another railroad. Neither opinion questioned that Congress had the power to authorize the ICC to force such a merger as part of a plan of reorganization. Something is sought to be made of Mr. Justice Douglas' statement, 347 U.S. at 332, 74 S.Ct. at 592, that if only 1% of the security holders approved of the proposal, it was "difficult even to imagine a case where it would be proper" to apply the cram-down provision of ง 77(e). But we think the Justice was speaking of the statutory qualification that the cram-down could be invoked only when the court found rejection was "not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts . . ." rather than making a constitutional point.[116]
We see no reason to doubt the power of Congress to compel a unification of properties of insolvent railroads if it finds that course necessary to serve the public interest in continued rail service, provided that the security holders receive fair compensation. As Mr. Justice Douglas wrote in RFC v. Denver & Rio Grande Western RR., supra, 328 U.S. at 535-536, 66 S.Ct. at 1303, investors "by their entry into a railroad enterprise assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." They may fairly be taken to have assumed the further risk that future events might require that parts or all of their enterprise might have to be joined with other rail lines. In reporting the bill that became the Rail Reorganization Act, the House Committee noted that one of the causes of railroad bankruptcies in the northeast was the existence of a rail system with "duplicated lines" and "far greater capacity than is needed." House Report at 27. At least a partial solution for their problems thus might lie in *952 abandoning mileage with less favorable physical characteristics or heavy deferred maintenance, and concentrating traffic on more efficient track. Often this could not be done without consolidation. As the Committee indicated there were six railroads in bankruptcy in the northeast "and no one Court can restructure the entire system under Section 77." Hence the Act was designed "to accomplish a reorganization for the entire area, supplementing Section 77 of the Bankruptcy Act." Id. at 29.
The principle that a particular railroad may be required to make sacrifices in the interest of the railroad system as a whole goes back as far as the notable opinions of Mr. Justice Brandeis in The New England Divisions Case, 261 U.S. 184, 190-192, 43 S.Ct. 270, 67 L.Ed. 605 (1923), and of Chief Justice Taft in Dayton-Goose Creek Ry. v. United States, 263 U.S. 456, 44 S.Ct. 169, 68 L. Ed. 388 (1924). Two more recent lines of decision also furnish strong analogical support for the conclusion that Congress may constitutionally compel a union of assets of the bankrupt railroads in the northeast provided just compensation is afforded. The first is based on the holding in Group of Institutional Investors v. Chicago, M., St. P. & P. R. R., 318 U.S. 523, 558, 63 S.Ct. 727, 87 L.Ed. 959 (1943),[117] that owners of divisional mortgage bonds may be required to divest themselves of their separate liens and accept system mortgage bonds or even stock. This case is very much in point; indeed divisional mortgages often are the result of the previous union of railroads that were separately incorporated. The other line of decision consists of cases under the Public Utility Holding Company Act. There the courts not only sustained plans representing a distribution of a holding company's assets, e. g., In re Standard Gas & Electric Co., 151 F.2d 326 (3rd Cir. 1945), cert. denied, 327 U.S. 796, 66 S. Ct. 820, 90 L.Ed. 1022 (1946) (cancellation of notes and debentures of holding company in exchange for cash and common stock in five of the company's operating subsidiaries), but also plans whereby stock of a former holding company was exchanged for cash and stock in one operating subsidiary. Phillips v. SEC, 153 F.2d 27 (2d Cir. 1947) (preferred stock of holding company for common stock of subsidiary plus cash).

C.
Although we believe that the assurance of a remedy under the Tucker Act would render the processes of the Act fair and equitable,[118] we are not sure we can give that assurance. In discussing this issue we will begin as if the Connecticut General case had not been decided and introduce that decision at an appropriate point.
We start from the general proposition that a federal court, in this instance the Court of Claims, has not only the power but the duty to examine its own jurisdiction, whether or not the issue has been raised by the parties and even when they affirmatively consent to have the court consider the merits of the controversy. See Mansfield, Coldwater *953 & Lake Michigan Ry. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); Mitchell v. Maurer, supra, 293 U.S. at 244, 55 S.Ct. 162. It might seem to follow that although our decision on the applicability of the Tucker Act would estop the Government from questioning the jurisdiction of the Court of Claims, it could not prevent that court from itself raising the issue and deciding as it saw fit, subject, of course, to Supreme Court review.
In opposition to this, the Government parties point to Hurley v. Kincaid, supra, 285 U.S. at 104, 52 S.Ct. 267, Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 697 nn. 17 & 18, 703 n. 27, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and Malone v. Bowdoin, 369 U.S. 643, 647 n. 8, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962). In these cases the Supreme Court reversed judgments against Government officials because of the availability of a remedy against the United States in the Court of Claims. It is contended that these decisions would be in error if the Court of Claims were free to deny the existence of the remedy when the issue was presented to it. Of course, the Court of Claims would not do that in a case where the Supreme Court had spoken. However, the Government parties argue that the Court, in the cases cited, was expounding a general principle that equitable or other non-monetary forms of relief should be denied whenever, in the view of the court seized of the case, adequate compensation could be obtained in the Court of Claims. See e. g., Western v. McGehee, 202 F.Supp. 287, 293 (D.Md.1962). If the Government has successfully relied on its suability in the Court of Claims to block an otherwise meritorious action, it cannot be allowed to take a contrary position in the Court of Claims in view of the manifest injustice that would be involved; and it would be inappropriate to invoke a concept of "jurisdiction", "a verbal coat of too many colors", United States v. Tucker Trunk Lines, Inc., 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (dissenting opinion of Mr. Justice Frankfurter), when the real issue โ whether the Government has consented to be sued โ has already been decided by a competent tribunal.
Against this suggestion that notions of "jurisdiction" should not prevent a federal court which itself has jurisdiction from making a definitive decision that an action can be maintained in the Court of Claims, the indenture trustee, the bondholders and the ง 77 trustee in the CNJ case claim there is Supreme Court authority to the contrary, to wit, United States v. United States Fidelity & Guaranty Co., supra, 309 U.S. at 514-515, 60 S.Ct. 653. In that case the Choctaw and Chickasaw Nations of Indians had filed a claim for royalties due on certain leases in ง 77B bankruptcy proceedings of Central Coal and Coke Company in the District Court for the Western District of Missouri; the debtor filed an answer and a cross-claim; and the bankruptcy court, without objection having been made on the issue of jurisdiction, awarded judgment for the debtor with respect to its cross-claim. When the United States subsequently sued on behalf of itself and the Nations on the same claim in the District Court for the Eastern District of Oklahoma against the surety on the Company's royalty bond, the bankruptcy trustee and the Company's successor intervened and pleaded the Missouri judgment both as a bar and as a basis for recovery. The district court concluded that the Missouri judgment barred the claim against the surety and entitled the intervenors to recovery for the amount of the prior judgment. This holding was affirmed on appeal, 106 F.2d 804 (10th Cir. 1939). Before the Supreme Court, the Government conceded the correctness of the decisions below that the Missouri judgment barred recovery by the Nations but challenged their conclusion that it supported the grant of affirmative relief against them. The Court sustained the Government, saying:
Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void. The failure of officials to seek review cannot give *954 force to this exercise of judicial power. Public policy forbids the suit unless consent is given, as clearly as public policy makes jurisdiction exclusive by declaration of the legislative body.15 Chicot County Drainage District v. Baxter State Bank16 is inapplicable where the issue is the waiver of immunity.
15. Kalb v. Feuerstein, 308 U.S. 433, [60 S. Ct. 343, 84 L.Ed. 370] . . .
16. 308 U.S. 371, [60 S.Ct. 317, 84 L.Ed. 329] . . .
. . . . . .
309 U.S. at 514, 60 S.Ct. at 657.
We doubt that the United States Fidelity case eliminates the application of collateral estoppel when the suability of the sovereign is at issue. The Missouri bankruptcy court simply had made the erroneous assumption that it had jurisdiction to award judgment against the Nations; the prevailing party was seeking to enforce the judgment in another action; and this could not be done since the court that rendered the judgment had no competency to do so. ALI, Restatement of Judgments ง 7 (1942). It is not certain that the result would have been the same if a challenge to the jurisdiction of the Missouri court had been made and erroneously overruled and the decision had not been appealed. See id. ง 7 comment e and ง 10 and comment thereon, and Durfee v. Duke, 375 U.S. 106, 114 n. 12, 84 S.Ct. 242, 11 L. Ed.2d 186 (1963).[119] Even assuming that it would have been, it still does not follow that a decision by us in favor of applicability of the Tucker Act would not prevent a later contrary decision by the Court of Claims. Congress has vested the reorganization courts and this court on review with the duty of determining whether the processes of the Act are fair and equitable. Determination of the availability of the Tucker Act remedy is part of that task, and there is no reason to think that Congress intended a second bite on the issue of sovereign immunity.
Here, however, we have the contrary decision with respect to the Tucker Act by the Connecticut General court. This is at once a puzzlement and the hope of a solution. The puzzlement is that, subject to some qualifications we need not now develop, the Connecticut General court may also have estopping powers. The hope for a solution is this: If the Supreme Court on its review of Connecticut General should agree with our Tucker Act holding, the Court of Claims will abide by its ruling, and it is immaterial whether such observance would be a matter of collateral estoppel or respect for a binding precedent. If the Supreme Court should agree with the Connecticut General court, the Court of Claims would likewise be bound to follow the Supreme Court decision. As previously explained, we are molding our judgment so as to enable us to conform it to the Court's action. Only if the Court should not determine the Tucker Act issue would it be necessary for us to decide whether our ruling would have preclusive effect.

------------
For the reasons stated in this opinion and in the opinions of Judges McGowan and Thomsen dealing with other points, this court orders as follows:
(1) The orders in the matters of Penn Central Transportation Company, The United New Jersey Railroad and Canal Co. and other Secondary Debtors of Penn Central Transportation Company, Lehigh Valley Railroad Co., The Central Railroad Company of New Jersey, and The Lehigh and Hudson River Railway Company, that the Regional Rail Reorganization Act of 1973 does *955 not provide a process which would be fair and equitable to the estate of the railroad in reorganization be and they hereby are reversed and the causes are remanded for the entry of orders consistent with our opinions providing for reorganization under the Act;
(2) The orders in the matters of Reading Company and The Ann Arbor Railroad Company directing that reorganization shall proceed under the Regional Rail Reorganization Act of 1973 be and they hereby are affirmed;
(3) The effective date of paragraphs (1) and (2) is stayed until a further order of this court, to be made after final determination by the Supreme Court of United States Railway Association et al, v. Connecticut General Ins. Corp. et al., Richard Joyce Smith, Trustee of the Property of The New York, New Haven and Hartford Railroad Co. v. United States Railway Association, and Blanchette v. Connecticut General Ins. Corp., Nos. 167, 166 and 165 [jurisdiction noted, ___ U.S. ___, 95 S.Ct. 9, 42 L.Ed. 2d 32], provided, however, that during the period of the stay the reorganization courts whose decisions are cited in paragraph (1) of this order shall not dismiss the respective proceedings under ง 77 of the Bankruptcy Act, and, notwithstanding the stay, such decisions shall not have the effect of causing the respective railroads not to be "a railroad in reorganization" as defined in ง 102(12) of the Act; and
(4) This court reserves jurisdiction to modify its opinion and this order in light of the decision of the Supreme Court of the United States on the appeals cited in Paragraph (3).

APPENDIX A

Appellants, Appellees, Amici Curiae and their counsel
In re Penn Central Transporation Co., No. 74-8
Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., David J. Anderson, Special Litigation Counsel, and James F. Dausch, Dept. of Justice, Washington, D.C. (Rodney E. Eyster, Gen. Counsel, Jerome E. Sharfman, Stuart G. Meister, Michael T. Haley, Dept. of Transp., Washington, D.C., of counsel), for appellant United States of America.[1]
Fritz R. Kahn, Gen. Counsel, and Theodore C. Knappen, I. C. C., Washington, D.C., for appellant Interstate Commerce Commission.[2]
Lloyd N. Cutler, Marshall Hornblower, William R. Perlik, and Louis R. Cohen, Washington, D.C. (Wilmer, Cutler & Pickering, Barry E. Carter, William T. Lake, and J. B. Stephens, Washington, D. C., of counsel), for appellant United States Railway Ass'n.
Jordan J. Hillman, Senior Legal Counsel, United States Railway Ass'n, Washington, D. C., for appellant United States Railway Ass'n.
William F. Hyland, Atty. Gen., of N. J. and Kenneth S. Levy, Deputy Atty. Gen., of N. J., for appellant State of New Jersey.[3]
Edward J. Hickey, Jr., William J. Hickey, and Geoffrey N. Zeh, Washington, D.C. (Mulholland, Hickey & Lyman, Washington, D.C., of counsel), for appellant Railway Labor Executives' Ass'n.[4]
James L. Highsaw, and William G. Mahoney, Washington, D.C. (Highsaw & *956 Mahoney, Washington, D.C., of counsel), for appellant Congress of Railway Labor Unions.
Albert D. Brandon, Utility Counsel, and Mead J. Mulvihill, Jr., City Sol., City of Pittsburgh, Pittsburgh, Pa., for appellant City of Pittsburgh.
Charles A. Horsky, Brice M. Clagett, and W. Crosby Roper, Jr., Washington, D.C. (Covington & Burling, Washington, D.C., of counsel), and Paul R. Duke, and John F. DePodesta, Penn Central Transp. Co., Philadelphia, Pa., for appellees Penn Central Trustees.
Louis A. Craco, New York City (Willkie, Farr & Gallagher, Walter H. Brown, Jr., Thomas L. Bryan, Michael B. Targoff, Cornelius T. Finnegan III, and Rebecca T. Halbrook, New York City, of counsel), for appellee Institutional Investors Penn Central Group.
Frederic L. Ballard, Philadelphia, Pa. (Ballard, Spahr, Andrews & Ingersoll and Alan S. Fellheimer, Philadelphia, Pa., of counsel), for appellees Institutional Investors Penn Central Group and Certain Indenture Trustees.
Joseph Auerbach, Morris Raker, and Charles W. Morse, Jr., Boston, Mass. (James Wm. Moore, New Haven, Conn., and Sullivan & Worcester, Boston, Mass., of counsel), for appellee New Haven Trustee.[5]
Charles C. Parlin, Jr., New York City (Shearman & Sterling, Robert H. MacKinnon, and David L. Bleich, New York City, of counsel), for appellee First National City Bank, as Agent and Pledgee.
David Berger, Gerald J. Rodos, and Edward H. Rubenstone, Philadelphia, Pa. (David Berger, P.A., Philadelphia, Pa., of counsel), for appellee Penn Central Co.
Israel Packel, Atty. Gen., of Pa., Harrisburg, Pa., and Gordon P. MacDougall, Spec. Asst. Atty. Gen., Washington, D.C., for appellee Commonwealth of Pennsylvania.[6]
Brock Adams, Washington, D.C., and 29 Other Members of Congress, as amici curiae.
Joseph C. Davidson, Jr., New York State Dept. of Transp., Albany, N.Y., for New York State Dept. of Transp., as amicus curiae.
In re The United New Jersey Railroad and Canal Co. and Other Secondary Debtors of Penn Central Transportation Co., No. 74-12
Appellants United States, USRA, ICC, and New Jersey.
Appellee Commonwealth of Pennsylvania.
Richard G. Elliott, Jr., Wilmington, Del. (Richards, Layton & Finger, Wilmington, Del.; Proskauer, Rose, Goetz & Mendelsohn, and White & Case, New York City, of counsel), for appellee Michigan Central Railroad Co., secondary debtor.
William H. Ewing, Joseph J. Connolly, and Mitchell L. Bach, Philadelphia, Pa. (Goodman & Ewing, Philadelphia Pa., of counsel), for appellees The Connecting Railway Co., Fairfax Leary, Trustee of the property of The United New Jersey Railroad and Canal Co., John C. Kohl, Trustee of the properties of the Delaware Railroad Co. and The Philadelphia, Baltimore, and Washington Railroad Co.
Mark Willcox, Jr., and Herbert G. Schick, Philadelphia, Pa. (MacCoy, Evans & Lewis, Philadelphia, Pa., of counsel), for appellees Fairfax Leary, Trustee of the properties of The Philadelphia and Trenton Railroad Co., The Northern Central Railway Co., and Union Railroad Co. of Baltimore, Douglass Campbell, Trustee of the property of The Michigan Central Railway Co., and Robert Hellawell, Trustee of the property of The Pittsburgh, Youngstown & Ashtabula Railway Co.
Jerome K. Walsh, and E. Roger Frisch, New York City (Walsh & Frisch, New York City, of counsel), for appellees George W. Betz, Jr., Trustee of *957 the properties of Beech Creek Railroad Co., The Cleveland and Pittsburgh Railroad Co., Erie and Pittsburgh Railroad Co., and Penndel Co., Albert B. Huttig, Trustee of the property of The Cleveland, Cincinnati, Chicago and St. Louis Railway Co., and Robert W. Valimont, Trustee of the property of Pittsburgh, Fort Wayne and Chicago Railway Co.
William T. Finley, Jr., and Peter J. Levin, Washington, D.C. (Sharon, Pierson, Semmes, Crolius & Finley, Washsington, D.C., of counsel), for appellee Pennsylvania Co.
Donald M. Wilkinson, Jr., New York City (White & Case, P. B. Konrad Knake, Robert L. Clare III, and Edmond C. Gregorian, New York City, Chatz, Sugarman & Abrams, Chicago, Ill., Proskauer, Rose, Goetz & Mendelsohn, New York City, Morgan, Lewis & Bockius, Wolf, Block, Shorr & Solis-Cohen, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Winthrop, Stimson, Putnam & Roberts, Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., and Richards, Layton & Finger, Wilmington, Del., of counsel), for appellees Bankers Trust Co., American National Bank and Trust Co., of Chicago, The Bank of New York, The Fidelity Bank, First Pennsylvania Banking and Trust Co., Girard Trust Bank, Irving Trust Co., Manufactures Hanover Trust Co. of New York, Mellon Bank, N.A., and Wilmington Trust Co., secondary debtor indenture trustees and creditors.
In re Lehigh Valley Railroad Co., No. 74-11

Appellants United States, USRA, State of New Jersey, RLEA, and CRU.
Louis G. Feldmann, Hazelton, Pa., for appellants Greater Hazelton Community-Area New Development Organization, Inc., and Railroad Task Force for Northeast Region.
Appellee Commonwealth of Pennsylvania.
Oliver C. Biddle, Philadelphia, Pa. (Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Cravath, Swaine & Moore, Kelley, Drye, Warren, Clark, Carr, & Ellis, New York City, Morgan, Lewis & Bockius, Philadelphia Pa., and Sherman & Sterling, New York City, of counsel), for appellees Girard Trust Bank, Chemical Bank, Manufacturers Hanover Trust Co., The Fidelity Bank, and First National City Bank, as indenture trustees.
In re The Central Railroad Co. of New Jersey, No. 74-6
Appellants United States, USRA, State of New Jersey, RLEA, CRU, and ICC.
Appellee Commonwealth of Pennsylvania.
Roger C. Ward, Newark, N.J. (Pitney, Hardin & Kipp, Newark, N.J., of counsel), for appellee Manufacturers Hanover Trust Co., Indenture Trustee of the General Mortgage Bonds.
Jacob I. Goodstein, New York City, for appellee Bondholders Protective Committee (of the 3ผ% General Mortgage Bonds).
Stanley Weiss, Newark, N.J. (Dean R. May, Newark, N.J., on the brief; Richard B. Wachenfeld, Newark, N.J., of counsel), for appellee R. D. Timpany, Trustee of the Property of The Central Railroad Co. of New Jersey.
In re The Lehigh and Hudson River Railway Co., No. 74-10
Appellants United States, USRA, State of New Jersey, RLEA, CRU, and ICC.
Appellee Commonwealth of Pennsylvania.
In re Reading Co., No. 74-7
Appellant Commonwealth of Pennsylvania.
Edward Roberts, III, and William F. Sorin, New York City (Kelley, Drye, Warren, Clark, Carr & Ellis, and G. Clark Cummings, New York City of counsel), for appellant Manufacturers Hanover Trust Co. as Indenture Trustee. Appellees United States, USRA, and ICC.
Howard H. Lewis, Philadelphia, Pa. (Obermayer, Rebmann, Maxwell & Hippel, and Barry J. Hart, and Alfred W. Hesse, Jr., Lockwood W. Fogg, Jr., and William C. Jamouneau, Reading Co., *958 Philadelphia, Pa., of counsel) for appellees Trustees of Reading Co.
In re Ann Arbor Railroad Co., No. 74-9
William T. Finley, Jr., Peter J. Levin, and William C. Lieblich, Washington, D.C. (Sharon, Pierson, Semmes, Crolius & Finley, Washington, D.C., of counsel), and Frederick C. Nash, Detroit, Mich. (Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., of counsel), for appellant Detroit, Toledo and Ironton Railroad Co.
Edward Roberts, III, and William F. Sorin, New York City (Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, of counsel), for appellant Manufacturers Hanover Trust Co.
Appellees United States, USRA, and UCC.
Frank J. Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Solicitor Gen. of Mich., and Robert J. Taube, Asst. Atty. Gen. of Michigan, Lansing, Mich., for appellees State of Michigan and Michigan Pub. Service Comm'n.
Robert W. Warren, Atty. Gen. of Wis., and George B. Schwahn, Asst. Atty. Gen. of Wis., Madison, Wis., for appellees State of Wisconsin, Wisconsin Department of Trans., and Public Service Comm'n.
James F. Schouman, Dearborn, Mich., for appellee United Trans. Union.
Daniel J. Sweeney, Washington, D. C. (Belnap, McCarthy, Spencer, Sweeney, & Harkaway, Washington, D. C., of counsel), for appellee Green Bay & Western Ry.

APPENDIX B
UNITED STATES RAILWAY ASSOCIATION
2100 Second Street, S.W. Office of Public and
Washington, D.C. 20595 Governmental Affairs
Contact: (202) 426-4250
 FOR IMMEDIATE RELEASE
 August 22, 1974
 CONTACT: Bob O'Rourke
 STRATEGIC OPTIONS
 (ALTERNATE INDUSTRY CONCEPTS)

I. Concept: CONRAIL
Description: Merger of all bankrupt carriers into a unified system.
Major Justification: Follows the strict interpretation of the law; and the major thrust of the legislation to merge, then rehabilitate the bankrupt carriers. Offers the best potential for eliminating duplicative facilities and services of present bankrupt carriers.

II. Concept: EASTERN SEABOARD "FEEDER" SYSTEMS
Description: Conrail is organized and operated as a major regional line haul carrier, except that facilities along the eastern seaboard are spun off and formed into one or more terminal districts, or companies. This company(ies) would originate and terminate traffic for Conrail and the solvent carriers.
Major Justification: The eastern sea-board, especially the metropolitan areas of Philadelphia, Newark and New York represent a unique operating environment because (a) it is here that nearly all duplicative services and facilities of the potential Conrail carriers are located, (b) the freight operations of PC, RDG [Reading], and CNJ are interwoven with passenger services and (c) the Northeast Carridor [sic] passenger improvement program will restrict current patterns of through freight operations. These unique conditions indicate that perhaps the structure employed along the eastern seaboard should differ from *959 that applied to the bankrupt lines elsewhere.

III. Concept: MODERATE SIZED CARRIERS (Multi Conrail)
Description: Existing bankrupt properties and services are restructured into a number of moderate sized firms (one billion or less in revenue).
Major Justification: Economies in railroading are not dependent on firm size but upon joint use of track, terminals, run through train operations, etc. Bigger is not necessarily better, and competition is enhanced by having a number of smaller firms rather than one giant Conrail. The risk of a huge federally financed entity dominating the region is avoided. Also avoided is the creation of another Penn Central situation where the collapse of one firm undermines the region's rail transportation.

IV. Concept: CONTROLLED LIQUIDATION
Description: The solvent carriers assume most of the essential services presently provided by the bankrupt carriers. Other essential services (i. e., passenger, commuter, east coast terminals, etc.) are taken over by existing entities such as Amtrak, commuter authorities, or port authorities. USRA and other federal programs fund necessary transfers, rehabilitation and modernization so that solvent carriers can assume essential services that are financially weak and in order to preclude restricting services to those that can be privately financed.
Major Justifications: Head on competition between the present solvent carriers and a quasi-public carrier with access to government funding is unstable in the long term, especially since the quasi-public corporation will be the dominant carrier in the region.

V. Concept: SEPARATE FIXED PLANT ENTITY
Description: The fixed plant is separated from the operating company in (1) ownership, and (2) financing. In certain structures, the control of use of the fixed plant may also rest outside the operating company.
Major Justification: The major rehabilitation funding and the asset value of the bankrupts is in the fixed plant. The level of rehabilitation (repayment of past costs avoided) required and the possible payment of "real" money for the assets at some point in time makes Conrail viability uncertain. To protect government funding against this risk of default the law already sets up Presidential appointments as the majority of the Conrail Board for an unspecified (but lengthy) period of time. The more federal funding required, (the major uncertainty is creditor claims) the greater the risk of a permanent federal role. The objective of a fixed plant solution is to minimize (or eliminate) the government role in the operating company while still recognizing that substantial federal funding will require some "quid pro quo" public role in asset ownership.
McGOWAN, Judge:
This opinion is addressed to the pending appeals in respect of the so-called secondary debtors of the Penn Central system. The orders appealed from are those entered by the Section 77 reorganization court (Eastern District of Pennsylvania, Fullam, D. J.) under the second sentence of Section 207(b) of the Regional Rail Reorganization Act of 1973 (P.L. 93-236, 93rd Cong.), which became effective January 2, 1974, and which is hereinafter referred to as the "Act."
The secondary debtors are 15 corporations owned or controlled by Penn *960 Central.[1] The rail properties owned by them are under long-term lease to Penn Central and are operated by it as a significant part of its system, constituting, as they do, nearly 50% of the total route mileage operated by Penn Central.[2] No payments have been made by Penn Central to the secondary debtors under their respective lease agreements since Penn Central came under the jurisdiction of the Section 77 bankruptcy court on June 21, 1970. Neither have the Penn Central Trustees acted since that time either to affirm or to disaffirm the leases in question, as they are authorized by Section 77 to do, the reorganization court having extended indefinitely the time within which such an election is to be made.[3]
In July of 1973, the secondary debtors each filed separate petitions for reorganization under Section 77(a) of the *961 Bankruptcy Act, seeking reorganization as a part of or in connection with the plan of reorganization of Penn Central. Such petitions were approved, and the secondary debtors have been under the jurisdiction of the bankruptcy court since that time.[4] These actions by the secondary debtors followed upon the filing by Penn Central, earlier in 1973, of a reorganization proposal premised upon the termination of all rail operations and the disposition of all rail properties โ a proposal which evoked subsequent congressional response in the form of the Act.

I

A. The 120-day Proceedings

Section 207(b) of the Act provides in its first sentence that, within 120 days after its enactment, the reorganization court shall decide whether the railroad in its charge "is reorganizable on an income basis within a reasonable time under Section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by continuing the present proceedings than by a reorganization under this Act." In response to this mandate, the reorganization court having the secondary debtors in its care held hearings on these issues. Thereafter, in early May of this year, it made separate findings of fact as to each of the secondary debtors, and entered separate orders with respect to each.
In the case of 12 of such debtors, the order concluded that (1) the debtor is reorganizable on an income basis within a reasonable time under Section 77, and (2) the evidence available does not preponderate in favor of a finding that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under the Act. In the case of the three remaining secondary debtors, the orders stated only that "the record as a whole does not permit a decision at this time as to whether or not the debtor is reorganizable on an income basis within a reasonable time under Section 77" within the meaning of Section 207(b) of the Act.
The reorganization court filed a separate memorandum on May 2, 1974, in which it discussed the considerations prompting its orders. It rejected a contention by the Government that the finding of non-reorganizability which had been made as to Penn Central dictated a similar finding as to the secondary debtors. It concluded that it had jurisdiction to make the determination as to the public interest called for by Section 207(b).[5] With respect to the issue *962 of reorganizability, the court found the burden of proof to be on the opponents of reorganizability; approaching the matter in this way, it said that its approval of the secondary debtors' petitions for reorganization necessarily reflected a belief that they were probably reorganizable, and it purported to see differences between a lessor railroad and an operating lessee that held out special possibilities of reorganization on an income basis for the formerโpossibilities which there had not yet been adequate time to explore. No appeals were sought to be taken from these so-called "120-day orders" involving the secondary debtors.[6]

B. The 180-day Proceedings

The second sentence of Section 207(b) of the Act calls for a further determination by the reorganization court. It provides that within 60 days after the report, elsewhere required in the Act, of the Secretary of Transportation (which means within 180 days from enactment of the Act), the reorganization court shall decide whether its ward "shall be reorganized by means of transferring some of its rail properties" to the private corporation (Conrail) elsewhere created in the Act to operate the rail network contemplated by the final system plan. Section 207(b) goes on to say that, because of the "strong public interest" in the provision of rail service pursuant to such system plan, the reorganization court shall order reorganization under the Act "unless it (1) has found that the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by such a reorganization than by a reorganization under this Act, or (2) finds that this Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization in which case it shall dismiss the reorganization proceeding."[7]
The reorganization court for the secondary debtors responded to this further mandate by again holding hearings within the required time. Thereafter it entered separate orders in the case of each of the secondary debtors reciting that the Act does not provide a fair and equitable process, and that reorganization shall not be carried out under the Act. Each order was stayed pending final determination by the Special Court. As in the case of the 120-day proceedings, Judge Fullam again filed a separate memorandum, on July 2, 1974, which he described as in support of the findings and orders pursuant to the second sentence of Section 207(b). In that memorandum he referred first to his memorandum filed concurrently in the Penn Central proceeding stating the reasons why he had found the process of the Act not to be fair and equitable vis-a-vis the estate of that debtor. Those same reasons were said to justify the entry of similar orders in respect of each of the secondary debtors.
The memorandum went on, however, to discuss certain issues which it characterized as "uniquely applicable" to the secondary debtors. The first of these *963 was the contention by the secondary debtors that because they had earlier been found to be reorganizable under Section 77, they no longer met the Act's definition (ง 102(12)) of a "railroad in reorganization." Judge Fullam rejected this on the ground that the finding of reorganizability had not been accompanied by a finding that the public interest would be better served by reorganization outside the Act. The absence of such a finding made it necessary, in his view, to proceed to a determination as to the fairness and equity of the process.
The constitutional issues centering around the requirement that the secondary debtors take stock in payment for their properties were said to be substantially the same as in the Penn Central case, although Judge Fullam went on to note that to the extent a secondary debtor can show present profitability, or potential independent reorganizability, it might be entitled to have higher values for its properties recognized by the Special Court. This, however, was said to be a matter for the latter tribunal.
Judge Fullam next referred to a problem which he characterized as not directly before him, namely, the possibly differing treatment of non-bankrupt lessors of rail properties to Penn Central. He commented, however, that there appeared to be nothing in Section 303(c)(1)(A) of the Act necessarily requiring the application of different valuation standards to the properties of the secondary debtors, on the one hand, and the non-bankrupt lessors, on the other.
Lastly, Judge Fullam referred to the Act's provisions relating to the "Northeast Corridor" between Boston and Washington. He noted that certain of the secondary debtors own most of this trackage, and that the government in the proceedings before him had, on the question of Conrail's viability, alleged that it would be able to raise $500 million in cash by acquiring such properties and selling them to Amtrak. Absent any eminent domain power in Amtrak, Judge Fullam purported to "find it difficult to accept the theory that it is constitutionally permissible for the government to achieve that result by means of the [Act], without providing the present owners with cash or its equivalent." He concluded by saying that this particular aspect of the Act supplied a further reason, over and above those given in his Penn Central memorandum, for finding the process of the Act deficient in fairness and equity in the case of the affected secondary debtors.

C. Appeals from the 180-day Orders

Notices of appeal from the orders entered in the 180-day proceedings affecting the secondary debtors were filed by the United States of America and the United States Railway Association ("USRA"); the Interstate Commerce Commission; and the State of New Jersey, this last appeal being limited to the secondary debtor known as the United New Jersey Railroad and Canal Company.
In none of these three appeals was any challenge made to the findings by the reorganization court of the reorganizability under Section 77 of the twelve secondary debtors so found to be reorganizable. The errors claimed are directed to issues bearing upon the finding by the reorganization court that the Act does not provide a fair and equitable process โ issues which the reorganization court purported to decide by reference to its resolution of them in the Penn Central case.
There is some limited reference to issues said to be peculiarly applicable in the case of one or more of the secondary debtors. The State of New Jersey asserted that, to the extent that the court determined that the acquisition by Conrail and subsequent sale to Amtrak of the northeast corridor properties would violate the constitutional rights of UNJ, the court erred; and the notice of appeal of the United States and USRA makes the same claim. The notice of appeal of the latter appellants disclaimed any contention that non-bankrupt lessors *964 of rail properties to Penn Central can constitutionally be compelled to transfer such properties to Conrail on other than an eminent domain theory. They added, however, that the reorganization court was in error to the extent that "it be taken to have endorsed the argument that the treatment of Penn Central and secondary debtors under the Act must take into account the treatment of Penn Central non-bankrupt rail subsidiaries."
The briefing in this court of these appeals reflects the recognition by the parties of the significant degree to which issues raised by them are common to the Penn Central case and have now been resolved in Judge Friendly's opinion. The appellants relied mainly on their joint brief filed in the Penn Central appeal. As for the appellees, one brief was filed on behalf of all the secondary debtors, together with Pennsylvania Company, a Penn Central subsidiary holding debt and equity interests in certain of such debtors. Another brief was filed by trustees under mortgage indentures of the secondary debtors.
Each of these appellees' briefs in terms relied heavily, and without further discussion, on the joint brief filed in the Penn Central case on behalf of the institutional investors. Each did, however, go on to discuss questions that were conceived of as being peculiar to the secondary debtors. In like fashion, we do not in this opinion retrace the ground covered by Judge Friendly's opinion, issued simultaneously herewith. We turn, therefore, to the identification and disposition of those issues affecting the secondary debtors that are not disposed of by that opinion.

II
The salient difference between the secondary debtors and the operating railroads involved in the 180-day proceedings is the finding or reorganizability as to most of the former.[8] That difference is the pivot of most of the contentions made by appellees and which they characterize as presenting issues unique to the secondary debtors.[9]

A. The "Public Interest" Provision of Section 207(b)

1. The nature of the "public interest" finding.

Both the indenture trustees and the secondary debtors press arguments directed at the first sentence of Section 207(b) and asserting that the finding of reorganizability in the 120-day decision, without more, ended the proceedings under that section and left the secondary debtors free to pursue their Section 77 reorganizations. In the case of the indenture trustees, the argument is formulated in terms of the allegedly legislative nature of the determination contemplated by the "public interest" clause of the first sentence โ the kind of determination that, so it is said, is foreclosed to Article III courts by the constitutional separation of powers. If, so the argument goes, the reorganization court was thereby lacking in jurisdictional power to make that determination, the "public interest" clause drops out of the picture, leaving the finding of reorganizability standing alone. That being so, the terms of Section 207(b) with respect to the 180-day proceeding are such that the reorganization court cannot under that *965 section proceed further, and the issue of the fairness and equity of the Act's process is not reached.
It will be readily seen that, so articulated, this argument is the same as the jurisdictional challenge dealt with by Judge Friendly in his opinion; and the disposition he made of it there, adverse to the contention as presented, is dispositive of it here.
The secondary debtors themselves, although endorsing the position of the indenture trustees in this regard, pursue an alternative theory.[10] This is that, properly construed, the "public interest" clause of Section 207(b)'s first sentence is not to be taken as a separate substantive determination that the court must make, but is, rather, a legislative finding to the effect that, if reorganizability under Section 77 is found, continuation of that proceeding will better serve the public interest than reorganization under the Act. Appellees remind us that the reorganization court in its memorandum of May 2, 1974, recognized that the literal phrasing of the Act lends itself to this interpretation. Although that court went on to reject this reading, it is said to have erred in doing so, and to have missed the opportunity provided by that interpretation to lay to rest the serious constitutional problems otherwise created by the Act. These are the allegedly irrebuttable presumption that the public interest mandates reorganization under the Act, and the asserted violation of the uniformity requirement of the bankruptcy power caused by the statutory directive that Section 77 proceedings be dismissed unless reorganization is to take place under the Act.
The shaping of statutory construction to avoid an inconsistency with the uniformity requirement is, of course, rendered unnecessary by the treatment of this issue in Judge Friendly's opinion. As we conclude below, we do not think that the public interest presumption is in fact irrebuttable. We therefore do not see any necessity to read the language as appellees would have us do.
The secondary debtors make one further point, however, which is that their interpretation is the only means by which Section 207(b) can be squared with Section 102(12) of the Act. The latter section defines "railroad in reorganization" as "a railroad [in reorganization] which is subject to a bankruptcy proceeding and which has not been determined by a court to be reorganizable or not subject to reorganization pursuant to this Act as prescribed in Section 207(b) . . . ." We are told that a close and careful reading of this definition inescapably leads to the conclusion that a secondary debtor found to be reorganizable is no longer a "railroad in reorganization". Since 12 of the secondary debtors were so found to be reorganizable under the first sentence of Section 207(b), they could not be subject to the Act insofar as the latter is restricted by its own terms to "railroad[s] in reorganization."
This approach is said to reflect a patent congressional purpose to leave opportunities for reorganization under Section 77 unimpeded. Any reorganization plan under Section 77 must itself be found in the public interest, so the argument runs, and it could not be so if it was at odds with the final system plan under the Act. If Penn Central is itself reorganized under the Act, Conrail will have the power to acquire Penn Central's interest in the leased properties irrespective of whether the secondary debtors are reorganized under the Act or under Section 77. The goal of efficient rail service will not, therefore, be injured by the secondary debtors continuing under Section 77.
*966 We believe that this interpretation of the Act, although perhaps making grammatically consistent what is otherwise an inelegant exercise in draftsmanship, does violence to the logic and purposes of the Act.
The House version of the bill, as submitted to the Senate and, eventually, to the conference committee, stated:
Within sixty days after the date of enactment of this Act, each United States district court having jurisdiction over a railroad in reorganization shall make a finding as to whether or not, based on the financial condition and prospects for such railroad, it can be reorganized on an income basis under section 77 of the Bankruptcy Act. With respect to a railroad which is found not to be reorganizable on an income basis under section 77 of the Bankruptcy Act, the court shall enter an order to the effect that such railroad shall be reorganized in accordance with the provisions of this Act and those provisions of such section 77 not inconsistent with this Act, or the court may entertain a motion to dismiss the section 77 proceedings. In any case in which a United States district court does not make the finding referred to in the first sentence of this section with respect to any railroad in reorganization within the sixty-day period referred to in such sentence, such railroad shall be presumed to be a railroad with respect to which there is a reasonable likelihood that it can be reorganized on an income basis under section 77 of the Bankruptcy Act.
H.R. 9142 ง 301, 93rd Cong., 1st Sess. (as passed by the House of Representatives November 8, 1973) [hereinafter House Bill].
The House Bill defined "railroad in reorganization" as any railroad undergoing reorganization in a Section 77 proceeding. It then divided this category into "bankrupt railroads" (which were to receive Conrail common stock with a possible supplement of other securities), and "nonbankrupt railroads" (which had an absolute right to refuse to convey their properties, and which could only receive obligations other than common stock, in case they chose to convey). House Bill ง 303(d).
"Nonbankrupt railroads" were defined as:
. . . any railroad in reorganization which, pursuant to section 301 of this Act, is determined or presumed to have a reasonable likelihood of being reorganized on an income basis under section 77 of the Bankruptcy Act.
House Bill ง 102(6).
"Bankrupt railroads" were defined as those found to be not reorganizable under Section 77.
It thus is clear that the House version of the bill contemplated exactly what appellees argue is the meaning of the present Act โ that a railroad should be reorganized under the Act only if it was found to be not reorganizable under Section 77.
The bill as adopted by the Senate and sent to conference distinguished only between "railroad[s] in reorganization" and "profitable railroad[s]." "Railroad in reorganization" followed the House definition of "bankrupt railroad" in stating that:
"Railroad in reorganization" means a railroad which is subject to a bankruptcy proceeding and which has not been determined by a court to be reorganizable on an income basis within a reasonable time pursuant to Section 207(b) of this Act.
H.R. 9142 ง 103(12), 93rd Cong., 1st Sess. (as passed by the Senate, with amendments, Dec. 13, 1973) [hereinafter Senate Bill].
Section 207(b) of the Senate Bill provided:
Within 90 days after the adoption and release by the Association of the preliminary system plan pursuant to subsection (a) of this section, each United States district court or other court having jurisdiction over a railroad *967 in reorganization shall decide whether or not such railroad shall be reorganized by means of transferring some of its rail properties to the Corporation pursuant to the provisions of this Act. Because of the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act, each such court shall order that reorganization be proceeded with pursuant to this Act unless it finds (1) that the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by such a reorganization than by a reorganization under this Act, or (2) that reorganization under this Act is not possible on terms which would be fair and equitable to the estate of the railroad in reorganization. [emphasis added]
The Senate Report on the bill described the section as follows:
[The district] court shall direct reorganization under S. 2767[11]unless (1) it finds that the railroad is reorganizable on an income basis under section 77 of the Bankruptcy Act "within a reasonable time" and if it is reorganizable, that the public interest would be better served by an independent section 77 reorganization than by reorganization under this legislation or (2) it finds that "reorganization under this Act is not possible on terms which would be fair and equitable to the estate of the railroad in reorganization."
S.Rep. No. 93-601, 93rd Cong., 1st Sess. 28 (1973), U.S. Code Cong. & Admin. News, 1973, pp. 3242, 3268, (emphasis in the original).
On the floor of the Senate, Senator Hartke, Chairman of the Senate Committee on Commerce, which drafted the bill, stated the meaning of this provision of Section 207 as follows: Within 90 days after release of the preliminary system plan, a reorganization court will order a railroad in reorganization in the region to proceed in reorganization under the bill unless it finds; One, that such railroad is capable of income reorganization โif it would be in the public interest โor two, that such reorganization under the bill is not possible on terms which would be fair and equitable . . ."
Cong.Rec. S. 22481 (daily ed. Dec. 11, 1973).
It is thus clear that the Senate introduced the public interest provision with the deliberate intent of requiring a separate determination over and above the capacity of the debtor to be reorganized on an income basis within a reasonable time.
The conference report, which describes the bill as it was finally adopted by both houses, makes no mention of the insertion (at conference) of the public interest determination into the definition of a "railroad in reorganization." It describes the compromise wording of Section 207 as follows:
[T]he timing for decisions by the reorganization or other courts with regard to whether a railroad is reorganizable on an income basis or whether the "this Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization" has been modified. The conference substitute provides that, within 120 days after date of enactment, the reorganization or other court must decide whether a railroad in reorganization is reorganizable on an income basis within a reasonable period of time and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this bill. If the court decides that a railroad is not so reorganizable, the court is then required to order the *968 railroad to proceed with reorganization pursuant to the bill.
S.Rep. No. 93-664; H.R.Rep. No. 93-774, 93rd Cong., 1st Sess. 52 (1973), U.S. Code Cong. & Admin.News, 1973, pp. 3306, 3315 (emphasis added).
The wording of the conference report indicates that, as in the Senate version, mere reorganizability was not sufficient to create exemption from reorganization under the Act. The reorganization necessary for exemption had also to be in the public interest, a determination separate from the determination of mere reorganizability.
We find ourselves unable, therefore, to accept, for any of the reasons advanced by appellees, their contention that the finding of "public interest" must necessarily follow on a finding of reorganizability. We note also that such an interpretation would contravene the basic rule of statutory construction that language should not be treated as superfluous if a reasonable meaning is possible. See e. g., United States v. Menasche, 348 U.S. 528, 538-539, 75 S.Ct. 513, 99 L.Ed. 615 (1955); Platt v. Union Pacific R.R. Co., 99 U.S. 48, 25 L. Ed. 424 (1878); Parker v. United States, 448 F.2d 793 (10th Cir. 1971); Montgomery Charter Service, Inc. v. Washington Metropolitan Area Transit Commission, 117 U.S.App.D.C. 34, 325 F.2d 230 (1963); Tabor v. Ulloa, 323 F.2d 823 (9th Cir. 1963).
We believe that the proper interpretation of the Act is as follows:
1. Section 102(12), which defines a "railroad in reorganization," should be read in light of the House and Senate versions from which it came, and must be found to define a "railroad in reorganization" as a railroad subject to a bankruptcy proceeding that has not been determined by a court to be
a. "reorganizable" pursuant to the 120-day decision under 207(b) โ which would include both the income basis and the public interest criteria; or
b. not subject to the Act, pursuant to the 180-day decision under 207(b), because the Act would fail to provide a process that is fair and equitable.
2. The requirement in the 180-day order that certain reorganization proceedings be dismissed if the Act is found to be unfair and inequitable should be read as applying only to those railroads found not reorganizable on an income basis. In thus interpreting the Act, we note that the Senate bill makes no mention of possible dismissal of proceedings. The dismissal provision, added in conference, is clearly an incorporation of the House language, which originally read:
With respect to a railroad which is found not to be reorganizable on an income basis under section 77 of the Bankruptcy Act, the court shall entertain an order to the effect that such railroad shall be reorganized in accordance with the provisions of this Act and those provisions of such section 77 not inconsistent with this Act, or the court may entertain a motion to dismiss the section 77 proceedings.
House Bill ง 301.

2. The merits of the "public interest" finding.

There remains for consideration the correctness of Judge Fullam's resolution of the public interest issue in his 120-day decision. That decision was separated into three components: individual orders entered in each case, findings of fact in each case, and a memorandum opinion covering all of the cases together.
In the individual orders entered in each case involving a secondary debtor found to be reorganizable, Judge Fullam stated:
That the evidence available does not preponderate in favor of a finding that the public interest would be better served by continuing the present reorganization proceedings than by a *969 reorganization in accordance with the Regional Rail Reorganization Act of 1973; that the presumptions established by ง 207(b) of said Act have not been overcome; and that therefore, until further Order of this Court, the reorganization of the above-named Secondary Debtor shall be conducted pursuant to the Regional Rail Reorganization Act of 1973 as well as the pertinent provisions of ง 77 of the Bankruptcy Act.
These orders were presumably based upon the findings of fact in the individual cases. In those findings, Judge Fullam reviewed the conclusions of the Trustees of Penn Central, and, in some instances, the Report by the Secretary of Transportation, "Rail Service in the Midwest and Northeast Region." The Trustees' conclusions and, where mentioned, the Report were evidently viewed by Judge Fullam as tending to show the nature of the final system plan. They stated that at least some properties of each secondary debtor were expected or intended to be included in the final system. The Secretary's Report estimated "potential excess" trackage among the reorganizable railroads as ranging from about 50% for Connecting Railway's western lines to no potential excess for the Union Railroad Company of Baltimore. All of the Trustees' projections contemplated inclusion of at least 50% of the trackage of each secondary debtor.
Judge Fullam's findings also noted possible alternative uses of the trackage. For example, in the case of the Philadelphia, Baltimore & Washington Railroad Company, he stated:
PB&W's western rail lines could be a potentially attractive acquisition for some railroads operating west of Chicago and St. Louis because of the access these lines provide to the Pittsburgh gateway. Similarly, southern carriers may favorably consider the possible lease or acquisition of PB&W's western lines because of their access to the Chicago gateway.
It thus appears that at the time he made his finding that "the evidence available does not preponderate in favor of a finding that the public interest would be better served by continuing the present reorganization proceeding than by a reorganization in accordance with the Regional Rail Reorganization Act of 1973," Judge Fullam had considered both the utility of the lines to the final system plan, and possible alternative uses of those lines.
The dispute over the correctness of Judge Fullam's public interest findings stems from language in his memorandum of May 2, in which he considered all of the secondary debtors together. In that memorandum, Judge Fullam correctly noted that the comparison to be made "is between a ง 77 proceeding without resort to the Act, and a proceeding under ง 77 as supplemented by the Act," at 8 n. 2. He then stated:
Perhaps the clearest indication of Congressional intent lies in its allocation of the burden of proof on this issue. In the first place, if the Court finds that the public interest would be equally well served under either method of reorganization, the procedures of the 1973 Act must be chosen. The same result follows if the Court is unable to make a decision on the subject. Other portions of ง 207(b) provide:
". . . Because of the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act, each such court shall order that the reorganization be proceeded with pursuant to this Act unless it (1) has found the railroad is reorganizable on an income basis within a reasonable time under ง 77 of the Bankruptcy Act (11 U.S.C. ง 205) and that the public interest would be better served by such a reorganization than by reorganization under this Act . . . . If a court does not enter an order or make a finding as required by this subsection, *970 the reorganization shall be proceeded with pursuant to this Act. . . ."
Unquestionably, by this language, and by all of the provisions of the Act, including its preamble, Congress has expressed a decided preference for proceeding under the Act, rather than continuation of the ง 77 proceedings.
Stated otherwise, by placing the burden of proof upon those who argue for continuation of the ง 77 proceedings, while simultaneously failing to provide any standard by which a court might adjudge that course to be preferable, Congress has effectively deprived the court of any power to decide in favor of the ง 77 proceeding. [Id. at 8-9].
Appellees argue that Judge Fullam was in error when he stated that "by placing the burden of proof upon those who argue for continuation of the ง 77 proceedings, while simultaneously failing to provide any standard by which a court might adjudge that course to be preferable, Congress has effectively deprived the court of any power to decide in favor of the ง 77 proceeding." Appellees imply that a proper interpretation of "public interest," if applied by the district court, would have resulted in a finding that the public interest favored their reorganization outside of the Act.
As stated in Judge Friendly's opinion, the concept of "public interest" is not without meaning. We therefore find ourselves obliged to disapprove Judge Fullam's decision insofar as it rests upon his interpretation of the Act as discussed in the memorandum. Having made this determination, we would normally be inclined to reverse and remand for reconsideration in light of the correct standard. This Act contains, however, special time constraints, and because we find upon review of all the evidence that application of the correct standards would have resulted in the same ultimate result, we believe that the appropriate course is to affirm the 12 individual orders in which Judge Fullam stated that "the evidence available does not preponderate in favor of a finding that the public interest would be better served by a continuation of the present reorganization proceedings than by reorganization under the Regional Rail Reorganization Act of 1973."[12]
In determining the proper criteria for the public interest decision, we are aided by reference to the Senate Bill, in which the public interest decision was first set forth. In that bill, the district court was to review the "preliminary system plan" and then order reorganization pursuant to the Act unless it found that the railroad was reorganizable on an income basis within a reasonable time and that the public interest would be better served by a reorganization under Section 77 than under the Act or unless it found that the Act did not provide a process that was fair and equitable. It appears that under this procedure the district court was to weigh the value of the railroad to Conrail (as evidenced by the preliminary system plan) against the value to the public of having the railroad reorganized separately (such value including, for example, maintenance of competition and preservation of certain lines).
We believe that the determination required by the Act as adopted is the same as that contemplated in the Senate Bill, with the one modification that the district judge does not have, under the present Act, the "preliminary system plan" to guide his decision on the usefulness of the railroad to Conrail. This lack, however, merely places a greater burden on the railroads; it does not require a finding in favor of the Act. It is perhaps helpful to enunciate, by way of illustration, a situation in which the district judge would be justified in finding that the public interest favors reorganization solely under Section 77.
*971 Where, for example, a railroad (1) is reorganizable on an income basis so as to be competitive with Conrail (maintenance of competition is one of the goals of the final system plan, see ง 206(a)(5)); (2) its trackage is duplicative of trackage available to Conrail from other, non-reorganizable railroads; and (3) those parts of the railroad that would be abandoned should reorganization take place under the Act[13] are essential or important to certain interests in the affected areas, then we believe that the district court would be fully justified in ordering that reorganization take place outside of the Act.
We note that the situation described above is very like that found in the case of the Erie Lackawanna, in which the district court found that the public interest mandated reorganization outside of the Act, from which order no appeal has been taken. Most of the Erie's trackage is closely paralleled by lines belonging to Penn Central (or, occasionally, by tracks belonging to other roads, such as the Lehigh Valley, that were found to be not reorganizable). As to the need for competition, the Report of the Secretary of Transportation made it amply clear that, in several important areas, an operating, competing Erie would be highly desirable. See, e. g., Secretary's Rept. pp. 41, 53. The district court in the Erie reorganization heard extensive evidence on the public interest question from a wide range of parties, including the United States Department of Transportation, all of whom concluded that the public interest would best be served by a reorganization not under the Act. In such circumstances it seems obvious that a district court would be justified in finding that reorganization solely under Section 77 would better serve the public interest.
As Judge Friendly notes in his opinion, we agree with Judge Fullam's statement that the presumption of the public interest being better served by reorganization under the Act is a strong one. We also note, however, that the evidence introduced in the secondary debtor cases to show that the public interest requires reorganization solely under Section 77 is insufficient to rebut even a slight presumption. In seven of the nine cases in which the public interest finding is appealed, no evidence whatever was introduced to show that reorganization outside the Act would be in the public interest.[14] The only public interest argument that might be held to cover those cases was made during argument by the lawyer for the trustees, when he maintained that the possibility of reorganization outside of the Act was preferable because it would continue rail operations without requiring any compensation by Conrail โ thus presumably saving the taxpayers' money, strengthening Conrail, and leaving the secondary debtors in a more secure position. (Transcript of hearings before Judge Fullam, 11,355) We find this argument unpersuasive because it is clearly in the taxpayers' (and Conrail's) interest to have a viable system, and evidence has been introduced (in the Trustee's proposed plan and the Secretary of Transportation's Report) showing that a viable Conrail would be benefited by inclusion of these roads. As we have noted above, at least 50% of the trackage of each secondary debtor was slated for inclusion in the 15,000 mile system. Further, the secondary debtor investors are constitutionally guaranteed that their position will not be unduly weakened.
In two of the cases (Delaware and PB&W), affidavits were introduced containing public interest arguments. We set out the relevant portions of these affidavits *972 in full in the margin.[15] In addition, in the hearing on the Delaware there was testimony to the effect that the Delmarva peninsula would be better served by a reorganization outside the Act, because a road outside of Conrail would be more responsive to the interests of the community.
In reference to the arguments made in the Delaware case it appears to us that:
In the affidavit, points (a) and (b) are equally well satisfied by a Conrail based on the 15,000-mile system plan with the option (as USRA surely has) to take only the leasehold interest from the Penn Central rather than the fee from the leased line. Points (c), (d), and (e) simply state that it would be nice if the massive restructuring of the northeastern railroads were not necessary. The Delaware is, however, a railroad in reorganization, and Congress has determined that Conrail is the preferable means of solving an extremely serious problem. We believe that the reasons offered provide little support for *973 the argument in favor of reorganization outside of the Act. We are slightly more impressed by the testimony of Mr. Love (Tr. 11,679) that a "short-line" would be more responsive to community needs. This single opinion, however, unsupported by empirical data, seems to us totally insufficient to overcome the Congressional preference, expressed in the Act, for reorganization under the Act.[16]
Similarly, in the affidavit concerning the PB&W, arguments (a) through (e) are no less applicable to the results under the Act, and arguments (f) through (h) simply deplore the need for the Act.
By way of contrast, without passing on its sufficiency or insufficiency, we quote the summary of the public interest evidence introduced in the Erie Lackawanna proceeding:
The unanimous consensus of all interested parties, including 48 major business concerns appearing at the hearing, the United Transportation Union, Eastern District, the Brotherhood of Locomotive Engineers, the Port Authority of New York and New Jersey, the Mayor of Hornell, New York speaking on behalf of himself and 13 other municipalities in New York State, representatives of the Delaware & Hudson Railroad, representatives of the Pittsburgh & Lake Erie Railroad, the Chairman of the Board of Public Transportation of Morris County, New Jersey, representatives of the States of Pennsylvania and New Jersey, the Detroit, Toledo and Ironton Railroad Company, together with counsel for the United States Department of Transportation was that the public interest would best be served if EL were permitted to pursue its present reorganization under the Bankruptcy Act.
In re Erie Lackawanna Ry. Co., Order No. 234, April 30, 1974, at 12 (N.D. Ohio).
In conclusion, we find that the importance of these twelve lessors to a viable Conrail, and the Congressional preference for reorganization through Conrail, have not been outweighed by the extremely limited evidence offered in these cases to show a public interest in reorganization outside the Act. We therefore leave undisturbed Judge Fullam's finding that the evidence does not preponderate in favor of a finding that reorganization under Section 77 would better serve the public interest.

B. Fairness and Equity of the Ultimate Transfer

The fact that the financial health of the secondary debtors may be superior to that of Penn Central also forms the basis of claims that the transfer of rail properties contemplated in the Act will be particularly unfair to them. There are really two contentions.
The indenture trustees assert that some of the secondary debtors (they do not make clear precisely which)[17] are profitable in the sense that income attributable to their leased properties is sufficient to support their existing capitalizations.[18] The trustees of the *974 secondary debtors themselves make the more modest claim that, as Judge Fullam found, they are reorganizable on an income basis.[19] The Penn Central, with respect to which we have found the Act fair and equitable, is admittedly neither profitable nor reorganizable on an income basis. However, for the reasons developed below, we do not consider that these alleged distinctions call for a different result in the case of the secondary debtors.

1. Profitability.

The indenture trustees maintain that the secondary debtors are "profitable," and that application of the Act to such debtors is not within the bankruptcy power granted by Article I, Section 8, Clause 4 of the Constitution. This argument has as its legal base the district court opinion in In Re Missouri Pacific R. R., 93 F.Supp. 832 (E.D.Mo. 1950), aff'd sub nom. State of Texas v. Group of Institutional Investors, 191 F. 2d 265 (8th Cir., 1951), cert. denied, 342 U.S. 904, 72 S.Ct. 293, 96 L.Ed. 676, 342 U.S. 918, 72 S.Ct. 364, 96 L.Ed. 686, 343 U.S. 929, 72 S.Ct. 757, 96 L.Ed. 1339 (1952).
In Missouri Pacific, the district court was concerned with a plan of reorganization for the Missouri Pacific Railroad Company, the New Orleans, Texas & Mexico Railway Company (NOTM), and the International-Great Northern Railroad Company (I-GN). NOTM was a subsidiary of the Missouri Pacific. After seventeen years in bankruptcy, NOTM petitioned for discharge. It argued that there were five adverse factors influencing the status of NOTM, namely, "[the] bankruptcy of the debtor, bankruptcy of the parent, the length of the proceedings, the fact that NOTM credit is not generally eligible for investments by banks, trust and insurance companies, and the fact that credit agencies for rating railroad securities will not rate obligations of bankrupt railroads as eligible for bank investments." It offered a witness who testified that, if these adverse factors were removed, he would form a group to bid on $60 million of NOTM "refunding" bonds (to refund $40 million of existing debt and to provide $20 million of new debt). There was testimony that sale of the refunding issue would make NOTM able to meet its debts as they matured, and testimony disputing that conclusion.
The district court, considering the petition to have NOTM dismissed, stated that:
There is no doubt that the court has jurisdiction to dismiss the proceedings if it finds that the NOTM can pay or otherwise satisfy its matured obligations and be able to meet its debts as they mature.
The court's jurisdiction to dismiss the reorganization proceedings is not predicated on any specific provision of Section 77, but upon the inherent powers of the court, as a court possessing full equity powers to dismiss the proceedings when their purpose has been achieved.
* * * * * *
To keep a debtor which is able, or which can be become able by refunding, to meet its debts as they mature in a Section 77 proceeding would not be in accord with the policy of that Section and would be in violation of the Fifth Amendment.
93 F.Supp. at 857, 859.
The court held, however, that the testimony left too many uncertainties to constitute sufficient proof that NOTM, if discharged from bankruptcy, would in fact be able to meet its debts as they matured. The court emphasized both that the purported bid on the $60 million issue was rendered virtually meaningless *975 by the condition that the "adverse" circumstances be eliminated, and that no other witness had been brought forth to state unequivocally that he would be willing to purchase the bonds.
The Missouri Pacific case appears to stand for the proposition that when a company properly in bankruptcy proposes a plan under which it would be able, without reorganization, to pay its debts as they mature, it is within the power of the bankruptcy court, as a court of equity, to dismiss the reorganization and allow the debts to be satisfied under the alternative plan. Stated otherwise, when the purposes of the statute have been satisfied, there is no reason to continue with the statutory mode of resolution.[20]
Whatever the teaching of Missouri Pacific may be as to the reach of the bankruptcy power, the argument of the indenture trustees depends on the fact of "profitability." The reorganization court, however, made no findings of "profitability," and neither the findings of fact made by it nor any other evidence of record establishes "profitability." The approach founded upon Missouri Pacific is, therefore, unavailing.[21]
The financial health of the secondary debtors may conceivably be relevant to the fairness of the treatment they eventually receive in the final system plan. This court, accordingly, may perhaps be called upon at that time to deal with issues not unlike those tendered now. But the state of the present record does not admit of a conclusion by us that Missouri Pacific, or any other principle of law, requires us to gratify the desire of appellees to remove the secondary debtors here and now from the operation of the Act.

2. Reorganizability.

The principal thrust of the argument made by the secondary debtor trustees is that the finding of their reorganizability "highlights the condemnatory nature of the Act." Br. 15. As should be clear from Judge Friendly's opinion, we do not think it necessary in order to uphold the fairness of the Act to find that it will necessarily effect no compensable taking. Foreseeing a recovery for such *976 a taking in the Court of Claims, we have found in the case of the Penn Central that there is not sufficient certainty of a substantial taking to make resort to the Court of Claims unfair. We therefore construe the secondary debtor trustees' arguments as attempting to establish that there is such a sufficient certainty in their cases. We take their assertions of "condemnation" to be claims either that they must be paid for their properties entirely in cash, or that the transfer of such properties cannot fairly be effected except through normal condemnation proceedings.
It is first argued that the Act would certainly work a "condemnation" if the secondary debtors had in fact already proposed plans of reorganization, it being the trustees' further contention that if they will be able to do so in the future, they should not be treated any differently. We doubt that if the secondary debtors had happened to submit a reorganization plan to Judge Fullam prior to the Act's passage, this fact would significantly strengthen their claim of compensability only in cash. Suffice it to say that they did not do so, and that we must consider the case as it stands.
A more plausible alleged distinction from Penn Central rests simply on the secondary debtors' undisputed reorganizability: conversion into Conrail and USRA securities of the interests of investors in a railroad otherwise headed for liquidation is said to be less clearly a "condemnation" than a similar conversion of the interests of investors in a railroad which would otherwise continue on a reorganized basis. A difference is apparent; that it cuts in the trustees' favor is not so apparent. If anything, it might seem that the expectation of Penn Central investors of receiving cash from an imminent liquidation suffers a greater defeat under the Act than the expectation of investors in reorganizable railroads of receiving new securities in an ongoing entity.
The railroad trustees make the further argument that there will be unfair disparity between the treatment of the secondary debtors, on the one hand, and solvent lessors whose property is ordered transferred to Conrail, on the other. They assert that, as the government concedes, the only constitutional basis for transfers in the latter case is "condemnation under the Commerce Power," and apparently conclude that Congress must therefore have intended that the solvent lessors receive cash and they, securities. Even if we took this to be Congress's intent, and we need not now decide that it was, ample justification for a difference in treatment appears in the fact that only the secondary debtors have found it necessary to seek a reorganization and forgiveness of past debts under Section 77.[22]

III
We now consider the claim that the Act is unfair to investors in the secondary debtors because it works unconstitutional erosion of the value of their claims. There is a spirited exchange in the briefs submitted by the government parties and by the Penn Central trustees on the question of whether there is any such erosion as a result of the Act.[23]
The position of the government parties is that the estates of the secondary debtors consist primarily of the right to *977 receive from Penn Central either the rent stipulated in the leases or, in the event of their disaffirmance, an accounting for profits attributable to the leased assets. It it then concluded that no erosion of the value of these rights is occurring; and that, if anything, the opposite is true, since the chances of affirmance of the leases are improved by the prospect of what amounts to Penn Central's rehabilitation under the Act.[24]
On this question of whether some erosion of the secondary debtors may be occurring, we think the Penn Central trustees have the better of the argument. They point out that physical erosion of leased assets may be taking place, reducing the value of the lessors' reversionary interests and also their more immediate prospects in the event of disaffirmance. They add that with disaffirmance may come a claim by Penn Central against the secondary debtors for any loss attributable to leased assets. Most important, they emphasize that, to the extent that the estates of the secondary debtors consist of claims against Penn Central, for rent or otherwise, such claims will suffer the same reduction in value as do those of other creditors, all of whose claims must be satisfied out of the same "system assets."
In our view so much of that dispute as concerns the money claims of the secondary debtors is somewhat beside the point. Charges of the erosion of the value of these claims should perhaps have been made by the secondary debtors as creditors of Penn Central and in the course of the appeal in that case. Substantially identical claims were of course made there very ably by those creditors who did participate. In any event, insofar as the secondary debtors rely on the erosion of creditor claims against Penn Central, they fail to distinguish themselves in any way from the creditors with respect to whom the Act has been found in that appeal to be fair.
We think the question for us is whether erosion is unfairly caused by subjecting the secondary debtors to the process of the Act. The one brief that seems to have focused on this question is that of the secondary debtor trustees. They assert that "the Act appears to force [the secondary debtors] to await the disposition in the Final System Plan," suggesting that they would be better off if the Act did not prevent them from acting sooner, as by going forward with the sale or lease of their properties to profitable railroads. They overlook the fact that, even in the absence of the Act, such a redisposition of their properties would require the approval of the ICC, see 49 U.S.C. ง 5, and that this might not be forthcoming without considerable delay. And there is a greater obstacle here. In order to withdraw their assets from Penn Central's hands, the secondary debtors would have to secure permission on its behalf to abandon the leased lines. Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 144-145, 66 S.Ct. 937, 90 L.Ed. 1132 (1946); Smith v. Hoboken R. R. Whse., & S. S. Connecting Co., 328 U.S. 123, 129-130, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). Abandonment by Penn Central *978 is, however, barred by the Act pending the issuance of the final system plan, unless such abandonment is unopposed by any State or regional or local transportation authority and also gains the approval of USRA. ง 304(f).

IV
The secondary debtor trustees point out an apparent discrepancy in the treatment afforded under the Act to those secondary debtors who do, and who do not, own properties which form part of the Northeast Corridor ("NEC").[25] Those that do are assertedly subject to a forced transfer of their properties to Conrail solely to allow Conrail to re-sell or lease the same properties to the National Railroad Passenger Corporation (Amtrak). Unfairness is charged in that, for no apparent reason, railroads whose properties are thus destined under the final system plan for Amtrak are denied the opportunity to deal directly with potential purchasers, as those whose properties are destined for other profitable purchasers may do.
It seems clear that title to the NEC properties must pass through Conrail's hands even if it is on its way directly to Amtrak. The enumerated kinds of transfers which the final system plan may "designate" to be made by railroads in reorganization are transfers (1) to Conrail, (2) to a "profitable railroad" (a statutory term which does not include Amtrak), and (3) from Conrail to Amtrak (or a State or local transportation authority). ง 206(c). Transfers from railroads in reorganization directly to Amtrak are thus not among those contemplated by the Act. A reading of the statute which would neatly resolve the NEC problem would be one which allowed transfers directly to Amtrak simply to be omitted from the final system plan. We have rejected this possibility, however. Apart from the fact that such an omitted transfer would remain subject to the formidable ICC barriers which it is one purpose of the Act to bypass, see ง 304, we think it was clearly Congress's intent that all sales of the bankrupts' properties be encompassed within the plan. Only in that case could the overall fairness of outcome for the various estates be evaluated in the orderly fashion provided for in ง 303 of the Act. See also H.R.Rep.No.93-620, 93rd Cong., 1st Sess. 33 (1973) ("Rail properties of bankrupt railroads not conveyed to the corporation or another railroad are to be abandoned.")
The formality of the route which title takes will, however, be of less concern to the owners of NEC property than the answers to two more practical questions: (1) how are the terms of the sale of their property to be negotiated, and (2) what form of compensation will they receive?
As to the first of these questions, the statute explicitly makes Conrail the negotiator of any sales to Amtrak. ง 601(d)(1). Owners of properties going to profitable railroads are not necessarily better off in this respect, however. The statute is ambiguous, but apparently contemplates that offers made to other railroads will be controlled by USRA through the final system plan.[26] Whether *979 it represents a significant discrepancy in treatment or not, we think the substitution of Conrail for USRA as the negotiator of sales to Amtrak is adequately justified by Congress's wish to protect Amtrak, its creation and ward, from being forced to pay too dearly for the NEC properties.[27]
A distinct question is whether any cash attributable to sales to Amtrak might not pass through to the original transferors. Conceivably, the legislative intent might be fully satisfied by the special negotiation provisions described above, allowing the sales to Amtrak to be otherwise carried out in the same way as are the sales to other profitable railroads. In fact, however, there seems little escape from ง 206(d), which provides in relevant part as follows:
(d) Transfers. โ All transfers or conveyances pursuant to the final system plan shall be made in accordance with, and subject to, the following principles:
(1) All rail properties to be conveyed to the Corporation [Conrail] . . . shall be transferred in exchange for stock and other securities of the Corporation (including obligations of the [United States Railway] Association). . . .
(2) All rail properties to be conveyed to a profitable railroad . . . shall be conveyed in exchange for compensation from the profitable railroad.
. . . .
As noted above, we do not see any possibility of a "transfer or conveyance" to Amtrak which does not take place "pursuant to the final system plan" and after the intermediate step of a transfer to Conrail. It thus appears that while the compensation paid by other profitable railroads passes through to the transferors,[28] what the transferors of *980 property ultimately going to Amtrak receive must be encompassed within the phrase "stock or other securities of the Corporation (including obligations of the Association)."
Before further examining the difference of treatment mandated by ง 206(d), it might be well to inquire into the possible justifications for it. The most obvious purpose of the interposition of Conrail between NEC owners and purchasers is the one that the government has itself claimed for it in arguing the likelihood of Conrail's viability,[29] namely, that the sale to Amtrak will provide Conrail with badly needed cash. There are clear indications in the legislative history that Congress had this, among other things, in mind.[30] We wish to emphasize that we do not consider this a sufficient justification for the asserted discrepancy in treatment, nor do we consider the process of the Act "fair and equitable" insofar as the discrepancy rests solely on this justification. Conrail's need for cash does not in itself demonstrate why the cash should be raised uniquely out of the pockets of the NEC owners.
On the other hand, NEC and Amtrak itself are matters of particular and legitimate congressional concern, and there certainly are good reasons why Congress may have wished to interpose Conrail between the present and future owners of the NEC. Incorporating by reference the Secretary of Transportation's 1971 "Recommendations for Northeast Corridor Transportation," the Act makes it the duty of both Conrail and Amtrak to undertake improvements of the NEC properties "in order to meet the goal . . . [of] . . . improved high-speed passenger service . . . by the earliest practicable date."[31] Congress might well have thought it necessary, in order for Conrail to discharge this duty, that it become at least temporarily the owner of the properties in question.
Moreover, Conrail may not be merely a temporary owner. It may be found that a lease of the properties by Amtrak is to its best advantage. Indeed, the original House bill did not provide for purchase from Conrail at all, but only for lease from it.[32] One can see why Congress might prefer Conrail to the bankrupt railroads as Amtrak's landlord. A third and perhaps most likely possibility is that in view of the heavy multiple use of the NEC facilities, the best solution will be found to be some form of joint ownership by Conrail and Amtrak.[33] If this is to be the outcome, and if the relationship between the two entities is to be at all complex, time constraints upon USRA would alone seem to justify leaving the matter to subsequent resolution between Conrail and Amtrak, rather than attempting to dictate in the final system plan what joint interests Conrail is to take from the various present lessors and lessees[34] and what is to be left for sale by them.
*981 It might be objected that Conrail's interposition as owner of the NEC properties does not mean that the cash which it receives when it does dispose of them cannot be passed on to the original owners. The determination of how much is to be passed through would be complicated by any substantial delay in the disposition, however, as well as by any improvements Conrail had made in the interim. Furthermore, the interest which Amtrak ultimately takes โ if it is, for example, some kind of joint interest with Conrail โ may be totally dissimilar from the various lessor and lessee interests which have to be compensated.
If Amtrak remains a lessee, of course, there will never be a lump sum to be passed through. A pass-through of rent is conceivable, but the transferors could be put in the same or better positions as recipients of Conrail securities.[35] Indeed, the all-encompassing nature of the latter term prevents us from concluding that the Act in fact prohibits a pass-through, for Conrail could give as "securities" its obligations to pass through whatever are the proceeds of its disposition to Amtrak. Assuming, as we do, that Congress meant to pass a fair statute, we do not hesitate to construe the term "securities" in such a way that fairness is achieved.
We are handicapped in this matter, as in others, by our inability to predict the contents of the final system plan. It may be, of course, that USRA or Conrail will use the authority to take and reconvey NEC properties purely to raise cash and without any such justifications as we have described being applicable. Still, we conclude that the process of the Act is not unfair to the NEC owners, and for these reasons:
First, as we have suggested, the inability of the NEC owners to receive cash for property which is actually sold to other railroads is really a matter of discretion with the USRA planners, who will specify what "securities" the NEC owners will receive. To some extent, all railroads under the Act are subject to that same discretion. There is no limit on what may be initially transferred to Conrail, and though the statute might be thought to prohibit such transfers for resale or lease to other profitable railroads, it specifically allows such transfers for re-sale or lease to "a State or a local or regional transportation authority." ง 206(c)(1)(D). In short, virtually any railroad could be thus made the victim of Conrail's need for cash.
Second, we anticipate that if USRA does in fact subject the NEC owners to what we consider an unjustified disadvantage, we will have the power to undo that unfairness in our review of the final system plan. We are given the power at that time to reallocate existing Conrail "securities," as well as to create new ones, and, as we have said, we are inclined to construe the term "securities" quite broadly in this context. We have the further power, moreover, to "enter a judgment against the Corporation" if unfairness is not otherwise curable. This may be the best use to which we can put this "curious" power, as Judge Friendly has called it. Should the final system plan contemplate Conrail's immediate resale of NEC properties to Amtrak, for example, we do not doubt our power to enter a judgment in favor of the NEC owners and against Conrail in the amount of the proceeds of such resale.

V
A final challenge to the fairness of the Act is made on the ground that the early date of the 120-day hearing denied the secondary debtors "an adequate opportunity to develop a complete record on the issues considered therein."[36] Once again, the claim of unfairness *982 is cast in terms of unconstitutionality. The secondary debtors contend that they will be denied due process by reason of the prejudice (i. e., reorganization under the Act), flowing from adverse findings on the issues of reorganizability and the public interest, when the lack of time makes a "meaningful" hearing on these issues impossible.
Judge Fullam made no specific reference to this matter in discussing his 180-day finding that the Act was unfair to the secondary debtors.[37] He did state in the memorandum issued in connection with his 120-day finding of reorganizability, and apparently in answer to a claim that the Constitution required an affirmative finding, that he was "inclined to agree with the contention . . . that requiring a finding on reorganizability by May 2, 1974 represents a violation of due process of law." (p. 25). Judge Fullam proceeded with the reorganizability finding, however, partly on the ground that his findings would in fact be affirmative.
The claim of inadequate time is made only by the secondary debtors. They allege that the statutory timetable is unfair as to them because: (1) they did not enter bankruptcy until July of 1973, whereas Penn Central had been in bankruptcy since 1970; (2) trustees were not appointed for the secondary debtors until March of 1974; (3) at the time of the 120-day hearing no action had been taken by Penn Central on the rejection or adoption of its leases from the secondary debtors; and (4) no severance studies with respect to the leased properties had been completed at that time. Br. Secondary Debtor Trustees 21.
The secondary debtors, so it seems to us, have somewhat overstated their difficulties. The absence of appointed trustees, for example, can hardly have prevented the various creditors from undertaking whatever preparation may have been necessary to protect their interests. Appellees have been tactful enough to complain of the delayed trustee appointments in the brief of the secondary debtor trustees, rather than in the brief submitted by the indenture trustees themselves, but the fact remains that in this and every other 207(b) appeal the creditors have been ably and independently represented. The secondary debtor trustees' brief is itself joined in by Connecting, which remains without a trustee by agreement of all interested parties. May 2 Memorandum, 835 p. 4, 382 F.Supp. 821 (E.D.Pa. 1974).
A somewhat stronger point is that the secondary debtors, unlike Penn Central, have not been in reorganization long enough to develop the kind of information that would be necessary in order for them to argue the issues of reorganizability and public interest effectively. We point out that, although Penn Central *983 has been in reorganization longer, no one had notice prior to the passage of the Act of what exactly would be the content of the 120-day findings. The secondary debtors were in reorganization well before that date. On the question of whether the public interest would be served by exclusion from the Act, no analogous question would have been addressed in the course of a reorganization proceeding no matter how long it had been going on, so that the secondary debtors do not in that respect appear to have been at all handicapped by their late arrival within the shelter of Section 77.
As for reorganizability, we note that twelve of the fifteen secondary debtors prevailed on this point. Only the remaining three can claim that they were prejudiced by an inadequacy of time, therefore, and this claim is dramatically weakened by the fact that their twelve coappellees have apparently managed quite well under the time constraint.
There is no denying that the task of the secondary debtors in the 120-day hearing was made difficult by their uncertainty over the fate of their leases to Penn Central and by the unavailability of completed severance studies, which, of course, are necessary to evaluate accurately the secondary debtors' prospects in the event of disaffirmance. If due process requires that Congress wait until these uncertainties are removed, however, Congress may have a very long wait. Final action on the leases must apparently await approval of the final system plan. Even in the absence of the Act, immediate action on the leases would only be tentative, since Section 77 allows a bankrupt lessee to reject a lease, even one previously adopted, when the lessee's final reorganization plan issues. Moreover, it seems doubtful that severance studies, the objective of which is to estimate the profitability of leased lines if operated in competition with the lessee's remaining operation, could be completed prior to the release of the final system plan.[38] We note finally that the debate over reorganizability is not likely to end with the completion of severance studies; the content and significance of these will no doubt be matters of considerable subsequent controversy.
We do not think that due process requires Congress to wait this long, or indeed any longer than it has waited in this Act. The question is whether Congress could provide, consistently with due process, that railroads in reorganization at the time of the Act's passage be reorganized under the Act unless their independent reorganizability, and the public benefit therefrom, could be made plain to the reorganization courts within 120 days. The answer must be found in the balance which due process always implies between the interests of those seeking a more "meaningful" hearing and the interests of the government in proceeding expeditiously with the action on which a hearing is sought.[39]
On the one hand, it should be clear from other parts of these opinions that we do not consider an adverse ง 207(b) finding and consequent inclusion in the Act to be as severe a burden as the secondary debtors apparently do. On the other hand, the government's interest in *984 proceeding to a swift resolution of the rail crisis seems to us a peculiarly compelling one. This matter of paramount national concern has been in a state of critical uncertainty for too long already, and, as the proponents of erosion have labored to point out, the situation may be growing worse every day. We cannot think that under these circumstances due process requires that the secondary debtors be given more than 120 days to establish their eligibility for escape from the Act.[40]
THOMSEN, Judge:
In dealing with the cases of the railroads covered by this opinion, it is unnecessary to repeat what has been said in the opinions of Judge Friendly and Judge McGowan with respect to the proper construction and constitutionality of the Regional Rail Reorganization Act (RRRA).

A.

In re Lehigh Valley Railroad Company (LV).
The main line of LV extends from Buffalo, N. Y., to Jersey City, N. J., via Pennsylvania. Significant branch lines serve various areas near the main line, notably in northeastern Pennsylvania. LV interchanges with other railroads at many points. Penn Central Transportation Company (PC) owns 97% of the stock of LV. Banks in New York and Philadelphia are trustees for the holders of bonds issued and outstanding under various mortgages, executed by LV, under which the bondholders have liens on most of its assets. A petition for reorganization under ง 77 of the Bankruptcy Act was filed by LV in the Eastern District of Pennsylvania and approved by that court on July 24, 1970.
On May 2, 1974, after a hearing, Judge Fullam of that court entered a memorandum, order and findings pursuant to the first sentence of ง 207(b) of RRRA, sometimes referred to as the 120-day order, in which he found and concluded, for reasons stated in the memorandum, that LV is not reorganizable on an income basis within a reasonable time under ง 77 of the Bankruptcy Act [11 U.S.C. ง 205], within the meaning of ง 207(b) of RRRA. Judge Fullam did not make a finding whether the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under RRRA. Because of the failure to make such a finding, and from the finding that LV is not reorganizable on an income basis within a reasonable time under ง 77, the Commonwealth of Pennsylvania appealed to this court. The Commonwealth also raised the question whether Congress had the power to delegate the "public interest" function to an Article III court.[1] This court dismissed the appeal from the 120-day order, noting that review of decisions under the first sentence of ง 207(b) would come if *985 and when an appeal was taken from the 180-day order (or non-order) under the third and fourth sentences of ง 207(b).[2]
The reorganization court held a further hearing in June, and on July 1, 1974, entered its 180-day order, in which it found and ordered that RRRA does not provide a process which would be fair and equitable to the estate of the debtor (LV), and that the reorganization of its estate shall not be carried out pursuant to RRRA.[3] In his memorandum accompanying the 180-day order, Judge Fullam stated that the reasons for this determination were essentially the same as those set forth in his corresponding memorandum in the PC case.
On appeal from the 180-day order in the LV case the government parties,[4] joined by the labor parties,[5] make the same arguments which the government and labor parties make in connection with their appeals in the PC case. They are opposed by the Commonwealth of Pennsylvania and by the Indenture Trustees.
The points raised by the government and labor parties are discussed in Judge Friendly's opinion. That discussion need not be repeated here.

(1)
The Commonwealth argues here, as it does in the PC and other cases, that the decision of the reorganization court should be affirmed, but for different reasons than those stated by Judge Fullam. The Commonwealth opposes the abandonment of unprofitable lines, arguing that a reduction in railroad capacity is not the solution to the problem, and contends that the railroads, including LV, are reorganizable on an income basis within a reasonable time under ง 77 of the Bankruptcy Act. It cites no evidence which would support such a conclusion, and we find the arguments without merit in this case.
With respect to the point raised by the Commonwealth on appeal from the 120-day order and repeated on this appeal, that the reorganization court erred in not making a "public interest" finding, we conclude that since that court decided in its 120-day order that the debtor could not be reorganized on an income basis within a reasonable time, it correctly held that there was no need for a finding as to whether the public interest would be better served by continuing the existing reorganization proceeding than by a reorganization under RRRA. Moreover, after considering the evidence produced at the hearing on the 180-day order as well as the hearing on the 120-day order and the arguments presented at the hearing before us on appeal from the 180-day order, we conclude that the public interest would be better served by reorganization under RRRA. USRA will consider the various possibilities provided by ง 206 of RRRA and select such one or more of them as it finds will best serve the public interest while preserving the legal rights of the bondholders and other creditors of the several debtors. The final system plan proposed by USRA will be reviewed by Congress and by this court.
The Commonwealth also argues that ง 207(b) is unconstitutional as applied in certain situations, because of the delegation by Congress of public interest matters to reorganization courts. We find no merit in this contention, for reasons fully discussed in Part I of Judge Friendly's opinion.
It is unnecessary to discuss here the contention of the Commonwealth that so much of ง 207(b) of RRRA as requires a reorganization court to dismiss proceedings under ง 77 of the Bankruptcy Act, *986 under certain circumstances set forth in ง 207(b), violates the requirement of uniformity contained in Art. 1, ง 8, cl. 4 of the Constitution. See Part III of Judge Friendly's opinion. Moreover, none of the reorganization courts ordered that the ง 77 proceeding be dismissed, and the question is now moot. Finally, we find no substantial difference between the standard used in ง 207(b) โ "reorganizable on an income basis within a reasonable time under section 77" โ and the standard โ "undue delay" โused in ง 77(g).

(2)
The Indenture Trustees argue that there has been unconstitutional erosion of the LV estate since June 1973, when a hearing was held on a petition filed by the Indenture Trustees in March 1973 for a cessation of operations and liquidation of the assets of LV. The law with respect to interim erosion has been fully covered in Part V of Judge Friendly's opinion. In answer to the Trustees' interim erosion argument, the government parties contend: (a) that there has been no interim erosion since June 1973; (b) that most of the erosion took place before the filing by LV in July 1970 of the original petition under ง 77; (c) that there has been no unreasonable delay; and (d) that the reorganization court did not make any finding of unconstitutional erosion. They conclude that no justification for an immediate liquidation has been shown. We find that contentions (b), (c) and (d) of the government parties are correct and, with respect to (a), that no such interim erosion as would justify liquidation at this time has been shown. See opinion of Judge Friendly, referred to above, for a discussion of the applicable law.

(3)
At the hearing before the reorganization court in June 1974, faced with creditors' objections to receiving Conrail stock, possible USRA obligations and a deficiency judgment against Conrail as consideration for the transfer of the LV rail properties, the Trustee of the LV estate argued that the LV estate could be compensated exclusively in government-guaranteed USRA obligations, either as a result of the final system plan or an order of this court. The reorganization court expressed grave doubt: (1) whether ง 303(c)(2)(A) of the Act permits the Special Court to reallocate USRA obligations from another railroad in reorganization, in the absence of a finding that the securities allocated in the plan to that railroad exceed the "constitutional minimum"; (2) whether, if USRA does not originally allocate all of the potential government-guaranteed obligations available to it, the Special Court may require that the unused obligational authority be exhausted, in the absence of congressional approval; and (3) whether the Special Court would do so. Those doubts are considered and answered in Parts VI, VII and VIII of Judge Friendly's opinion. Of course, both USRA and this court must follow the constitutional requirements of RRRA and other federal statutes, and cannot rob Peter to pay Paul.

(4)
Greater Hazelton Community-Area New Development Organization, Inc., and the Railroad Task Force for Northeast Region (of Pennsylvania) support the arguments made by the government parties, and argue that the public interest in implementing the Act outweighs any foreseeable burden on LV investors. They cite several provisions of RRRA in support of their argument, namely: (1) The reference in ง 207(b) to "the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act"; and (2) the statement in ง 206(a) that "[t]he final system plan shall be formulated in such a way as to effectuate the following goals," including:
* * * * * *
"(2) the establishment and maintenance of a rail service system adequate to meet the rail transportation *987 needs and service requirements of the region;
* * * * * *
"(4) the preservation, to the extent consistent with other goals, of existing patterns of service by railroads (including short-line and terminal railroads), and of existing railroad trackage in areas in which fossil fuel natural resources are located, and the utilization of those modes of transportation in the region which require the smallest amount of scarce energy resources and which can most efficiently transport energy resources;
* * * * * *
"(8) the minimization of job losses and associated increases in unemployment and community benefit costs in areas in the region presently served by rail service."
They call attention to the fact that LV serves an area in which fossil fuel natural resources, especially anthracite coal, are located, and to the efforts which community organizations have made to preserve and improve economic conditions in the northeast Pennsylvania area in the face of hurricane Agnes and other problems. The statutory provisions quoted above will, of course, be considered by USRA and Congress.

B.

In re Central Railroad Company of New Jersey (CNJ)
CNJ operates solely in New Jersey. Its operations are centered in the northern New Jersey metropolitan area, with lines running southerly and westerly. It provides freight service to industries in northern New Jersey and passenger service between Newark and Phillipsburg.
CNJ has wrestled with financial problems for decades and has been in reorganization before. Its present petition for reorganization under ง 77 of the Bankruptcy Act, filed in the District of New Jersey, was approved in 1967. Losses have continued to mount and CNJ has had a negative net worth for some years. The State of New Jersey has subsidized the passenger operations, but not sufficiently to make those operations profitable.
On April 30, 1974, after a hearing, the reorganization court entered its 120-day order in which it made findings pursuant to the first sentence of ง 207(b) of RRRA. The court found the conclusion "inescapable" that CNJ was not reorganizable on an income basis within a reasonable time. It, therefore, found it unnecessary to make a finding whether the public interest would be better served by continuing with proceedings for a reorganization of CNJ under ง 77 rather than by a reorganization under RRRA.
The Commonwealth of Pennsylvania appealed from that order on the identical grounds that it appealed from the 120-day order in the LV case. This court dismissed that appeal, noting that review of decisions under the first sentence of ง 207(b) would come if and when an appeal was taken from the 180-day order (or non-order) under the third and fourth sentences of ง 207(b).[6]
On June 28, 1974, after further hearings, the reorganization court entered its 180-day order, in which it concluded that RRRA does not provide a process which would be fair and equitable to the estate of CNJ. It construed ง 304(f) as compelling the railroads to continue operations pending the final conveyance of rail properties to Conrail, and concluded that RRRA does not provide adequate assurance that the estate of CNJ would be reimbursed for operational losses incurred during this interim period. The court found funds available under RRRA "woefully inadequate" to compensate *988 the railroads for the erosion which can be reasonably anticipated; that a suit against the United States in the Court of Claims under the Tucker Act is only a "mere possibility"; and, therefore, that ง 304(f) mandates a taking of the Debtor's property without just compensation in contravention of the Fifth Amendment.
On appeal from the 180-day order in the CNJ case the government parties and the labor parties make the same arguments which they make in the PC case. They are opposed by the Indenture Trustees of the General Mortgage Bonds of CNJ, the Bondholders Protective Committee and the Trustee of the Property of CNJ, who argue: (1) that the reorganization court's disposition of the application of ง 304(f) to CNJ was clearly correct; that any alternative disposition would have been improper, and, in any event, that appellants have not shown an abuse of discretion sufficient to justify reversal; and (2) that there was no assurance that CNJ's assets would not be unconstitutionally taken if CNJ were reorganized under RRRA.
The Commonwealth of Pennsylvania filed a brief in which it makes the same arguments it makes in the PC and LV cases.[7] It also refers to Chesapeake & O. Ry. Co. โ Control โ Western Maryland Ry. Co., 328 I.C.C. 684 (1967), as modified by order of February 23, 1968 (Finance Docket No. 23178), under which CNJ and Reading Company have each filed a petition seeking inclusion in the Chessie System.[8]
The legal principles which this court should apply in considering the arguments which have been made by various appellees in support of the 180-day order in this case are set out in Judge Friendly's opinion, particularly in Parts IV-VIII. The conclusion reached in that opinion โ that the process established by RRRA is fair and equitable, in that a Tucker Act remedy is available for any interim erosion which reaches unconstitutional proportions and for any compelled conveyance for a consideration found not to meet constitutional standards โdestroys the legal basis upon which the 180-day order is based.
Many of the arguments advanced by appellees are based upon legal premises which we have found not to be applicable. They also ignore important facts, e. g.: the long history of unprofitable operations both before and after the ง 77 proceedings were instituted in 1967; the fact that the parties who support the decision have been negotiating and are continuing to negotiate with the State of New Jersey to persuade it to take over or subsidize adequately the essential freight and passenger operations; and that there is no likelihood that the petition filed with the ICC for inclusion in the Chessie system will result in any favorable action in the near future, if ever.
Negotiations for the inclusion of part or all of CNJ in the Chessie system may be worked out under ง 206 of RRRA, apart from or in connection with the pending petition before the ICC. Such a sale to Chessie under ง 206 would provide cash or securities which could be used for the benefit of CNJ security holders and creditors. If the final system plan is not fair to the bondholders and other creditors of CNJ, it can be disapproved by Congress or modified by this court, and, as Judge Friendly's opinion shows, adequate compensation can be obtained for any loss suffered as *989 a result of interim erosion which exceeds constitutional limits or for a compelled conveyance under a plan which does not protect whatever constitutional rights CNJ security holders or creditors may have. The same is true of the negotiations with the State of New Jersey to take over or subsidize some or all of the operations. Those negotiations with various alternative possibilities can be continued pending the development of the final system plan by USRA. The suggestion that approval of abandonments could be more easily obtained from the ICC than under RRRA is disposed of in Part V of Judge Friendly's opinion.
Appellees object to the prospect of having the rail properties of CNJ subjected to a "forced merger" with other railroads to form Conrail. They cite St. Joe Paper Co. v. Atlantic Coast Line Railroad Co., 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710 (1953), and the decisions below in that case. This objection is carefully considered and disposed of in Part VIII-B of Judge Friendly's opinion.
Appellees argue that a government attorney conceded below that the level of assurances required by ง 207(b) must rise to a certainty and that the CNJ case, therefore, differs from the other cases in which no such concession was made. We do not find that the statements made by the government attorney, considered as a whole, amounted to such a concession. Moreover, the reorganization court did not rely on the claimed concession, but stated that it was "satisfied that the Act does not provide assurance of adequate protection against interim losses over an uncertain and lengthy period". Its conclusion was that 304(f) mandates a taking of CNJ's property without just compensation in violation of the Fifth Amendment, and so does not provide a process which would be fair and equitable to the estate of CNJ.
The opinion of Judge Friendly herein shows that adequate protection against possible unconstitutional interim erosion or deficiency in consideration for the transfer of rail properties is provided by the Tucker Act. We conclude that RRRA does provide a process which is fair and equitable to the estate of CNJ.

C.

In re Lehigh and Hudson River Railroad Company (L & H)
L&H is the only Class II railroad (i. e., one with annual revenue less than $5 million) involved in these cases. It operates some 100 miles of track in New Jersey, New York and Pennsylvania, which, in addition to serving local industry, provides a connecting link for traffic moving to and from the New England area. The stock of L&H is owned in varying amounts by LV and the Trustees of certain other railroads.[9] L&H has no bonds outstanding. On April 24, 1974, after a hearing in the ง 77 proceedings now pending in the Southern District of New York, the reorganization court issued its 120-day order in which it found that L&H is not reorganizable on an income basis within a reasonable time and that the public interest requires reorganization under RRRA.
The Commonwealth of Pennsylvania appealed from that order to the Second Circuit and to this court. As in the other cases, this court dismissed that appeal, noting that review of decisions under the first sentence of ง 207(b) would come if and when an appeal was taken from the 180-day order (or non-order) under the third and fourth sentences of ง 207(b).
On July 1, after a further hearing, the reorganization court entered its 180-day order, holding that for the reasons set forth in the decision of the three-judge court in the Connecticut General case, RRRA does not provide a process of reorganization which is fair and equitable to the L&H estate.
The government parties (see n. 5 above), the State of New Jersey and the *990 Railway Labor Executives' Association appealed to this court, and make essentially the same arguments which the government parties make in their other appeals. The Commonwealth of Pennsylvania attacks the 120-day order and supports the 180-day order for essentially the same reasons it asserts in the PC, LV and CNJ cases.
For the reasons stated in the portion of this opinion dealing with LV, including the references therein to the opinions of Judge Friendly and Judge McGowan herein, we find no merit in the contentions of the Commonwealth with respect to L&H

D.

In re Reading Company (Reading)
Reading operates 1,138 miles of track in eastern Pennsylvania and New Jersey, providing essential commuter and freight service.
Reading has been in reorganization under ง 77 of the Bankruptcy Act, 11 U.S.C. ง 205, since November 23, 1971. In each of the last five years its rail operation expenses have exceeded its rail operation revenues; these losses have been partially offset by non-operating income. Its financial situation is less desperate than that of some other railroads involved in these cases, but the reorganization court (Ditter, J.), found in the memorandum accompanying its 120-day order (the order called for by the first sentence of ง 207(b) of RRRA) that the trustees of Reading have explored all reasonably possible alternatives which would permit reorganization under ง 77 of the Bankruptcy Act, including: (1) the transfer of its commuter responsibilities and resulting losses to the Southeastern Pennsylvania Transportation Authority (SEPTA); (2) combination with other bankrupt carriers to create a profitable rail system, referred to for planning purposes as the Mid-Atlantic Railroad Company (MARC); (3) the abandonment of certain branch lines and marginal operations to create a "core" system that would be profitable;[10] and (4) acquisition of Reading by an existing profitable rail system. See note 11, below. The court concluded, for reasons stated in that memorandum, that Reading is not reorganizable on an income basis within a reasonable time under ง 77.
The reorganization court also found that if Reading is reorganized under RRRA, the advantages which that Act provides so far as funding employee benefits, permitting track abandonments, and interim financial support would be available to a consolidation of companies as envisioned by the MARC plan, or to rail systems such as Chessie or Norfolk and Western Railroad, which might acquire all or part of Reading.
The Commonwealth of Pennsylvania argues here, as it did below, that the Trustee has ignored the opportunity offered by the Interstate Commerce Commission for the merger of Reading into the Chessie system. The Commonwealth contends that Chessie is obligated to include Reading in its system and cites for its authority a decision by the ICC, Chesapeake & O. Ry. โ Control โ Western M. Ry., 328 I.C.C. 684 (1967), as amended by order of February 23, 1968. That decision, however, does not support the Commonwealth's contention.[11]
*991 The Commonwealth also argues that the reorganization court erred in not making a "public interest" finding. We conclude, however, that since the reorganization court decided in its 120-day order that the debtor could not be reorganized on an income basis within a reasonable time under ง 77 of the Bankruptcy Act, it correctly held that there was no need for a finding as to whether the public interest would be better served by reorganization under ง 77 than by reorganization under RRRA. Moreover, after considering the evidence produced at the hearing on the 180-day order as well as the hearing on the 120-day order and the arguments presented at the hearing before us on appeal from the 180-day order, we agree that the public interest would be better served by reorganization under RRRA. As we noted in the LV opinion, the United States Railway Association (USRA) will consider the various possibilities provided by ง 206 of RRRA and select such one or more of them as it finds will best serve the public interest while preserving the legal rights of the bondholders and other creditors of the several debtors. The final system plan proposed by USRA will be reviewed by Congress and by this court.
Whether Reading can be reorganized under ง 77 if RRRA is ultimately held to be unconstitutional, or if for some other reason it is not included in the final system plan, need not be decided at this time. See Paragraph (3) of the order entered today by this court, which is set out at the end of Judge Friendly's opinion.
Manufacturers Hanover Trust Company (MHTCo.), the Indenture Trustee, argues that the reorganization court incorrectly concluded that the process of RRRA would not be fair and equitable in only two situations โ where the ง 77 proceedings have practically been completed and the bankrupt is in a position to operate on a profitable basis, or where it is in such precarious financial position that it is useless and impossible to continue any longer despite whatever interim assistance might be granted by RRRA. MHTCo. argues that the Act is unconstitutional and not fair and equitable because, among other reasons, it could not have been known by July 1, 1974, what rail properties of Reading are to be transferred to Conrail or the nature and value of the consideration to be received in return therefor. Although the stated premises of this argument are true, the conclusion does not follow. The matter is fully covered by Judge Friendly's opinion. That opinion also considers and finds unpersuasive the other constitutional arguments advanced by MHTCo., including the arguments raised by the Indenture Trustees in the PC case and adopted in this case by MHTCo.
After giving full consideration (a) to the argument of MHTCo. that Reading is in such hopeless shape despite the relief offered by RRRA that its reorganization proceeding should be dismissed, and (b) to the argument of the Commonwealth that Reading is in such good shape that despite potential competition with a revitalized PC, it can reorganize on an income basis within a reasonable *992 period of time under ง 77, we agree with the conclusions reached by Judge Ditter.

E.

In re Ann Arbor Railroad Company (AA)
AA operates a freight line which extends from Toledo, Ohio, in a northeasterly direction to the Lake Michigan port of Frankfort, Michigan. It also operates a rail car ferry service between the port of Frankfort and the Wisconsin ports of Kewaunee and Manitowoc. This cross-lake operation is AA's largest single source of gross revenue; it also constitutes the major source of its losses. Its only branch line is six miles long.
Manufacturers Hanover Trust Company is the indenture trustee for AA's outstanding First Mortgage 4% Gold Bonds. Detroit, Toledo and Ironton Railroad Company (DT&I) owns virtually all of the outstanding common and preferred stock of AA. It also owns a substantial amount of the first mortgage bonds, and holds a second mortgage on certain AA property.
AA has suffered losses for many years and in 1973 petitioned the Eastern District of Michigan for reorganization under ง 77 of the Bankruptcy Act. On May 1, 1974, after a hearing, the reorganization court issued its 120-day order in which it found that AA is not reorganizable on an income basis within a reasonable time. The court found it unnecessary to reach the issue whether the public interest would be better served by reorganization under ง 77 than under RRRA. This interpretation is consistent with the view we expressed in Part (1) of our opinion in the LV case.
The reorganization court held a further hearing in June, and on July 1, 1974, entered its 180-day order. The court properly construed ง 207(b) as placing on parties opposing the reorganization of AA under RRRA the burden of establishing that RRRA does not provide a process that is fair and equitable to the estate. "Not being convinced that a fair and equitable process is not afforded" by RRRA, Judge Pratt found and ordered that AA should be reorganized under that Act.
Appeals from the 180-day order were taken by the indenture trustee and by DT&I; they are opposed by the government parties and by the State of Michigan, the State of Wisconsin, Green Bay & Western Railroad Co. and United Transportation Union.
Appellants adopt the arguments made by the "Institutional Investor and Indenture Trustee Appellees" in the PC case. Those arguments are dealt with in Judge Friendly's opinion herein. Appellants also make several additional arguments.
They argue that "to the extent, if any, that the Act constitutionally imposed the burden of evidence at the `180-day determination' upon parties opposing reorganization of the Ann Arbor under the Act, the District Court erred in applying that burden too stringently and in failing to hold that it had been discharged". We find no error in the reorganization court's ruling that having found that the railroad is not reorganizable on an income basis within a reasonable time under ง 77 of the Bankruptcy Act, ง 207(b) of RRRA places the burden on the parties opposing reorganization under that Act to show that it does not provide a process which would be fair and equitable to the estate of the debtor. We also agree with his ruling that the parties opposing reorganization of AA under RRRA had failed to meet that burden.
Appellants argue that the "reorganization court erred in failing to deal with the constitutional issues raised by the `180-day determination' and in failing to properly consider the effect on these issues of the holdings of the three-judge district court in Connecticut General Insurance Corp. v. United States Railway Association and companion cases". It is true that the reorganization court did not decide the constitutional issues which were before the three-judge court in the Connecticut General case.[12] Nor *993 did it ignore them. The court stated that the order of the three-judge court "does not halt the operation of the Act, nor even hinder the preparation of plans nor the continuation of procedures. Actually, the sections determined to be unconstitutional can be remedied by legislative action either before or after the Supreme Court review". It further noted that the three-judge court "did not, however, decide several constitutional issues which could have invalidated the entire Regional Rail Reorganization Act, e. g., the Fifth Amendment and due process issue relating to a permanent taking without just compensation, holding such issues to be premature. Its major determination was its conclusion that the Tucker Act remedy was not available to creditors or the estate and that, therefore, Sections 304(f) and 303 were unconstitutional in failing to provide a remedy for interim erosion."[13] These matters have been fully covered by Judge Friendly's opinion herein.
Appellants further argue that even if the process of the Act be viewed as a reorganization scheme rather than a taking, the Act fails to provide a constitutionally adequate prospect of reorganization which would justify further interim losses. As a subpoint, they argue that there is no assurance that all or even a substantial portion of the Debtor's estate will be included in Conrail, and thus, even if Conrail offered some prospect of viable reorganization, there is no assurance that Ann Arbor will not simply be required to sustain deficit operations for an indeterminate period pending the unveiling and approval of the final system plan, only to be left out of the new system altogether.
It has not been shown that there will be any greater erosion during reorganization under RRRA than there would be during reorganization under ง 77, especially in view of the assistance which may be available under ง 213 of RRRA; and, if there shall have been any unconstitutional interim erosion, an adequate remedy is available under the Tucker Act. For reasons stated in Judge Friendly's opinion, it is unlikely that approval of abandonments of unprofitable lines during the period required for adoption of the final system plan could be more easily obtained from the ICC than under RRRA.
In support of a general point that RRRA denies the estate and its claimants fundamental rights and protections essential to a constitutional "fair and equitable" reorganization procedure, appellants advance essentially the same arguments that were advanced in the PC case, as well as in some of the other cases, with respect to: interim erosion; the likelihood of successful reorganization; the claimed inadequacy of the consideration provided by RRRA by way of interim assistance and final compensation to remedy the claimed defects in its process; and the claimed failure of the Act to provide effective judicial supervision of the "reorganization process" and other safeguards essential to a fair and equitable reorganization process. These points have been adequately considered in Judge Friendly's opinion.
Finally, appellants argue that "[t]o the extent that Appellants may be required to accept a limited participation in Conrail in place of their specific investment in the property of the Debtor, the Act denies them a fair and equitable process". They cite St. Joe Paper Co. v. Atlantic Coast Line Railroad Co., 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710 (1953), and the decisions below in that case. Their argument is essentially the same as that made by the appellees in the CNJ case, and has been fully dealt with in Judge Friendly's opinion.
NOTES
[1] Approval โ Within 120 days after the date of enactment of this Act each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act. Within 60 days after the submission of the report by the Office, under section 205(d)(1) of this title, on the Secretary's report on rail services in the region, each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether or not such railroad shall be reorganized by means of transferring some of its rail properties to the Corporation pursuant to the provisions of this Act. Because of the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act, each such court shall order that the reorganization be proceeded with pursuant to this Act unless it (1) has found that the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by such a reorganization than by a reorganization under this Act, or (2) finds that this Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization in which case it shall dismiss the reorganization proceeding. If a court does not enter an order or make a finding as required by this subsection, the reorganization shall be proceeded with pursuant to this Act. An appeal from an order made under this section may be made only to the special court. Appeal to the special court shall be taken within 10 days following entry of an order pursuant to this subsection, and the special court shall complete its review and render its decision within 80 days after such appeal is taken. There shall be no review of the decision of the special court.

[The "Office" is the Rail Services Planning Office within the Interstate Commerce Commission established under ง 205 of the Act. ง 102(8). The "Secretary" is the Secretary of Transportation. ง 102(14). The "Corporation" is the Consolidated Rail Corporation established under ง 301 of the Act. ง 102(3)].
[2] Judge Fullam in the District Court for the Eastern District of Pennsylvania in the first three cases, Judge Augelli in the District Court for the District of New Jersey in the CNJ case, and Judge Ward in the District Court for the Southern District of New York in the L&H case.
[3] In re Penn Cent. Transp. Co., Bky. No. 70-347 (E.D.Pa., order July 1, 1974, mem. op. July 2, 1974); In re United New Jersey R. R. & C. Co. and Other Secondary Debtors of Penn Cent. Transp. Co., 382 F.Supp. 851 (E.D.Pa.1974); In re Lehigh Valley R. R., 854 F.Supp. 382 (E.D.Pa., 1974); In re Central R. R. of N. J., No. B.401-67 (D.N.J., June 28, 1974); In re Lehigh & H. R. Ry., 377 F.Supp. 475 (S.D.N.Y.1974). Judge Fullam's orders, which he stayed pending decision by this court, also contained a provision "that the reorganization of the estate of the Debtor shall not be carried out pursuant to the Regional Rail Reorganization Act of 1973." Since he regarded the requirement in ง 207(b) of dismissal of the ง 77 proceedings as unconstitutional under the uniformity clause, see his opinion in Connecticut Gen. Insurance Corp. v. United States Railway Ass'n, 383 F.Supp. 510, 530 (E.D.Pa., 1974), he made no order for dismissal. Judge Augelli also ordered that the CNJ not be reorganized pursuant to the Act but made no provision for dismissal. Judge Ward simply determined that the Act did not provide a fair and equitable process of reorganization and retained jurisdiction over the ง 77 proceeding "[u]nless and until the decision of the three-judge court [in the Connecticut General case] and the resulting order dated June 25, 1974, are reversed and vacated." In re Lehigh & H. R. Ry., supra, 377 F.Supp. at 476 (footnote omitted). No one has appealed from the orders on the ground of their failure to provide for dismissal.
[4] In re Reading Co., 378 F.Supp. 481 (E.D. Pa., 1974); In re Ann Arbor R. R., No. 74-90833 (E.D.Mich., July 1, 1974).
[5] Most public bodies (e. g., the State of New Jersey, the City of Pittsburgh, and the States of Michigan and Wisconsin) attack the orders refusing to direct reorganization under the Act or support those that do. The Commonwealth of Pennsylvania, taking a different course, attacks the order directing that reorganization of the Reading proceed under the Act and supports orders that the reorganization of the Penn Central, the Penn Central secondary debtors, the LV, the CNJ, and the L&H shall not. Differing positions have been taken by the various reorganization trustees. The court has received a brief as amici curiae from Representative Brock Adams, one of the draftsmen of the Act, and 29 other members of the House of Representatives, supporting the validity of the Act.

It will sometimes be convenient to refer to those supporting the view that the Act provides a fair and equitable process as "supporters" and their adversaries as "opponents".
[6] In re Litigation Under the Regional Rail Reorganization Act of 1973, 373 F.Supp. 1401 (Jud.Pan.Mult.Lit.1974).
[7] Judge Krupansky and Judge Murray.
[8] In re Erie Lackawanna Ry., No. B72-2838 (N.D.Ohio, April 30, 1974); In re Boston & Maine Corp., 378 F.Supp. 68 (D.Mass.1974).

The other reorganization courts also entered orders under the first sentence of ง 207(b). Except for some of the Penn Central Secondary Debtors, the railroads were found not to be reorganizable on an income basis within a reasonable time under ง 77. In re Penn Cent. Transp. Co., 382 F.Supp. 831 (E.D.Pa., 1974); In re Lehigh Valley R. R., 382 F.Supp. 842 (E.D.Pa., 1974); In re Central R. R. of N. J., No. B.401-67 (D. N.J., April 30, 1974); In re Lehigh & H. R. Ry., 374 F.Supp. 4 (S.D.N.Y.1974). In the first three proceedings, the reorganization courts declined to make findings as to whether the public interest would better be served by continuing the ง 77 reorganization than by reorganization under the Act because the respective judges viewed such findings as unnecessary unless the railroads in question had been found reorganizable under ง 77. Judge Ward in the L&H proceeding found both that that road cannot be reorganized on an income basis within a reasonable time and that "the public interest requires reorganization under the Act." Id. at 8. The rulings with respect to the Penn Central Secondary Debtors are stated in Judge McGowan's opinion.
Appeals were taken from the orders of the reorganization courts under the first sentence of ง 207(b) in the Penn Central, Reading, LV, CNJ, and L&H proceedings, but we dismissed those appeals for lack of jurisdiction, In re Penn Cent. Transp. Co., No. 74-3 (Spec.Ct., Regional Rail Reorg.Act of 1973, May 24, 1974), though acknowledging that the validity of the findings in those orders could be raised in the present appeals.
[9] Doubtless through inadvertence the Panel on Multi-district Litigation was not asked to consolidated the ง 77 proceeding of the Cadillac and Lake City Railroad, a Class II railroad within the region. Judge Engel, sitting by designation, made findings under the first sentence of ง 207(b) that that road was reorganizable on an income basis (indeed, an Administrative Law Judge of the Interstate Commerce Commission had given tentative approval to a plan of reorganization) and that the public interest would be better served by a continuation of the ง 77 reorganization than by reorganization under the Act. In re Cadillac & L. C. R. R., No. G 723 71 B 7 (W.D. Mich., June 29, 1974) (entered nunc pro tunc as of May 2, 1974).
[10] The Interstate Commerce Commission's authorization of the merger of the Pennsylvania and the New York Central railroads was sustained in Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 88 S. Ct. 602, 19 L.Ed.2d 723 (1968).
[11] See H.R.Rep.No.620, 93d Cong., 1st Sess. 29 (1973) [sometimes hereinafter cited as House Report]; Note, The New Haven Reorganization Proceedings, or The Little Railroad that Couldn't, 78 Harv.L.Rev. 861, 862 (1965).
[12] During the recent New Haven reorganization proceedings, Judge Anderson noted, in comparing the New Haven's reorganization under its petition filed in 1935 with the reorganization then before him:

The former reorganization, therefore dealt solely with the debt structure with a view to reducing the fixed charges to a level which could be met out of the net profits from the Railroad's operations. Today there are no net profits. Then, the very existence of the Railroad was not threatened; today it is. Then, the reorganization was mainly concerned with the interests of various classes of bondholders and preferred and general creditors; the present reorganization is concerned not only with safeguarding the rights of similar groups, but it is also vitally concerned with the public interest in preserving a transportation plant of major importance to the region in which it lies.
1 The New York, N. H. & H. R. R. Proceedings in the United States District Court for Connecticut 289-90, quoted in Note, the New Haven Reorganization Proceedings, supra, 78 Harv.L.Rev. at 863.
[13] This included the Emergency Rail Services Act of 1970, 45 U.S.C. ง 661 et seq. (1970), authorizing the Secretary of Transportation to guarantee up to $125 million in certificates issued by trustees of railroads in reorganization under ง 77 if he found, inter alia, that there was a threat of imminent cessation of essential rail services and that the only practicable means of meeting expenses necessary to continue such services was the issuance of such guaranteed certificates.
[14] The "Region" as defined by ง 102(13) also includes "those portions of contiguous States in which are located rail properties owned or operated by railroads doing business primarily in the aforementioned jurisdictions (as determined by the Commission by order)." The Commission has ordered that the "Region" includes:

Points in Kentucky in the Louisville, Kentucky, Standard Metropolitan Statistical Area as used in the latest national census; Points in Missouri in the St. Louis, Missouri, Standard Metropolitan Statistical Area as used in the latest national census; and
Kewaunee and Manitowoc, Wisconsin.
Northeastern Railroad Investigation, Definition of the Midwest and Northeast Region (Ex parte 293), 39 Fed.Reg. 3605 (1974).
[15] SEC. 206. (a) Goals. โ The final system plan shall be formulated in such a way as to effectuate the following goals:

(1) the creation, through a process of reorganization, of a financially self-sustaining rail service system in the region;
(2) the establishment and maintenance of a rail service system adequate to meet the rail transportation needs and service requirements of the region;
(3) the establishment of improved high-speed rail passenger service, consonant with the recommendations of the Secretary in his report of September 1971, entitled "Recommendations for Northeast Corridor Transportation";
(4) the preservation, to the extent consistent with other goals, of existing patterns of service by railroads (including short-line and terminal railroads), and of existing railroad trackage in areas in which fossil fuel natural resources are located, and the utilization of those modes of transportation in the region which require the smallest amount of scarce energy resources and which can most efficiently transport energy resources;
(5) the retention and promotion of competition in the provision of rail and other transportation services in the region;
(6) the attainment and maintenance of any environmental standards, particularly the applicable national ambient air quality standards and plans established under the Clean Air Act Amendments of 1970, taking into consideration the environmental impact of alternative choices of action;
(7) the movement of passengers and freight in rail transportation in the region in the most efficient manner consistent with safe operation, including the requirements of commuter and intercity rail passenger service; the extent to which there should be coordination with the National Railroad Passenger Corporation and similar entities; and the identification of all short-to-medium distance corridors in densely populated areas in which the major upgrading of rail lines for high-speed passenger operation would return substantial public benefits; and
(8) the minimization of job losses and associated increases in unemployment and community benefit costs in areas in the region presently served by rail service.
(b) Factors. โ The final system plan shall be based upon due consideration of all factors relevant to the realization of the goals set forth in subsection (a) of this section. Such factors include the need for and the cost of rehabilitation and modernization of track, equipment, and other facilities; methods of achieving economies in the cost of rail operations in the region; means of achieving rationalization of rail services and the rail service system in the region; marketing studies; the impact on railroad employees; consumer needs; traffic analyses; financial studies; and any other factors identified by the Association under section 202(b) of this title or in the report of the Secretary required under section 204(a) of this title.
(c) Designations. โ The final system plan shall designateโ
(1) which rail properties of railroads in reorganization in the region or of railroads leased, operated, or controlled by any railroad in reorganization in the region โ
(A) shall be transferred to the Corporation;
(B) shall be offered for sale to a profitable railroad operating in the region and, if such offer is accepted, operated by such railroad; the plan shall designate what additions shall be made to the designation under subparagraph (A) of this paragraph in the event such profitable railroad fails to accept such offer;
(C) shall be purchased, leased, or otherwise acquired from the Corporation by the National Railroad Passenger Corporation in accordance with the exercise of its option under section 601(d) of this Act for improvement to achieve the goal set forth in subsection (a)(3) of this section;
(D) may be purchased or leased from the Corporation by a State or local or regional transportation authority to meet the needs of commuter and intercity rail passenger service; and
(E) if not otherwise required to be operated by the Corporation, a government entity, or a responsible person, are suitable for use for other public purposes, including highways, other forms of transportation, conservation, energy transmission, education or health care facilities, or recreation. In carrying out this subparagraph, the Association shall solicit the views and recommendations of the Secretary, the Secretary of the Interior, the Administrator of the Environmental Protection Agency, and other agencies of the Federal Government and of the States and political subdivisions thereof within the region, and the general public; and
(2) which rail properties of profitable railroads operating in the region may be offered for sale to the Corporation or to other profitable railroads operating in the region subject to paragraphs (3) and (4) of subsection (d) of this section.
(d) Transfers. โ All transfers or conveyances pursuant to the final system plan shall be made in accordance with, and subject to, the following principles:
(1) All rail properties to be transferred to the Corporation by a profitable railroad, by trustees of a railroad in reorganization, or by any railroad leased, operated, or controlled by a railroad in reorganization in the region, shall be transferred in exchange for stock and other securities of the Corporation (including obligations of the Association) and the other benefits accruing to such railroad by reason of such transfer.
(2) All rail properties to be conveyed to a profitable railroad operating in the region by trustees of a railroad in reorganization, or by any railroad leased, operated, or controlled by a railroad in reorganization in the region, shall be conveyed in exchange for compensation from the profitable railroad.
(3) Notwithstanding any other provision of this Act, no acquisition under this Act shall be made by any profitable railroad operating in the region without a determination with respect to each such transaction and all such transactions cumulatively
(A) by the Association, upon adoption and release of the preliminary system plan, that such acquisition or acquisitions will not materially impair the profitability of any other profitable railroad operating in the region or of the Corporation, and (B) by the Commission, which shall be made within 90 days after adoption and release by the Association of the preliminary system plan, that such acquisition or acquisitions will be in full accord and comply with the provisions and standards of section 5 of part I of the Interstate Commerce Act (49 U.S.C. 5). The determination by the Association shall not be reviewable in any court. The determination by the Commission shall not be reviewable in any court.
(4) Where the final system plan designates specified rail properties of a railroad in reorganization in the region, or of a railroad leased, operated, or controlled by a railroad in reorganization in the region, to be offered for sale to and operated by a profitable railroad operating in the region, such designation shall terminate 30 days after the effective date of the final system plan unless, prior to such date, such profitable railroad has notified the Association in writing of its acceptance of such offer. Where the final system plan designates specified rail properties of a profitable railroad operating in the region as authorized to be offered for sale or lease to the Corporation or to other profitable railroads operating in the region, such designation and authorization shall terminate 60 days after the effective date of the final system plan unless, prior to such date, a binding agreement with respect to such properties has been entered into and concluded.
(5) All properties sold by the Corporation pursuant to sections 206(c)(1)(C) and 601(d) of this Act shall be transferred at a value related to the value received for the transfer to the Corporation of such properties.
(e) Corporation Features. โ The final system plan shall set forth โ
(1) pro forma earnings for the Corporation, as reasonably projected and considering the additions or changes in the designation of rail properties to be operated by the Corporation which may be made under subsection (d)(4) of this section;
(2) the capital structure of the Corporation, based on the pro forma earnings of the Corporation as set forth, including such debt capitalization as shall be reasonably deemed to conform to the requirements of the public interest with respect to railroad debt securities, including the adequacy of coverage of fixed charges; and
(3) the manner in which employee stock ownership plans may, to the extent practicable, be utilized for meeting the capitalization requirements of the Corporation, taking into account (A) the relative cost savings compared to conventional methods of corporate finance; (B) the labor cost savings; (C) the potential for minimizing strikes and producing more harmonious relations between labor organizations and railway management; (D) the projected employee dividend incomes; (E) the impact on quality of service and prices to railway users; and (F) the promotion of the objectives of this Act of creating a financially self-sustaining railway system in the region which also meets the service needs of the region and the Nation.
(f) Value. โ The final system plan shall designate the value of all rail properties to be transferred under the final system plan and the value of the securities and other benefits to be received for transferring those rail properties to the Corporation in accordance with the final system plan.
(g) Other Provisions. โ The final system plan may recommend arrangements among various railroads for joint use or operation of rail properties on a shared ownership, cooperative, pooled, or condominium-type basis, subject to such terms and conditions as may be specified in the final system plan. The final system plan shall also make such designations as are determined to be necessary in accordance with the provisions of section 402 or 403 of this Act.
(h) Obligational Authority. โ The final system plan shall recommend the amount of obligations of the Association which are necessary to enable it to implement the final system plan.
(i) Terms and Conditions for Securities. โ The final system plan may include terms and conditions for any securities to be issued by the Corporation in exchange for the conveyance of rail properties under the final system plan which in the judgment of the Association will minimize any actual or potential debt burden on the Corporation. Any such terms and conditions for securities of the Corporation which purport to directly obligate the Association shall not become effective without affirmative approval, with or without modification by a joint resolution of the Congress.
[16] SEC. 303(c). Findings and Distribution. โ (1) After the rail properties have been conveyed to the Corporation and profitable railroads operating in the region under subsection (b) of this section, the special court, giving due consideration to the findings contained in the final system plan, shall decide โ

(A) whether the transfers or conveyances โ
(i) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to the Corporation in exchange for the securities and the other benefits accruing to such railroad as a result of such exchange, as provided in the final system plan and this Act, and
(ii) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to a profitable railroad operating in the region, in accordance with the final system plan,
are in the public interest and are fair and equitable to the estate of each railroad in reorganization in accordance with the standard of fairness and equity applicable to the approval of a plan of reorganization or a step in such a plan under section 77 of the Bankruptcy Act (11 U.S.C. 205), or fair and equitable to a railroad that is not itself in reorganization but which is leased, operated, or controlled by a railroad in reorganization; and
(B) whether the transfers or conveyances are more fair and equitable than is required as a constitutional minimum.
(2) If the special court finds that the terms of one or more exchanges for securities and other benefits are not fair and equitable to an estate of a railroad in reorganization, or to a railroad leased, operated, or controlled by a railroad in reorganization, which has transferred rail properties pursuant to the final system plan, it shall โ
(A) enter a judgment reallocating the securities of the Corporation in a fair and equitable manner if it has not been fairly allocated among the railroads transferring rail properties to the Corporation; and
(B) if the lack of fairness and equity cannot be completely cured by a reallocation of the Corporation's securities, order the Corporation to provide for the transfer to the railroad of other securities of the Corporation or obligations of the Association as designated in the final system plan in such nature and amount as would make the exchange or exchanges fair and equitable; and
(C) if the lack of fairness and equity cannot be completely cured by reallocation of the Corporation's securities or by providing for the transfer of other securities of the Corporation or obligations of the Association as designated in the final system plan, enter a judgment against the Corporation.
(3) If the special court finds that the terms of one or more conveyances of rail properties to a profitable railroad operating in the region in accordance with the final system plan are not fair and equitable, it shall enter a judgment against such profitable railroad. If the special court finds that the terms of one or more conveyances or exchanges for securities or other benefits are fairer and more equitable than is required as a constitutional minimum, then it shall order the return of any excess securities, obligations, or compensation to the Corporation or a profitable railroad so as not to exceed the constitutional minimum standard of fairness and equity.
(4) Upon making the findings referred to in this subsection, the special court shall order distribution of the securities, obligations, and compensation deposited with it under subsection (b) of this section to the trustee or trustees of each railroad in reorganization in the region who conveyed right, title, and interest in rail properties to the Corporation and the respective profitable railroads under such subsection.
[17] In light of the many contrasts between this section and งง 211 and 215, we construe ง 213(a) as providing for grants rather than loans. John Ingram, Federal Rail Administrator in the Department of Transportation, agrees with this interpretation. Deposition of John W. Ingram at 99, In re Penn Cent. Transp. Co., 382 F.Supp. 831, supra.
[18] Although this definition is hard reading, we construe it to mean only such bankrupt railroads as are approved candidates for inclusion in the final system plan. See the discussion in Judge McGowan's opinion.
[19] The ง 211 loans are to be made "under such terms and conditions, and pursuant to such regulations as the Association deems appropriate." ง 211(c). Before granting a ง 211 loan, USRA must make various findings, including one that "the applicant has offered such security as the Association deems necessary to protect reasonably the interests of the United States." ง 211(e)(3). The Act provides that "[n]o such loan shall be made . . . to a railroad unless such loans shall, where applicable, be treated as an expense of administration." ง 211(a).
[20] It is common knowledge that one cause of the Penn Central debacle was the cost of complying with the protective conditions assumed in order to secure the acquiescence of labor organizations to the merger between the Pennsylvania and the New York Central. See Preliminary Report of Trustees Concerning Premises for a Reorganization 9, February 10, 1971, submitted by the Penn Central Trustees to the reorganization court, in which it was estimated that merger-related guarantee payments cost the Penn Central an extra $28 million in 1970. Reduction of these and other labor costs was one of the four prerequisites for viability of a smaller Penn Central system stated in this report.
[21] On the other hand the Act contains no provisions that would relieve Conrail of burdensome work rules with respect to labor that it retains. These were estimated by the Trustees to have cost the Penn Central $120 million in unnecessary labor expenses in 1970. Id. Some improvement has been seen in this area, however. See Trustees' Interim Report of January 1, 1973, at 3.
[22] The court also enjoined all parties from taking steps to enforce ง 207(b) insofar as it purports to require dismissal of reorganizations under ง 77, enjoined defendants USRA, Secretary of Transportation, Chairman of the ICC, Secretary of the Treasury, and United States from taking action to enforce ง 304(f) "with respect to any abandonment, cessation, or reduction of service which has been or may hereafter be determined by a court of competent jurisdiction to be necessary for the preservation of rights guaranteed by the United States Constitution," and further enjoined USRA from certifying to this court a final system plan pursuant to ง 209(c). USRA was not prohibited from continuing its work up to that point.
[23] Calculated from Trustees' Annual Reports to the Interstate Commerce Commission for the Year Ending December 31, 1973, Form R-1, Schedules 310 and 411 (for Class I railroads (those with operating revenues in excess of $5 million): Penn Central, Reading, LV, CNJ, and Ann Arbor), or Form C, Schedules 2001 and 2202 (for Class II railroad (operating revenues less than $5 million): L&H).
[24] The New Haven trustee also makes some point of the fact that the Act does not expressly require the district court to conduct a hearing on the determinations required under ง 207(b). Lack of hearing would go to the constitutionality of the process rather than demonstrate the absence of a case or controversy. In any event Congress had a right to assume that the district judges would act in a lawful manner and accord a hearing, as all did.
[25] The only party making such a challenge is the Commonwealth of Pennsylvania, which relies, particularly with respect to Penn Central, on the benefits to be derived from the 10% freight rate increase authorized in June 1974, of which more hereafter. While, as we later note, this has indeed brightened the prospects, there is no reason to believe that it alone will provide a basis for successful reorganization under ง 77. Even the Commonwealth admits that "the 10 percent freight rate increase is not the complete answer to Penn Central's difficulties." Brief for Appellee Commonwealth of Pennsylvania, Add. at 5, In re Penn Cent. Transp. Co., 382 F.Supp. 856, supra. As our subsequent analysis demonstrates, the viability of a major rail system in the region depends also upon substantial government assistance of the sort provided in the Act. The arguments of the Commonwealth with respect to other roads are discussed in Judge Thomsen's opinion.
[26] The McGrath decision also disposes of a related argument by the New Haven trustee based on the possibility that, despite our decision, a final system plan may never be developed or implemented. Interim grants under ง 213 and action under ง 215 would nevertheless ride on our decision, as would the continued operation of which the opponents complain. Beyond this no one, to our knowledge, has ever suggested that an Article III judge may not constitutionally approve a petition under ง 77 or Chapter X simply because the proceeding may never result in a consummated plan.
[27] The House bill, ง 301, did not provide for a special court; appeals from orders (or non-orders) with respect to reorganizability under ง 77 were appealable to the several courts of appeals, with consequent certiorari jurisdiction in the Supreme Court. The special court and the non-review provision originated in the Senate bill, ง 207(b). Although the Senate report does not explain the reason for this, it seems likely that the Senate was concerned with decisions on the facts relating to a particular railroad, since delay in review of this would interfere with early development of the final system plan, rather than with serious issues of constitutionality or the related question of availability of a remedy under the Tucker Act.
[28] Since this pair of adjectives has generally been applied to the substantive elements of a reorganization plan, see Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 114-119, 60 S.Ct. 1, 84 L.Ed. 110 (1939), and cases there cited, General Stores Corp. v. Shlensky, 350 U.S. 462, 466, 76 S.Ct. 516, 100 L. Ed. 550 (1956); United States v. Key, 397 U.S. 322, 327, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970); New Haven Inclusion Cases, 399 U.S. 392, 430 n. 59, 90 S.Ct. 2054, 26 L.Ed. 2d 691 (1970), so as to protect the interests of senior claimants over those of junior claimants during reorganization, rather than to procedure or "process," we must draw largely on our own judgment for their meaning as used in ง 207(b).
[29] Some opponents challenge this qualification on the ground that ง 207(b) charges us to look at the process provided in the Act and not at some other. But ง 604 is itself a part of the Act. Whether a particular provision comes within a fair interpretation of the separability clause is another matter.
[30] It is clear from the Conference Report that Congress intended that this court would examine factual issues in making this determination. In explaining the timing of the reorganization court orders here under appeal, the Report says:

The conferees decided that a decision within 180 days after the date of enactment would provide the planners with adequate time to make their planning decisions, while simultaneously providing the court sufficient information concerning the process of reorganization under this legislation. For example, before the court is required to order a railroad to proceed in reorganization pursuant to this legislation it will have the benefit of the Secretary's report on rail services in the region, the Office's public hearings and its study and evaluation of that report, and study information and preliminary planning endeavors of the Association to consider if any person tries to sustain the burden of showing that the process of reorganization pursuant to this legislation would not be fair and equitable.
H.R.Rep.No. 93-744, 93d Cong., 1st Sess. 52 (1973), U.S.Code Cong. & Admin.News, 1973, pp. 3306, 3316. Unhappily neither the reorganization courts nor this court have had the benefit of "study information and preliminary planning endeavors of the Association," see note 73 infra.
[31] We assume neither of the qualifications mentioned below could apply if, after all reasonable efforts, a reorganization trustee was faced with an imminent depletion of cash that would make it impossible for him to pay current bills for wages, supplies, interline balances, and similar expenses, and still leave an amount sufficient to permit an orderly liquidation.
[32] The original basis for this principle, which applied to non-utility as well as to utility companies, was to prevent the destruction or serious impairment of the interests of junior creditors and stockholders that would be involved in a foreclosure sale to senior creditors. Cf. R. F. C. v. Kaplan, 185 F.2d 791 (1st Cir. 1950). However, as the plight of the railroads has worsened, the public interest in continued service has loomed large. See In re New York, N. H. & H. R. R., 289 F.Supp. 451, 459 (D.Conn.1968) ("the extent to which the constitutional minimum of value of property rights to which the bondholders are entitled . . . may properly be invaded in the public interest to keep railroad operations going pending a solution of the problem of reorganization" depends not only on the security interests of the road, its rate of losses, and the feasibility of solution, but also on "the seriousness of adverse consequences to the public if service were terminated.").
[33] There is a suggestion in the recent decision by the Third Circuit, cited above, 485 F.2d at 215 & n. 42, that, when a statute "inexorably conflicts with the Constitution" and "the point of taking" has been reached, there is justification for a "deviation from the mandate of Section 77", and presumably of ง 1(18) of the Interstate Commerce Act and pertinent state statutes, insofar as they require agency approval of termination of losing service. This point was not argued before us and it runs counter to the explicit assumption of all courts, including the Supreme Court in the New Haven Inclusion Cases.
[34] The Penn Central Trustees, in their brief at 39-40, express the view that there is uncertainty as to whether ง 304(f) of the Act supersedes the ICC's abandonment authority under 45 U.S.C. ง 1(18). In their view the Act "may require that both the Interstate Commerce Act and Section 304(f) be complied with." We find the language of ง 304(f) quite clear to the contrary, as does the Commission. "As to interim erosion, the ICC [here speaking separately for itself] believes that Section 304(f) of the Act provides an adequate safeguard by authorizing USRA to grant interim abandonment applications unless an affected state, local or regional transportation authority `reasonably opposes such action.'" Appellants' Joint Brief at 31-32 n. 54.
[35] The Interstate Commerce Commission suggested to this court that opposition to an abandonment which is necessary to avoid an unconstitutional taking cannot be "reasonable." Appellants' Joint Brief at 32 n. 54. While such a reading would seemingly provide a simple answer to this problem, it also flies in the face of the language and the context. The plain meaning of ง 304(f) is that USRA is not to permit interim abandonments opposed by affected states or local or regional transportation authorities except when the opposition is without substance from a transportation standpoint.
[36] Discontinuing service and abandoning lines arouse considerable local passion. The Secretary of Transportation's Report, Rail Service in the Midwest and Northeast Region 3 (1974), which deemed approximately 25% of the route mileage in the region "potentially excess, either because it is uneconomic or clearly redundant," aroused storms of protest at the local hearings held in seventeen cities by the ICC's Rail Services Planning Office. The Report of the Office, Evaluation of the Secretary of Transportation's Rail Services Report 9 (1974), see ง 205(d)(1), describes the "fear, anger, and frustration" of participants in the hearings with respect to the possible loss of "potentially excess" rail lines.
[37] Reference should also be made to ง 213(a), which requires that, in order to obtain emergency assistance pending implementation of the final system plan, "recipients must agree to maintain and provide service at a level no less than that in effect on the date of enactment of this Act."
[38] Counsel for USRA has advised us that it has already sought from Congress amendments to the Act postponing by 120 days the dates for submission of the preliminary and final system plans.
[39] Affidavit of Theodore C. Knappen, ถ 3, at 6. Additional time would be occupied by judicial review, see, e. g., North Carolina v. United States, 124 F.Supp. 529 (D.N.C. 1954), at least when a temporary injunction was issued or, as commonly occurs, the carrier agreed not to abandon pending hearing and decision.
[40] We recognize that delays of the magnitude here envisoned would test how long government can postpone the owner's withdrawal of his grant in the interest of carrying out regulatory policies. See Judge Aldisert's dissent in In re Central R. R. Co. of N. J., 485 F.2d at 223-227, and the statement of the majority mentioned in note 33 supra. But unless the Supreme Court should say something about this in the Connecticut General case, the very testing of such a position would take much time.
[41] The parties in Connecticut General have agreed to an accelerated briefing schedule over the summer and plan to move to have oral argument at the October 14 session of the Supreme Court. The only necessary qualification to the statement in text is the possibility, which seems to us rather remote, that the Supreme Court might hold the issue not to be properly before it.
[42] We think ง 304(f) is clearly within the separability clause, ง 604. Compare Railroad Retirement Bd. v. Alton R. R., 295 U. S. 330, 361-362, 55 S.Ct. 758, 79 L.Ed. 1468 (1935); Carter v. Carter Coal Co., 298 U.S. 238, 316, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); Electric Bond & Share Co. v. SEC, 303 U.S. 419, 433-438, 58 S.Ct. 678, 82 L. Ed. 936 (1938). See generally Separability and Separability Clauses in the Supreme Court, 51 Harv.L.Rev. 76 (1937). While USRA may experience some difficulty in framing a final system plan if uncertain whether an administrative agency or a court may authorize the abandonment of mileage which it desires to have included, the problem is scarcely insuperable. We have already stated and explained our disagreement with the view that the Act cannot be held to provide a fair and equitable process simply because a provision, not central to its operation, must be excised or qualified to meet constitutional requirements. See note 29 supra.
[43] An application for leave to do this generated Judge Frank's much cited opinion in In re Third Ave. Transit Corp., 198 F.2d 703 (2d Cir. 1952).
[44] Our statement assumes that further increases in operating expenses due to continued inflation during the interim period will be met by rate increases without serious regulatory lag and that such increases can largely be made effective. In that the ICC has permitted three other freight rate increases in 1974 (Ex parte 299, three percent; Ex parte 303, four percent; fuel surcharge, three percent), this assumption seems presently reasonable. It assumes also that the country is not now entering into a serious and continuing recession. While such a recession would invalidate estimates of future revenues, it would also have a devastating effect on the liquidation value of the properties.
[45] It might be objected that the July figures show the growth in revenue as a consequence of the Ex parte 305 freight rate increase without any compensating increase in maintenance expense, which will be required under the conditions of the Commission's order. In fact, maintenance expenses show a substantial rise over July of 1973 (14.6%), reflecting the Trustees' capital improvement program. Moreover, a good deal of the "catch-up" expenditures required by Ex parte 305 which will be recorded as operating expenses will not be "expenses" in the real sense of the term; they will in fact add in some measure to equity, although the exact amount is difficult to quantify.
[46] In our analysis of the Penn Central situation we have not been obliged to rely on the authorization for emergency assistance in ง 213. If this analysis is correct, the bulk of these funds would be available for the smaller roads.
[47] The PCTC Physical Asset Valuation Study (April, 1973, revised May 30, 1973), App. 1 to testimony of witness Carlisle, ICC Fin. Docket No. 26241. This is a figure representing gross proceeds over a period of years. The present value of estimated net proceeds was $1.99 billion.
[48] As we have previously mentioned, there was net railway operating income in July 1974.
[49] The argument of certain opponents that, whatever may be said of the interim harm to senior investor interests, clearly there will be erosion of "someone's interest in the estate during the interim period," Appellees' Joint Brief at 37 (emphasis in original), is apparently based upon their view that "there is no serious dispute that the interim operations of the Penn Central can only be conducted at huge losses to the estate." Id. at 29. These concerns are greatly reduced, however, if Penn Central can show net railway operating income in the months immediately ahead. Furthermore the erosion concept seems inappropriate as applied to investor interests that were without value on any appropriate valuation theory on January 2, 1974.
[50] Such calculations as can be made from the carriers' reports to the ICC indicate that for 1974, assuming the continuation of trends during the first quarter and taking account of freight rate increases already granted, there is no substantial likelihood that the Reading will experience interim erosion of the sort described in the text; that LV and Ann Arbor will experience some such erosion; and that CNJ, because of its heavier dependence on passenger traffic, and L&H will experience more. Against this must be weighed the effect of emergency assistance under ง 213. See note 46 supra.
[51] The House version of the Act, as explained by the report accompanying it, provided that "[t]he value of consideration must equal the fair and equitable value of the rail properties as of the date of the conveyance." House Report at 53. However, the Act contains no such limitation and the Conference Report, H.R.Rep.No. 93-744, 93d Cong., 1st Sess. (1973), makes no mention of the deletion.
[52] This is set out in note 16 supra.
[53] As we now envision, our initial task would be, after suitable briefing and argument, to set the principles for valuing the properties conveyed. We would then appoint a number of special masters to take evidence of value and make reports consistent with the principles so established. We would ourselves conduct hearings with respect to the value of the compensation. The final step before decision would be to receive briefs and hear argument on this and on exceptions to the special masters' reports.
[54] The reorganization of the Missouri Pacific lasted twenty-three years. Levin v. Mississippi River Corp., 59 F.R.D. 353, 357 (S.D.N.Y. 1973). See Ecker v. Western Pacific R. R., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 (1943); Group of Institutional Investors v. Chicago, M., St. P. & P. R. R., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); Barber, Rail Reorganization, Section 77, and the Need for Legislative Reform, 21 U.C.L. A.L.Rev. 553, 569 (1973).
[55] The Secretary of Transportation feared that the requirement of conveyance before valuation might pose a serious risk that a court would characterize the process as a condemnation. Letter from Claude S. Brinegar to Hon. Warren C. Magnuson, supra.
[56] The drafters considered and rejected these more drastic alternatives. See House Report at 28.
[57] Congress believed that these roads could themselves be made profitable. See Senate Report at 12.
[58] Since Conrail is ultimately liable for payment of these obligations, they do not, of course, represent an addition to Conrail's net worth but simply increase the value of the "pot" of securities Conrail may pay to the bankrupt estates. Counsel for USRA suggested at argument that, despite ง 211(e)(3), the terms of the loan might be "soft." While this is necessarily speculative at the moment, we shall assume this in the Government's favor.
[59] The view that exchanging rail properties for all of the common stock plus other "benefits" was fair, virtually as a matter of definition, was widespread in the Congress. See House Report at 54:

The Committee intends that the valuation of the common stock be based upon the intrinsic value of that stock, taking into account the full benefits to be realized from the reorganized rail system embodied in the Final System Plan. The Committee expects that the intrinsic value of the stock of [the] new Corporation will be found to be at least equal to the fair and equitable value of the rail properties conveyed in exchange.
In a similar vein, see 119 Cong.Rec. H9732, H9733, H9750 (daily ed. Nov. 8, 1973) (remarks of Representatives Hudnut, Kuykendall, and Harrington.)
A similar view was expressed in the amici curiae brief of Representative Adams and 29 of his colleagues, discussed in Part VII of this opinion.
[60] One argument against it in which we find no merit is that we are required to take account of "the other benefits accruing to such railroad as a result of such exchange." ง 303(c)(1)(A)(i). This court should be capable of doing this in a manner consistent with the fair and equitable standard.
[61] The question how valuable the securities issuable to the estates must be in order to meet that standard is a troubling one which we are not now in a position to decide. The investors assert the value of the securities must at least equal the liquidation value of the properties conveyed and perhaps must equal any higher value of the properties for railroad purposes. The Government parties claim it is sufficient if the securities constitute fair compensation for "substantial going-concern value," whatever that may mean. The theory behind this seems to be that Congress is not compelled to permit cessation of operations when rail properties can earn a fair return under the flexible standard of FPC v. Hope Natural Gas Co., 320 U.S. 591, 603-605, 64 S.Ct. 281, 88 L. Ed. 333 (1944), even though the capitalized value of this return is less than liquidation value. This is surely true of solvent railroads and there would seem to be no reason for a different rule concerning bankrupt ones. The problem is what level of earnings must fairly be foreseen. Counsel for USRA properly conceded that a nominal return would not suffice. On the other hand, the days when rail investors could reasonably expect a fair return on "prudent investment" have long since passed. As long ago as 1951 return on book value of railroads in the eastern district had fallen to 3.47%. This decreased to 1.58% in 1960 and 1.27% in 1968. ICC, Transportation Statistics in the United States, Part 1 (Railroads) (annual).

For the time being we neither sustain nor reject the Government's argument. We agree only that the issue was left open in the New Haven Inclusion Cases, supra, 399 U.S. at 436, 90 S.Ct. 2054. Since the New Haven had no hope of ever earning income, all parties accepted the liquidation value approach to valuation. See also 399 U.S. at 481-483, 90 S.Ct. 2054.
[62] This court would have before it USRA's valuation figures in the final system plan, ง 206(f), to which it is instructed to give "due consideration," ง 303(c)(1), but these would surely be contested.
[63] Assuming arguendo that Penn Central (including the secondary debtors) would receive some 90% of the consideration and that the road to which part of Penn Central's share was to be reallocated would receive 1%, a reduction in the Penn Central's share of .5% would mean a 50% increase in the share of the other line. But no foreseeable reallocation from the smaller lines could have a meaningful effect on Penn Central's share.
[64] Some opponents of the Act say this grant of power is nugatory because of the limiting words "as designated in the final system plan." If these read literally, they would make the subsection meaningless unless the final system plan itself provided for a pool of securities and obligations to be held in reserve for disposition. Since we must either disregard the limiting words, whose intended function is not intelligible to us, or render the subsection largely meaningless, we choose the former course. Some encouragement to take that road is furnished by the language of the Conference Report, H.R. Rep.No. 93-744, 93d Cong., 1st Sess. 59 (1973), U.S.Code Cong. & Admin.News, 1973, p. 3323:

If a reallocation cannot completely cure the lack of fairness and equity, the court shall order the transfer of additional securities of the Corporation or obligations of the Association.
For similar language, see Senate Report at 35. The issue is probably of scant importance, for the reason discussed in note 67 infra.
[65] This is due to the so-called "leverage" effect and the deductibility of interest for income tax purposes. For the conventional view that judicious addition of debt to the capital structure can increase the total value of an enterprise and thus be advantageous to stockholders, see Graham, Dodd and Cottle, Security Analysis 539-49 (4th ed. 1962); Brudney & Chirelstein, Corporate Finance 360-64 (1972). But see Modigliani and Miller, The Cost of Capital, Corporate Finance and the Theory of Investment, 48 Am.Econ. Rev. 261 (1948) (suggesting that the value of a firm is independent of its capital structure and is the product solely of the capitalized expected stream of operating income at a discount rate commensurate to the firm's business risk).
[66] Issuance of debt for acquisition purposes would also increase cash requirements, decrease coverage of fixed charges and particularly if secured, impair Conrail's ability to obtain financing in the private sector.
[67] The legislative history shows how this provision came about without truly illuminating what it means. Whereas the first two mechanisms in ง 303(c)(2) grew out of the Senate bill, S.2767, 93d Cong., 1st Sess. งง 303(c)(3)(A) & (B) (1973), the deficiency judgment clause had its genesis in the House version, though important changes in language were made in conference. Under the relevant provision, H.R. 9142, 93d Cong., 1st Sess. ง 502(d) (1973) (emphasis added), the sole method for curing inadequacy of compensation in the final system plan was as follows:

[I]f the consolidated district court [this court in the Act] finds that the obligations deposited . . . by the corporation (including any obligations of the association), have a value as of the date of conveyance which is less than the fair and equitable value of the rail properties so conveyed . . . to the corporation, the district court shall enter a judgment against . . . the corporation for the amount of the deficiency to be paid in securities of the corporation (which may include obligations of the association), in such amount and with such terms as the district court shall prescribe as necessary to equal the fair and equitable value of the rail properties conveyed.
The Committee Report explains this provision. "If the court should determine, however, that the initially issued common stock [which was to be the primary, indeed hopefully sole, means of compensation] is not equal to the fair and equitable value of the rail properties, then this section provides for the payment of additional securities and obligations to make up the deficiency." House Report at 54; see id. at 53. A further idea of the purpose of this provision may be found in the statement of Representative Adams, one of two authors of the bill.
There is a specific limitation in the final bill which says no more than $200 million of the Government loan guarantees can be used for acquisition in any event, so if the court . . . should come in with a higher value [in a deficiency judgment], the only judgment would be against this new corporation. . . .
119 Cong.Rec. H9742 (daily ed. Nov. 8, 1973). It would thus appear that the House intended that the deficiency judgment could take the form only of an increase in Conrail securities (including USRA obligations up to the authorized amount). As such it is understandable.
In ง 303(c)(2)(C) of the Act, the italicized language in the House bill was dropped, apparently because of the insertion of the two previous clauses drawn from the Senate bill. If ง 303(c)(2)(B) permits this court to order the transfer of other securities of the Corporation or obligations of the Association, as we think it does, the deficiency judgment provision, ง 303(c)(2)(C), would simply permit the levy of execution. On the other hand, if ง 303(c)(2)(B) has the more limited meaning contended for by some of the opponents of the Act, see note 64 supra, ง 303(c)(2)(C) would permit us to order the issuance of additional securities (including authorized USRA obligations). However, if this should not suffice, ง 303(c)(2)(C) apparently also permits a judgment on which execution could be levied.
[68] This is the substance of the position asserted in the amici curiae brief of Representative Adams and 29 other Representatives.
[69] There would also be serious practical problems in properly enforcing such a judgment if, for example, a line of railroad A had been abandoned because Conrail would use a parallel line of railroad B, or if rolling stock had been scrambled as it surely would have been.
[70] The Government parties call attention to the second sentence of ง 209(a), which says:

After the final system plan becomes effective under section 208 of this title, it may be reviewed with respect to matters concerning the value of the rail properties to be conveyed under the plan and the value of the consideration to be received for such properties.
They suggest that this provision permits a "preliminary review, before the transfers, of the fairness of the Final System Plan," based upon which this court can take corrective action. We read this, however, as a limitation intended to make clear that there was to be no judicial review of other matters, such as propriety of abandonments, effect on other railroads, or adequacy of competition in the region (see ง 206(a)(5) โ not as a grant of a general veto power. Moreover, the proposed reading of ง 209(a) is at odds with the clear intention of Congress, discussed above, that conveyance was to precede examination of the adequacy of consideration.
[71] Doubtless because of the uncertainties inherent in ง 206(d)(4), Congress gave USRA a period of up to ninety days from the effective date of the final system plan to certify the plan to this court, ง 209(c), which would mean a period of up to 110 days between the effective date of the final system plan and the date when the conveyance must be made. However, we would not know the precise contours of the plan until certification, and a certification prior to the permitted 90 days would shorten the period for action on our part.
[72] Whether the compensation would be fair depends at base upon whether and to what extent Conrail would be a viable economic entity such that its stock would have substantial value. None of the reorganization courts made findings on this in their 180-day decisions. In Penn Central, where the most extensive factual presentation was made, Judge Fullam, after referring to the evidence, all of which was presented by parties opposing the Act and suggested, he said a bleak future for Conrail, agreed "with the contention of the government that it would be both premature and inappropriate for this Court to express a judgment as to Conrail's prospects for viability." Only in the Ann Arbor case did some supporters of the Act, to wit, the States of Michigan and Wisconsin, the Green Bay & Western Railroad Company (which connects with the Ann Arbor's car ferry on the western side of Lake Michigan at Kewaunee, Wis.), and United Transportation Union, attempt to prove the viability of Conrail. The opponents introduced and relied on much of the evidence submitted in the Penn Central proceeding. The court made no findings, saying it had "labored strenuously to assimilate that mass of figures but without any real success due to the time factor and its lack of understanding of the Penn Central framework." Opponents of the Act contend that the very necessity of the reorganization courts' rendering decisions within 180 days after enactment of the Act makes it processes unfair and inequitable. We see no reason why 180 days did not suffice for the preparation of evidence and informed decision. Indeed the Act may mark the beginning of an effort, which we regard as generally salutary, to end an unhappy state of affairs wherein efforts by parties, agencies, and courts to attain an unattainable certainty result in such giant delays as to produce the worst of all possible worlds. See the writer's remarks some 14 years ago in A Look at the Federal Administrative Agencies, 60 Colum.L.Rev. 429, 432-36 (1960), reprinted in Benchmarks 65, 68-72 (1967).
[73] The opponents claim this to be another respect in which the process of the Act is unfair and inequitable. They say the reorganization courts, in the 180-day hearings, and this court on review, are being asked to start the various debtors on a path of no return without having any idea what will confront them at the end. In this connection they point to a reference in the Conference Report, H.R.Rep.No.93-744, 93d Cong., 1st Sess. at 52 (1973), showing that Congress expected that, before having to render the 180-day decisions, the reorganization courts would have at least some idea what the shape of Conrail would be โ a prospect blasted by former President Nixon's four months' delay in nominating the Chairman and certain other members of the Board of Directors of USRA, ง 201(d). They point also to an USRA press release dated August 22, 1974, a copy of which is annexed as Appendix B, showing that USRA is considering a wide โ the opponents say wild โ list of possibilities, some of which seem of dubious compatibility with the Act. We need not rule on this contention in view of our holding with respect to the Tucker Act.
[74] If, due to the unfortunate delay in its organization, see note 73 supra, USRA lacked necessary staff, the Department of Transportation and the ICC could readily afford this.
[75] Mr. Ingraham was extensively cross-examined by Government counsel on deposition and in open court.
[76] In plans for reorganization antedating the Act, the Penn Central trustees had considered systems wherein that carrier's existing 19,459 miles (including leased lines) would be reduced to 15,000 and 11,000 miles. Trustees' Interim Report of Oct. 1, 1972. The consultants' studies commissioned by the Trustees indicated that the reduction to 15,000 miles would produce some $300 million savings in expenses with almost no loss in revenue because these lines generate almost no freight traffic and serve very few shippers (and even as to these there are in most cases nearby alternative rail heads), but that elimination of another 4,000 miles would sacrifice $190 million of revenue to achieve a saving of $268 million in expenses and would yield a larger net railway operating deficit. Moreover, reduction to an 11,000 mile system for Conrail would generate greatly increased opposition from shippers and state and local governments and would involve substantially higher labor protection costs. The possibilities provided by the Act for aid in the purchase of rail property and continuation of rail services, งง 211, 402 and 403, which might permit otherwise unprofitable mileage to be operated without loss to Conrail, further suggest the reasonableness of a 15,000-mile system rather than a smaller one, which, in any event, few have seriously suggested.
[77] The Government parties question this on the basis that interest charges on initial debt would remain constant, whereas application of a given operating ratio to inflated operating revenues would produce a larger net railway operating income and a consequently greater amount available for fixed charges. While the proposition is arithmetically correct, we think for a variety of reasons, including the inevitability of some regulatory lag, that Mr. Ingraham's constant dollar approach was not unfavorable to Conrail.
[78] Mr. Ingraham assumed that, except for $500 million of Government guaranteed bonds, the entire acquisition price would be paid in common stock. Partial payment in Conrail bonds would increase cash needs for interest and amortization throughout the period. His total figure of $3 billion for acquisition cost may well be high in light of Day & Zimmerman's estimate that the present worth of the net liquidating value of all Penn Central's wholly owned assets (other than the Park Avenue properties in New York City) as of May 30, 1973, was only $1.996 billion. However, this would not affect Ingraham's cash analysis except for the amount of the hypothetical dividend beginning in the sixth year.
[79] During the 180-day hearing in the Lehigh Valley case, counsel for Citibank questioned Ingraham with regard to the Ex Parte 305 increase. Ingraham stated that this would not affect his conclusions since his earlier estimates had been unduly optimistic with regard to revenue growth and since inflation would in any event overtake the increase in less than a year, but we do not find his explanation, made in direct and cross-examination and without any supporting documentation, to be very convincing. For reasons previously explained, note 72 supra, Judge Fullam made no finding on the point.
[80] As a condition for granting the rate increase, the Commission stated that "[r]evenues generated by the increases should be expended for capital improvements and deferred maintenance of plant and equipment and the amount needed for increased material and supply cost, other than fuel," and it observed that it "expects that the authorized increases will enable the respondents to expend substantially more for maintenance and capital improvements than in recent years and will evaluate respondents' compliance with this directive."
[81] The full increase would not be effective due to hold downs, reductions for competitive reasons, and commodity exceptions to the rate increase, e. g., recyclables.
[82] This figure is derived as follows (in millions):

1973 freight revenues (from Ingraham affidavit) $1,995.0
 Ex parte 299, Ex parte 303, fuel surcharge (total 10%) 199.5
 Ex parte 305 (4.9%* for remainder of 1974) 97.8
 ________
1974 freight revenues 2,292.3
 Ex parte 305 (4.6%** for applicable part of 1975) plus 4.1% growth 199.4
 ________
1975 freight revenues 2,491.7
 4.1% growth 102.2
 ________
1976 freight revenues $2,593.9
* Estimate of Penn Central witness Varalli.
** Estimate reduced to reflect hold-downs, commodity exceptions, and other
factors.

[83] It seems impossible at this juncture to determine how much of the Ex parte 305 catch-up maintenance expenditure will be reflected in increased expense for maintenance of way and equipment and how much in additions to capital. There is the further uncertainty how much of this increase may be eaten up by inflationary cost increases before a further rate increase is granted.
[84] The opponents argue that ง 215 loans will not be available in significant amounts since these can be made only "for the acquisition, maintenance, or improvement of railroad facilities and equipment necessary to improve property that will be in the final system plan" and no one can know what property will be so included until the plan is submitted to and not disapproved by Congress. The argument is wholly unpersuasive as to equipment, which will be needed no matter what rail lines are included. It is scarcely more so as to way. There is a great deal of "core" mileage that must be included in any final system plan โ probably more than can be placed in proper condition within the available time. We should expect the Secretary of Transportation and USRA to adopt a practical approach to ง 215 โ not a literal one that would frustrate the manifest intention of Congress.
[85] The House Report at 55 noted that the abandonment provision was designed to permit the roads "to shed excess and uneconomical service as quickly as possible."
[86] Many means of accomplishing this are outlined in the affidavit of John W. Ingram, Administrator of the Federal Railroad Administration within the Department of Transportation, in the Connecticut General case, which was stipulated to comprise part of the record in the 180-day Penn Central proceeding. See also note 89 infra.
[87] Ingram affidavit, par. 13F. See งง 206(c) (1)(C) and 601(d)(1).
[88] This compares with a $1.99 billion May 30, 1973, estimate for all Penn Central properties (except the Park Avenue properties).
[89] The dimensions of the duplication of service and excess capacity problems at the local service level can be illustrated by examining the case of Philadelphia's rail system. The city's 19th century transportation requirements brought into being more than 12 different railroads, some less than two miles long. Over the years, many of them were brought under the control of the Pennsylvania Railroad (now the Penn Central). The city's growth and expansion during the subsequent period left little chance to construct new modern yards, and regulatory requirements often stymied efforts to eliminate uneconomic trackage. As a consequence, Philadelphia today has a multitude of freight yards (18 operated by Penn Central, three operated by the Reading and two operated by the Chessie System) and a maze of duplicative and often parallel trackage (much of which runs down the center of busy streets). The 150 square mile Philadelphia area is served by four Class I railroads which operate within the area approximately 500 miles of line haul trackage and more than 300 miles of yard and siding trackage [as illustrated]. While this trackage was constructed to serve a large number of shippers, some have since gone out of business, many are only occasional users of rail service and only a few are users of high volume rail service. For example, although the Penn Central serves more than 1,800 users (industries, coal and ore facilities, grain elevators, intermodal facilities and food terminals), only 36 of these customers account for more than half of the traffic generated in Philadelphia.

Rail Service in the Midwest and Northeast Region 69 (1974).
[90] We have considered whether we could dispose of the question of the availability of a Tucker Act remedy simply on the basis of the concession made in a brief signed by an Assistant Attorney General of the United States, whatever our own views might be. The Attorney General has been granted broad authority over "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested . . .," 28 U.S.C. ง 516, and the power to appoint subordinate officers to assist him in the discharge of his duties, id. งง 509, 510, 515, 533(c). We do not believe that a brief signed by an Assistant Attorney General could impose potentially large liabilities upon the United States in a manner contrary to the intent of Congress. Compare United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 513, 60 S.Ct. 653, 84 L. Ed. 894 (1940) (failure of officers of United States to object to jurisdiction of court to consider a claim against United States does not constitute a waiver of immunity from suit).
[91] A seemingly unnecessary explanatory statement contained in the Conference Report, H.R.Rep.No. 93-744, 93d Cong. 1st Sess. 56 (1973), adds

The conferees agreed that the arrangements recommended by the planners under Section 206(i) shall not include any form of Federal guarantee of the value of the Corporation stock.
See also 119 Cong.Rec. H 11,876 (daily ed. December 20, 1973).
[92] The timely implementation of the Final System Plan cannot be obstructed by controversy over the payment for the properties. The Committee is of the opinion that provisions of this title of the Act, and especially the provision for deficiency judgment and payment of obligations of the Association provided in the preceding subsection, are more than adequate to guarantee that the creditors of the bankrupt railroad will receive all that they may Constitutionally claim. In view of these extraordinary protections, no litigation should be permitted to delay the Final System Plan.

House Report at 55
[93] See งง 202(a)(10); 205(c)(2); 206(d) (3); 207(b); 209(a); 209(b); 303(b)(2); 303(d); 304(c); 304(f).
[94] 119 Cong.Rec.S. 23,783 (daily ed. Dec. 21, 1973).
[95] Mr. KUYKENDALL. Mr. Speaker, I would like to ask the gentleman from Washington to clarify one point, and that is the matter of the deficiency judgment. There was a lot of colloquy in the original debate which expressed fears that the Federal court had the key to the Treasury.

Will the gentleman give us his interpretation of the guarantees we have to keep that from happening in the court proceedings?
Mr. ADAMS. Mr. Speaker, there is a definite limitation on the total amount that can be authorized under this bill. Any amounts that go beyond that, or the shifting of the way in which it is spent, is to be approved by an act of Congress, to be signed by the President. It is defined as a joint resolution in the bill, and the statement of the managers, and it was the clear intent of the managers that any amount other than common stock was to be at the lowest possible limit to meet the constitutional guarantees.
Mr. KUYKENDALL. Mr. Speaker, is it not true, I will ask the gentleman from Washington (Mr. Adams) that the creditors, of course, are given protection, and that the Board of Directors, under the control of Government officials, is the owner of the entire block of stock of 100 million shares, whatever it is?
Mr. ADAMS. The gentleman is correct. It is controlled by the United States, so long as the Secretary determines that there is an amount of obligation funds which the United States might, in any way ever, have to have anything to do with.
During that period of time, it is controlled by a board of directors which consists of Government officials.
Mr. KUYKENDALL. There is no way the Federal court may assess the taxpayers or this Congress on the judgments of the creditors; is that correct?
Mr. ADAMS. The gentleman is correct.
Mr. KUYKENDALL. There is no way they can assess the Congress for the money?
Mr. ADAMS. The gentleman is correct.
[96] The brief submitted by the Penn Central investors to the Supreme Court in the Connecticut General case refers to certain remarks in addition to those cited to us, see 119 Cong.Rec. H9732, 9742 (daily ed. Nov. 8, 1973) (remarks of Rep. Adams); id. at 9741 (remarks of Rep. Metcalfe); id. at 9742 (remarks of Rep. Shoup); id. at 9746 (remarks of Rep. Conte); 119 Cong.Rec. S2377-78 (daily ed. Dec. 21, 1973) (remarks of Sen. Hartke), but we do not find them to be any more conclusive than those we have quoted.
[97] See the debate between Professor Radin, Statutory Interpretation, 43 Harv.L.Rev. 863 (1930), and Professor Landis, A Note On "Statutory Interpretation", id. at 886. Strong blows against the use of such statements were struck by Mr. Justice Jackson in his concurring opinions in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395-397, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), and United States v. Public Util. Comm'n, 345 U.S. 295, 319-321, 73 S.Ct. 706, 97 L.Ed. 1020 (1953), and in his speech before the American Law Institute, The Meaning of Statutes: What Congress Says or What the Court Says, first published in 34 A.B.A.J. 535 (1948), and reprinted in 8 F.R.D. 121 (1948). On the other hand, Mr. Justice Frankfurter was a leading advocate of their use in ascertaining the true meaning of legislation. See the opinions cited in Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 216 n. 117 (1967). See also Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527 (1947); McCallum, Legislative Intent, 75 Yale L.J. 754 (1966).
[98] As previously indicated, these amounts may be nonexistent and, barring an economic catastrophe which would doubtless provoke new legislation, need not be large if the planners follow a sufficiently hard-nosed course and Congress allows a sound plan to become effective despite inevitable local pressures, see note 36 supra.
[99] In an amici brief Representative Adams and 29 other Congressmen have stated that "[t]he concept of a deficiency judgment against the United States was discussed and rejected by the Congress" and that if this court should hold that such a judgment is necessary to make the "Act `fair and equitable' to the estates, then the Act must fall since the legislative history and the language of the Act are clear that no deficiency judgment against the U. S. is authorized." However, since they cite no legislative history other than the ambiguous materials we have summarized, their submission, while receiving our most respectful consideration, does not add to the colloquy on the floor of the House which we have cited. Our attention has also been called to a hearing held by a House Committee on June 14, 1974, where several Representatives who had taken an active part in enactment of the Act made evident their displeasure that the Government had suggested to the Connecticut General court that recourse might be had to the Tucker Act. See Oversight Hearings on the Regional Rail Reorganization Act Before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 2d Sess. (1974). But members of Congress, even those who have played an important role in the enactment of legislation, cannot thereafter change what they have wrought except by amendment. Our ruling leaves Congress free to do exactly that, except with respect to such claims for unconstitutional erosion, if any, as may have arisen prior to the Amendment.
[100] While the Government parties also cite Yearsley v. W. A. Ross Constr. Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), they correctly recognize that it is less useful to them than Hurley seems to be, since the statute under consideration there, which authorized the construction of river dikes, was admittedly silent with respect to possible claims of Government liability by persons injured as a result of the construction.
[101] As originally introduced into the Senate by Senator Jones, Chairman of the Committee on Commerce, the portion of the bill pertinent to this discussion provided that: "Just Compensation shall be paid by the United States for all property used, taken, damaged, or destroyed in carrying out the flood control plan . . . ." (ง 4) 69 Cong.Rec. 5482 (1928). Senator Jones indicated that the Constitution mandated such compensation for taking of private property and that the provision did not create a liability that otherwise might be avoided. Id. at 5485, 5487. Section 4 in this form was contained in the Flood Control Act as originally passed by the Senate. Id. at 5491. A bill containing a similar compensation provision was introduced by Congressman Reid in the House. Id. 6665, 6646 (remarks of Rep. Wilson). Representative Frear, who was the most vocal critic, expressed the view that the bill as then drafted would cost substantially more than originally estimated since large amounts would be expended in compensating complaining landowners for alleged damages. See, e. g., id. at 6654-63, 6712. Although sponsors of the bill indicated that in their opinion ง 4 required the Government to acquire only such lands and rights of way as were required under the Constitution, e. g., 69 Cong.Rec. 6646 (remarks of Rep. Wilson), contrary views were expressed, particularly by Representative Frear. Id. at 6655, 6657, 6659, 6660, 6712, 6718, 6999-7000.

Thereafter Representative Reid and the Flood Control Committee agreed to add to ง 3 the following: "No liability of any kind shall attach to . . . the United States for any damage from or by floods or flood waters at any place", id at 7022, and to substitute in lieu of the first paragraph of ง 4 as then constituted: "The United States shall provide flowage rights for destructive flood waters that will pass by reason of diversion from the main channel of the Mississippi River, and shall control, confine, and regulate such diversion." Id. at 7104. The reasonable interpretation of these amendments in light of the House debate, both before and after passage, is that while it was thought, even by critics of the bill, to be both desirable and necessary to compensate landowners for damages stemming directly from institution of the project, e. g., id. at 7110 (remarks of Rep. LaGuardia), there was also an articulated need to avoid unlimited liability for all damages resulting from future floods in areas affected by the project. Consistent with this interpretation are the "Provided, however," provision which follows immediately after the no liability clause in ง 3 as finally enacted and the interpretation placed upon it by its proponants. See id. at 7023 (amendment designed to compensate individuals for damage which the Project itself actually causes โ land which otherwise would not have been damaged if it were not for the diversion of flood waters by the Project) (explanatory remarks of Rep. Cox). See id. at 7104-08. 8120-23; note 102 infra.
[102] Representative Reid, one of the principal sponsors of the bill, saw condemnation proceedings as providing a faster and potentially more efficient remedy, not as a means of possibly avoiding compensation for the taking of private property. 69 Cong.Rec. 7105-06. See also, id. at 8122-23 (recognition of liability for damage actually caused). Another member, Representative Whittington, expressed the view that even if no flowage rights were acquired under the condemnation procedures expressly provided for in ง 4 as finally enacted, aggrieved landowners still had the alternate remedy of suing for damages and having the "Constitution fix the measure of their damages." Id. at 7889.
[103] Later cases under the Flood Control Act are consistent with this reading of the Hurley case. See Sponenbarger v. United States, 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230 (1939); Tilden v. United States, 10 F. Supp. 377 (W.D.La.1934); National Mfg. Co. v. United States, 210 F.2d 263 (8th Cir.), cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L. Ed. 1108 (1954); Clark v. United States, 218 F.2d 446 (9th Cir. 1954); Parks v. United States, 370 F.2d 92 (2d Cir. 1966).
[104] Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1371 (1953). The quoted passage can also be found in Hart & Wechsler, The Federal Courts and the Federal System 336 (2d ed. 1973).
[105] The holding was all the stronger in view of a provision in ง 17 that

nothing contained in this section shall interfere with payments heretofore made or hereafter to be made under contracts of yearly renewable term insurance which have matured prior to the date of enactment of the Act and under which payments have commenced, or on any judgment heretofore rendered in a court of competent jurisdiction in any suit on a contract of yearly renewable term insurance, or which may hereafter be rendered in any such suit now pending.
The Court managed to convert this into an argument in support of the ruling that Congress did not intend to withdraw the remedy as to suits like Lynch's and Wilner's which were not yet pending when the Economy Act was passed, 292 U.S. at 585, 54 S.Ct. 840; see also id. at 574 and the opinions of the courts of appeals.
[106] The argument of some opponents based on the doubt of the availability of a Tucker Act remedy expressed in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), is without force. The basis of the doubt was that the Executive's action there was without authorization in law. See also id. at 609, 72 S.Ct. 863 (Frankfurter, J., concurring).

We likewise dismiss as a mere exercise in literalism the further contention of some opponents that in evaluating the constitutionality of the Act, we may not consider the Tucker Act since ง 207(b) requires us to look only at the Rail Reorganization Act itself. In contrast to the argument that we have power to disregard the provision of ง 303(b) to direct conveyances, which we have rejected in Part VI, allowing a Tucker Act remedy in no way interferes with the operation of the Reorganization Act.
[107] In Vanhorne's Lessee v. Dorrance, 2 Dall. 304, 315-316, 1 L.Ed. 391 (Cir.Ct., Pa.Dist.1795), the circuit court found inadequate under the Pennsylvania Constitution compensation in the form of land for land taken and instead required that the compensation be paid in money.
[108] the beginning, the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power.
. . . . .
. . . And these acts, far-reaching though they may be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed.
[109] We intimate no opinion to what extent, if at all, the Court of Claims would be bound by our determination as to the value either of the compensation issuable under the Act or of the assets conveyed.
[110] The valuation assumed the realization of efficiencies expected to result from the merger.
[111] Even the New Haven bond holders would have been satisfied with a valuation as high as $63.375 per share, the price at which Penn Central stock was selling on the inclusion date. In re New York N. H. & H. R. R., supra, 304 F.Supp. at 809.
[112] In his concurring opinion in Connecticut General, Judge Fullam expressed concern over the adequacy of a Tucker Act remedy with respect to interim erosion because of the long delay before an award could be made by the Court of Claims. As explained in Part V of this opinion, we think the Connecticut General court and the district courts that followed it did not take adequate account of the delays that would have slowed the intended abandonments irrespective of the Act and thus exaggerated the erosion claims. Any additional delay that did result from being required to obtain action by the Court of Claims might adequately be compensated for by the award of interest. See Phelps v. United States, 274 U.S. 341, 344, 47 S.Ct. 611, 71 L.Ed. 1083 (1927); United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 588, 67 S.Ct. 398, 91 L.Ed. 521 (1947). See also Crozier v. Fried, Krupp Aktiengesellschaft, 224 U.S. 290, 32 S.Ct. 488, 56 L. Ed. 771 (1912).
[113] Since 1973 Penn Central (including its leased lines) accounted for 94% of the operating mileage and 87% of the operating revenues of the six bankrupt railroads here under consideration, see note 23 supra; even a considerably higher ratio of abandonments for Penn Central than the other lines would not significantly alter these proportions.
[114] See note 50 supra.
[115] Except in the case of CNJ, it is not clear to what extent the views expressed by counsel for investor interests in the smaller lines would be altered by our recognition of a remedy under the Tucker Act. The CNJ counsel stated that even if such a remedy were available, the investors would prefer not to have that road included in Conrail.
[116] The dissenting opinion of Judge Russell in the court of appeals, 201 F.2d 325, 331 (5th Cir. 1953), also relied on by the investors in the smaller lines, did not reach the constitutional question.
[117] The Court relied on its earlier decision in Consolidated Rock Prods. Co. v. DuBois, supra, 312 U.S. at 530-531, 61 S.Ct. 675, a ง 77B reorganization.
[118] Some opponents question the adequacy of a Tucker Act remedy upon the additional ground that Congress might refuse to appropriate any damages finally awarded by the Court of Claims. They would dismiss Mr. Justice Harlan's observation that "there seems to be no sound reason why the Court of Claims may not rely on the good faith of the United States," Glidden Co. v. Zdanok, 370 U.S. 530, 571, 82 S.Ct. 1459, 1484, 8 L. Ed.2d 671 (1962), on the basis that the Court of Claims has never rendered judgments of the size potentially present here and that some members of the House of Representatives have already indicated their strong opposition, see note 99 supra. But if Congress should allow the processes of the Act to go forward after a ruling that a remedy under the Tucker Act applies, we cannot believe it would thereafter fail to respond. Moreover, as also previously suggested in Parts V and VI, the amount of a Court of Claims award, while potentially large, need not be so astronomical as some of the opponents have indicated. See particularly note 98 supra.
[119] See also Hart & Wechsler, The Federal Courts and the Federal System 841-42, 1347 (2d ed. 1973), questioning whether the United States Fidelity and Kalb decisions are reconcilable with Chicot County and earlier cases and also challenging the validity of United States Fidelity and United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940), which was decided along with it, on broader grounds.
[1] Hereinafter the Appellants United States of America, United States Railway Association, and their counsel will be referred to as "United States" and "USRA". In No. 74-8 the United States and USRA participated as appellees with respect to the jurisdictional issues raised by the New Haven Trustee.
[2] Hereinafter the Appellant Interstate Commerce Commission and its counsel will be referred to as "ICC". In No. 74-6 the participation of the ICC is as an amicus curiae and in No. 74-8 it is an appellee with respect to the jurisdictional issues raised by the New Haven Trustee.
[3] Hereinafter Appellant State of New Jersey and its counsel will be referred to as "State of New Jersey".
[4] Hereinafter Appellants Railway Labor Executives' Association and Congress of Railway Unions and their counsel will be referred to as "RLEA" and "CLRU".
[5] In No. 74-8 the New Haven Trustee participated as an appellant with respect to jurisdictional issues raised by it.
[6] Hereinafter Appellee Commonwealth of Pennsylvania and its counsel will be referred to as "Commonwealth of Pennsylvania".
[1] The names of the secondary debtors, and the stock interests held in each by Penn Central, Pennsylvania Company ("Pennco" โ an independently managed subsidiary of Penn Central), and other Penn Central subsidiaries are as follows:

 Secondary Debtors Stockholdings
The United New Jersey Railroad and Canal Company Penn Central 54.1%
 ("UNJ")
Beech Creek Railroad Company Penn Central 79.2%
The Cleveland, Cincinnati, Chicago & St. Louis Ry. Penn Central 99.5%
 Co.
The Cleveland and Pittsburgh Railroad Company Penn Central 80.2%
The Connecting Railway Company ("Connecting") Penn Central 26.2%,
 Pennco 73.8%
The Delaware Railroad Company Penn Central 84.9%
Erie and Pittsburgh Railroad Company Penn Central 87.4%
The Michigan Central Railroad Company Penn Central 99.9%
The Northern Central Railroad Company ("Northern Penn Central 80.1%
 Central")
Penndel Company Penn Central 100%
The Philadelphia, Baltimore and Washington Railroad Pennco 34.8%,
 Company ("PBW") Penn Central 65.2%
The Philadelphia and Trenton Rail Road Company UNJ 64.9%
 Penn Central 11.4%,
 Associates of the Jersey
 Company (a wholly-owned
 subsidiary of
 UNJ) 2.8%
The Pittsburgh, Youngstown & Ashtabula Railway Penn Central .7%
 Company Connecting 79.5%
Pittsburgh, Fort Wayne & Chicago Railway Company Penn Central 88.5%
Union Railroad Company of Baltimore Northern Central 58.3%,
 PBW 41.7%

[2] There are some lessors of rail properties to Penn Central that are not in bankruptcy.
[3] The origins and characteristics of leased lines are authoritatively and informatively described, and the problems they present in bankruptcy discussed, in Meck and Masten, Railroad Leases and Reorganization: I, 49 Yale L.J. 626 (1940), and Meck, Railroad Leases and Reorganization: II, 49 Yale L.J. 1401 (1940). See also Friendly, Amendment of the Railroad Reorganization Act, 36 Colum.L.Rev. 27, 45-53 (1936).

The findings of fact made by Judge Fullam in the 120-day proceedings in respect of each of the secondary debtors indicate and confirm the typicality of their status as rail lessors. For example, the findings of fact in the case of United New Jersey Railroad and Canal Company show, among other things, that UNJ is a 54% owned subsidiary of Penn Central, with the balance of its stock publicly owned; in 1871 UNJ leased its entire line of railroad and appurtenant properties and equipment to the predecessor of Penn Central for a term of 999 years; since entering into the lease UNJ has performed no railroad operations, and does not have in its control either the equipment or the employees necessary to carry on rail operations; under the terms of the lease Penn Central is required to pay as annual rent $10.00 per share of the outstanding capital stock not owned by it, all taxes assessed against UNJ and its property, the interest payments due on UNJ's debt, and the corporate expenses of UNJ not exceeding $10,000 per year; UNJ's sole source of ordinary income is the rental from the lease; Penn Central owes UNJ $4,552,962 for inter-company advances made by UNJ to its parent; and, as of December 31, 1973, UNJ had $4,336 in unrestricted cash assets.
[4] In an effort to minimize expenses, the reorganization court initially did not appoint trustees for the secondary debtors. However, with the passage of the Act, the court thought it desirable to have trustees, and named them on March 11, 1974, for all except one, Connecting, as to which all the parties in interest stipulated that the debtor should continue in possession.
[5] Its reasoning on the merits of this issue was that "by placing the burden of proof upon those who argue for continuation of the ง 77 proceedings, while simultaneously failing to provide any standard by which a court might adjudge that course to be preferable, Congress has effectively deprived the court of any power to decide in favor of the ง 77 proceeding." The "constitutional difficulties" which it purported to see in this approach could not, in its view, be considered apart from the later findings required to be made by Section 207(b) with respect to whether the process of the Act was fair and equitable.
[6] In the rules initially issued by the Special Court, we expressed doubt as to the appealability of the results of the so-called 120-day proceedings; and we stated our purpose to respond to the filing of any such appeal by a notice to show cause as to why it should not be dismissed. Rule 13. Five such appeals were filed in the respective cases of Penn Central and four other bankrupt roads. After receiving briefs and hearing argument, we dismissed those appeals for want of jurisdiction in our opinion issued May 24, 1974. In that opinion we made clear that review could be sought of matters determined in the 120-day proceedings in connection with any appeals subsequently taken as a consequence of the proceedings contemplated by the second sentence of Section 207(b).
[7] If the reorganization court fails to act at all, the Act expressly provides that reorganization shall proceed under its terms.
[8] The three secondary debtors, as to which Judge Fullam found that "the record as a whole does not permit a decision at this time" on reorganizability under Section 77, are Beech Creek Railroad Company, Erie and Pittsburgh Railroad Company, and Penndel Company. We think that the evidence of record, and indeed the findings of fact made by Judge Fullam as to each of the three, point strongly toward a conclusion of non-reorganizability. This appraisal, in conjunction with what we believe to be the valid provision of Section 207(b) that if a reorganization court does not make a determination required by the Act, the debtor shall proceed under the Act, leads us to treat these debtors as subject to the Act.
[9] References hereinafter in this Part II to the secondary debtors do not include the three as to which no finding of reorganizability was made.
[10] Six of the secondary debtors (Beech Creek Railroad Company; The Cleveland, Cincinnati, Chicago & St. Louis Railway Company; The Cleveland and Pittsburgh Railroad Company; Erie and Pittsburgh Railroad Company; Penndel Company; and Pittsburgh, Fort Wayne and Chicago Railway Company) are recorded in the brief as not joining in this argument, for the reason that they are in agreement with the interpretation placed upon Section 207(b) by Judge Fullam.
[11] S. 2767 is the Senate bill that was embodied as the amendments to H.R. 9241 that were approved by the Senate.
[12] See note 8 supra for our purpose to affirm the individual orders directing that the three remaining secondary debtors, as to whom Judge Fullam stated he could make no finding on reorganizability, be reorganized under the Act.
[13] Either because partial inclusion of the road in Conrail would render the other parts nonviable, or because USRA ordered the abandonment.
[14] United New Jersey; Connecting; Michigan Central; Northern Central; Philadelphia & Trenton; Pittsburgh, Youngstown & Ashtabula; Union of Baltimore.
[15] Delaware: Beetle Affidavit pp. 17-18:

PUBLIC INTEREST ADVANTAGES
86. The Act requires that the public interest be considered in determining whether railroad companies presently in reorganization should be required to be reorganized under the Act.
87. I have described general possibilities for reorganization of the DRR that would rely principally on new lease arrangements that would place the DRR main line and the PBW branch to Snow Hill in the hands of a short line operator who would take responsibility for continued service to Delmarva Penninsula shippers. We have not had time to explore all of the ramifications of such a proposal in detail. It appears to us, however, that the arrangement would have the following public interest advantages:
(a) Railroad freight service to shippers in the Peninsula, with connected access to other points in the present Penn Central system and beyond, would be preserved.
(b) A new lease would make it possible for this to occur without the need for any public or private buyer to raise funds to purchase the DRR system, which could require as much as 25 billion dollars.
(c) Rather, the scheme would preserve intact the low investment cost base established years ago when the DRR lines were originally built.
(d) The interests of the present holders of DRR stock would be protected if terms similar to the present DRR lease to the Penn Central could be carried into the new lease agreement.
(e) The public confidence required to preserve a private market for capital investment in railroad properties would therefore to that extent be encouraged.
PB&W: Beetle Affidavit pp. 27-28:
PUBLIC INTEREST ADVANTAGES
116. The Act requires that the public interest be considered in determining whether railroad companies presently in reorganization should be required to be reorganized under the Act.
117. I have described general possibilities for reorganization of the PBW that would rely principally on a lease with AMTRAK or another public or private agency that would be interested in acquiring the right of access to PBW's properties. We have not had time to explore all of the ramifications of such a proposal in detail. It appears to us, however, that such an arrangement would have the following public interest advantages;
(a) The quality of existing passenger service between Washington and Philadelphia, and between Pittsburgh and St. Louis and Chicago could be substantially improved through AMTRAK control of train operations on these routes.
(b) Rail facilities serving corridors between these major cities would be preserved for use in future development and growth of passenger service.
(c) AMTRAK or another lessee could provide trackage rights for freight railroad movements over the leased tracks, deriving therefrom additional revenues to support improved passenger service.
(d) Since AMTRAK is not a freight carrier, prospects for preservation of good, competitive freight service through the PBW corridors would be excellent if such properties were leased to AMTRAK.
(e) There would be no need for any public or private buyer to raise funds to purchase the PBW system, which could require as much as one billion dollars.
(f) Rather, the scheme would preserve intact the low investment cost base established years ago when the PBW system was originally built.
(g) The interests of the present holders of PBW stocks and bonds would be protected if the terms of the present PBW lease to the Penn Central could be carried into the new lease arrangements.
(h) The public confidence required to preserve a private market for capital investment in railroad properties would therefore to that extent be encouraged.
[16] The secondary debtor trustees emphasize that the Love testimony in regard to the Delaware suggested the possibility that the road could be run with no abandonments. (Brief at 22 n. 21) They state that it "seems likely that such a railroad, if successful, would serve the public interest better than an alternative which might well entail abandonment of substantial segments of railroad on the Peninsula." (Brief of Appellees (secondary debtor trustees) at 22 n. 21) We do not believe, however, that a reduction in abandonments, without information as to the consequences of abandonment or nonabandonment, provides proof that the alternative plan is in the public interest.
[17] Though the indenture trustees are emphatic that they should be permitted to establish their "profitability" before this court, they never proceed to do so. Br. 14-43. Since they offer Judge Fullam's findings of reorganizability as support for their claims of profitability, presumably they make such claims only with respect to the twelve whom Judge Fullam found reorganizable. Id. at 17.
[18] They define "profitable" as follows: "A `profitable' Secondary Debtor is one whose net railway operating income exceeds the rent the Debtor is required to pay under the lease, or one whose net railway operating income, although not in excess of rent reserved under the lease, is sufficient to sustain the Secondary Debtor's existing capitalization." (Br. 11).
[19] Footnote 12 of the indenture trustees' brief also asserts unfairness on the grounds of reorganizability, substantially echoing the arguments of the secondary debtor trustees. Br. 38 n. 12.
[20] In some cases the bankrupt may have already paid all outstanding debts and since reorganization, with its risk that some parties will not be completely satisfied, is not to be preferred to repayment under the existing capitalization, it will be clear error for the bankruptcy court to refuse to dismiss the proceeding. Thus, as Judge Augustus Hand said in Sword S. S. Line v. Vendramis, 116 F.2d 665, 668 (2d Cir. 1940):

We think that in a case where all creditors have been eliminated so that the real objects of the statute have been satisfied, it is useless, and hence unnecessary, to have the proposed plan considered when neither it nor any substitute could properly be adopted. [referring to Section 77B]
It is possible to argue that when all debts have in fact been paid, the party in bankruptcy has a constitutional right to discharge. See Missouri Pacific, supra, 93 F. Supp. at 859. We do not reach this question, however, for there is scant possibility of such a situation arising in these cases. It is clear that discharge is discretionary in cases in which all that is offered to justify discharge is an alternative method of repaying outstanding debts. See Continental Illinois Nat'l Bank & Trust Co. v. Chicago, R. I. & Pacific Ry. Co., 294 U.S. 648, 672, 55 S.Ct. 595, 79 L.Ed. 1110 (1935). See also Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902); Bradford v. Fahey, 76 F.2d 628 (4th Cir. 1935); In re Merced Irrigation Dist., 25 F. Supp. 981 (S.D.Cal.1939), aff'd sub nom. West Coast Life Ins. Co. v. Merced Irr. Dist., 114 F.2d 654 (9th Cir.), cert. denied, 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 467 (1940).
[21] We also believe it important to note that, under Missouri Pacific, the secondary debtors are unlikely to be able to make the necessary showing in the foreseeable future. Missouri Pacific requires a virtual certainty of immediate ability to repay the debts. Not only do the secondary debtors rely on the speculative eventual payment of either back rent or profits but, most important, their "plan" for dealing with the contingency that the leases will be rejected requires re-lease or independent operation, both of which are significantly more speculative than the possibility of a bond issue that was considered too speculative in Missouri Pacific.
[22] The lessor trustees also contend that "unfairness is particularly acute" because the secondary debtors will receive securities in a corporation, Conrail, whose assets have long been operated at a loss. It is unclear whether their attempt is merely to establish that the Conrail securities will have little value, in which case it is an argument in no way unique to the secondary debtors, or to point out that railroads other than Penn Central are being forced to combine with a new and much larger railroad, in which case we refer them to our disposition of this argument in Judge Friendly's opinion.
[23] The trustees of Penn Central have not appealed Judge Fullam's orders with respect to the secondary debtors; and their brief in these cases is confined to comments on the claim by the government parties that secondary debtors can in no circumstances suffer erosion.
[24] The indenture trustees say in their brief (note 8, p. 26) that, in general, they "have no quarrel with the Government Appellant's analysis of the rights of Secondary Debtors as they bear on the issue of interim erosion." However, they characterize some of the points made by the government parties as meriting further discussion; and they go on (1) to challenge the assertion that the Act increases the chances of lease affirmance, (2) to assert that a secondary debtor whose properties are operated at a loss during the Act's planning period would suffer erosion, and (3) to dispute the argument that there can be no unconstitutional erosion of the secondary debtors because they have been in bankruptcy such a short time.

The secondary debtor trustees in their brief discuss erosion only to the extent of emphasizing the unfairness of the delay involved in the development of the final system plan โ a period during which, they insist, they could have gone forward with serious negotiations for the sale or lease of their properties to profitable roads. They also state that the delay, with its mounting liabilities in the event of affirmance, can only operate to make such affirmance less likely.
[25] Charges of unfairness on this basis can be made by five of the secondary debtors: The United New Jersey Railroad and Canal Co., The Philadelphia and Trenton Rail Road Co., The Connecting Railway Co., The Philadelphia, Baltimore and Washington Railroad Co., and the Union Railroad Co. of Baltimore. The complaint need not have been unique to them: The Penn Central's leasehold interests in NEC properties are also subject to transfer to Conrail in exchange for securities, followed by redisposition to Amtrak in exchange for cash. We address the matter here because it was raised only in the brief of the secondary debtor trustees. Br. 20.
[26] The final system plan is to "designate โ which rail properties of railroads in reorganization . . . shall be offered for sale to a profitable railroad," ง 206(c) (1) (B), but it is nowhere specified whether this means that the final system plan shall dictate the terms of the offer that is made or merely release the designated properties for sale by their owners to other railroads. The latter interpretation is suggested by the reference in ง 303(a)(2) to "each profitable railroad . . . purchasing rail properties from a railroad in reorganization." (Emphasis added.) But the greater number of textual clues to this riddle point the other way. The section which provides for sales to profitable railroads goes on to specify that such sales must be "for compensation," ง 206(d) (2), scarcely a constraint that would be required if the original owners were themselves negotiating the sales. Section 206(d) (4) specifies that the designation of property to be offered for sale to a profitable railroad "shall terminate 30 days after the effective date of the final system plan unless, prior to such date, such profitable railroad has notified the Association in writing of its acceptance of such offer." Thirty days seems a short time in which to negotiate and complete what may be an immensely complex transaction; it seems a less inadequate time if what Congress had in mind was only the consideration within that period of an offer which had been fully set out in the final system plan. See also งง 206(f) (final system plan to designate the value of properties transferred to profitable railroads) and 303(b) (special court to "order" transfers to profitable railroads).
[27] The principal sponsor of the Senate amendment in which Conrail was expressly made the negotiator of sales to Amtrak argued that this step would "provide the corridor facilities to Amtrak at the minimum constitutional price." Statement of Hon. Edward M. Kennedy, Hearings on S. 2188 & H.R. 9142 Before the Surface Transportation Subcomm. of the Senate Comm. on Commerce, 93rd Cong., 1st Sess., pt. 3, at 868-69 (1973). The Report on the bill which the Senate submitted to conference, and which contained the NEC references that were finally enacted, is to the same effect. S.Rep.No.93-601, 93rd Cong., 1st Sess. 16 (1973).

That Congress's purpose in the negotiation provision was to protect Amtrak from excessive financial burdens is further suggested by the fact that the bill which the Senate sent to conference spoke in each instance of sales by Conrail to Amtrak or to "a regional transportation authority," the latter being perhaps an even more likely candidate for this kind of congressional concern. S. 2767, 93rd Cong., 1st Sess. งง 206(c)(1)(C) & 701(d)(1).
[28] It is not expressly so provided; indeed, the compensation paid by profitable railroads does not go directly to the transferors, but is first paid in to the special court. ง 303(a)(2). Such compensation apparently must go out again to the transferors, however, since the special court has no power to reallocate it. ง 303.
[29] Though the government did not press the point in its appeal to this court of the Penn Central case, they took this stand before Judge Fullam. Memorandum of July 2, at 854 of 382 F.Supp. (E.D.Pa.1974).
[30] See S.Rep.No.93-601, supra note 27, at 16; Statement of Hon. Edward M. Kennedy, supra note 27, at 869.
[31] The text of the statute itself leaves unclear who precisely is to undertake the improvements, see ง 601(d) (2). One might assume that the duty falls upon Amtrak, the probable ultimate owner of the properties. The Senate report specifies, however, that "[t]he duties set out in paragraph (2) apply also to the Corporation [Conrail]." S.Rep. No.93-601, supra note 27, at 51, U.S.Code Cong. & Admin.News 1973, p. 3290.
[32] H.R.9142, 93rd Cong., 1st Sess. ง 303(c)(4) (1973).
[33] With this possibility explicitly in mind, the wording of the relevant section was changed in conference from "purchased or leased . . . by [Amtrak]," as the Senate Bill read, S. 2767, 93rd Cong., 1st Sess. ง 206(c)(1)(C) (1973), to "purchased, leased, or otherwise acquired . . . by [Amtrak]," as the statute now reads. ง 206(c)(1)(C) (emphasis added). See H.R. Rep. 74, 93rd Cong., 1st Sess. 55 (1973) (conference report).
[34] See note 25 supra.
[35] We note in passing that, even if the NEC owners were selling directly to Amtrak, it seems likely that they would receive obligations in some form other than cash.
[36] The phrase is drawn from the secondary debtor trustees' brief, p. 21, which makes this argument most extensively. The indenture trustees make a similar argument in support of their contention that this court should entertain claims of the secondary debtors' profitability. Br. 19-20.

The secondary trustees allege unfairness in the timing of the "hearings provided by Section 207(b) of the Act" (emphasis added), suggesting that their claim of inadequate time applies to the 180-day as well as the 120-day hearing. However, they then proceed to a discussion only of their difficulties in connection with the reorganizability and public interest findings, both made at the 120-day hearing.
[37] July 2 Memorandum 382 F.Supp. 851 (E. D.Pa.1974). The indenture trustees suggest that Judge Fullam based his finding of unfairness with respect to Penn Central partly on the inadequacy of the ง 207(b) time-table. Br. 19. He gave as one of the grounds for his conclusion (p. 25) the fact that:

Under the provisions of the Act, the only judicial determinations which can have significant effect in protecting the rights of the railroad estates and their creditors must be made at a time when substantially all of the information pertinent to those judicial decisions is unknown and unknowable.
A careful reading of the entire memorandum leads us to conclude, however, that Judge Fullam was referring to the fact that the fairness of the Act must be evaluated in ignorance of the make-up of the final system plan and thus of Conrail's prospects for viability.
[38] In the case of the United New Jersey, for example, it was testified that it would be impossible to estimate the UNJ's profitability as an operating railroad until six months after "the Final System Plan, or other definitive determination of which rail properties may be abandoned" had been made available. Affidavit of Harry A. Seibert and Leander H. Poor Relating to ง 207(b) Hearing, at 4-5. The secondary debtors thus offer us something of a logical conundrum: the ง 207(b) finding of reorganizability cannot be made until severance studies are complete, but severance studies are effectively impossible without the final system plan, which of course cannot proceed until after the ง 207(b) findings are made.
[39] See Goldberg v. Kelly, 397 U.S. 254, 262-263 & n. 10, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) ("The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be `condemned to suffer grievous loss,' . . . and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication.").
[40] We know of no decided case which could be considered inconsistent with our conclusion. The cases cited by the secondary debtors involved fact situations not even remotely similar to ours, as well as opportunities for hearing which were far less "meaningful" than the 120-day hearing. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L. Ed.2d 15 (1974) (no hearing prior to discharge from employment by government agency); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (no hearing prior to termination of welfare benefits); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (detention of juvenile without hearing of formal charges); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (adoption ordered without notice and hearing accorded natural father); Swallow v. United States, 380 F.2d 710 (10th Cir. 1967) (litigant accorded one day's notice of court proceedings).
[1] The Commonwealth has also appealed that issue to the United States Court of Appeals for the Third Circuit. That appeal is still pending.
[2] Those points are discussed, among others, in Part (1), below.
[3] Judge Fullam stayed his finding and order pending the final determination of this court pursuant to RRRA.
[4] The United States, the Interstate Commerce Commission (ICC) and the United States Railway Association (USRA).
[5] The Railway Labor Exectuives' Association and the Congress of Railway Unions.
[6] In its 120-day order the reorganization court concluded that "[t]he choices suggested by the Commonwealth for an income based reorganization of the Debtor are illusory, conjectural and speculative". Upon consideration of the evidence and arguments, we agree. The other points raised by the Commonwealth are discussed in Part (1) of the portion of this opinion dealing with the LV case.
[7] The arguments made by the Commonwealth were discusesd in Part (1) of the portion of this opinion dealing with the LV case. It is not necessary to add anything to that discussion.
[8] The petition of CNJ for inclusion in the Chessie System has been before the ICC for some years; the petition is opposed by Chessie; and no evidence was presented in the reorganization case that the petition is likely to be granted. It is quite possible, however, that Chessie might purchase some of the lines and other property of CNJ either as part of the final system plan (see ง 206(c)(1)(B) and (d)(2) of RRRA) or from the Trustee of CNJ if the road is not reorganized pursuant to the provisions of RRRA.
[9] PC, Reading, CNJ and Erie-Lackawanna.
[10] The reorganization court found that implementation of the core system would require massive abandonment and costly employee protection, and would not provide sufficient deficit reduction to permit Reading to reorganize on an income basis under ง 77 in the immediate future.
[11] As Judge Ditter noted, Reading and CNJ had a long-established relationship with the Western Maryland and Norfolk and Western Railroads. When Chessie petitioned for control of Western Maryland, Reading and CNJ (Reading owns almost 50 percent of CNJ's stock) petitioned the Interstate Commerce Commission to require Chessie to include them in the Chessie system. The Commission deferred consideration of Reading's petition until hearings were held on a proposed merger of Chessie and the Norfolk and Western. Subsequently, the C & O โ N & W merger was called off. Chessie does not have an obligation under any ICC order to include either Reading or CNJ in the Chessie system, unless the ICC so directs.

As of today Chessie is resisting the inclusion of Reading in its system. The Commission issued an order dated December 19, 1973, in which it decided that the Reading petition should be deferred until Reading files a plan for reorganization under ง 77.
The apparent reason why both Chessie and Norfolk and Western now oppose the inclusion of Reading in their respective systems is, as Judge Ditter found, that if either did take over the property of Reading, it would have to go through the complex abandonment procedures of ICC, be liable for large compensation payments to employees who are laid off, and be burdened with Reading's commuter problems. But if either acquires some or all of Reading under RRRA, it may take advantage of appropriate provisions of that Act.
Judge Ditter agreed with the Trustee of Reading that so long as it is being reorganized under ง 77, no profitable railroad will show an interest in it or any part of its properties, and that if those assets, though otherwise of potential economic value to another line, do not enjoy the additional benefits that will enure to them by reason of RRRA, an acquiring system will probably consider them of doubtful ultimate worth.
[12] Judge Pratt referred to the three-judge court as the Penn Central Court.
[13] Judge Pratt added: "If it is subsequently determined that such erosion has reached the proportions that the Penn Central Court found regarding the Penn Central and the Tucker Act remedy is found to be unavailable, then, of course, this constitutional issue must be considered with respect to the Ann Arbor." He concluded his opinion with the statement: "[T]his Court will retain jurisdiction over the case in the event that it is subsequently decided that the Regional Rail Reorganization Act, or portions of it, is unconstitutional and further action under Section 77 of the Bankruptcy Act is required."